IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | |
|---|---|
| VirnetX Inc.,<br><br>               Plaintiff,<br><br>v.<br><br>Cisco Systems, Inc., *et al.*,<br><br>               Defendants. | Civil Action No. 6:10-cv-00417-LED<br>**JURY TRIAL DEMANDED** |

## DEFENDANT APPLE INC.'S RULE 50(a) MOTION FOR JUDGMENT AS A MATTER OF LAW

## TABLE OF CONTENTS

I.  VirnetX Has Not Adduced Evidence Sufficient To Support A Finding Of Direct Infringement ............................................................................................ 1

    A.  The '135 and '151 Patents ......................................................................... 1

        1.  No Reasonable Factfinder Could Conclude That Apple Or Its Customers Perform The "Determining" Limitation ............................. 1

        2.  VirnetX Has Failed To Demonstrate That The Alleged Domain Name Service "Returns An IP Address For A Requested Domain Name To The Requester" As Required By The '135 And '151 Patents .................................................................. 4

        3.  VirnetX Has Failed To Demonstrate A "Secure And Anonymous" Communication As Required By The '135 Patent ........................................................................................................ 5

        4.  VirnetX Has Failed To Demonstrate That Apple's VPN On Demand Application Transmits "From The Client Computer" A DNS Request, As Required By The '135 Patent ........................................................................................................ 6

        5.  VirnetX Has Failed To Demonstrate An Encrypted Channel Between The Client *And* The Secure Server As Required By The '151 Patent ................................................................................ 6

    B.  The '504 and '211 Patents ......................................................................... 7

        1.  No Reasonable Factfinder Could Conclude That Apple Or Its Customers Perform A "Direct" Communication ................................... 7

        2.  No Reasonable Factfinder Could Conclude That Apple's FaceTime Servers Meet The "Lookup Service" Requirement ........................................................................................... 9

        3.  No Reasonable Factfinder Could Find An "Indication" That Apple's FaceTime Servers "Support Establishing A Secure Communication Link" .......................................................... 10

        4.  No Reasonable Factfinder Could Conclude That Email Addresses Or Telephone Numbers Are "Names".................................... 11

II.  VirnetX Has Not Adduced Evidence Sufficient To Support A Finding Of Indirect Infringement ................................................................................... 11

A.    No Reasonable Factfinder Could Conclude That Any Third Party
      Performed Any Infringing Acts ............................................................. 11

B.    No Reasonable Factfinder Could Conclude That Apple Knew (Or
      Knows Now) That Its Customers' Actions Infringe The Asserted
      Claims .................................................................................................... 12

C.    No Reasonable Factfinder Could Conclude That Apple Knew Of
      The Patents Prior To Their Assertion In Litigation Against Apple ...................... 13

D.    No Reasonable Factfinder Could Conclude That Apple
      Specifically Intended To Encourage Infringement Of The Asserted
      Claims .................................................................................................... 14

E.    VirnetX Offered No Evidence Of Contributory Infringement ............................ 15

III.   VirnetX Has Provided No Legally Sufficient Basis For The Jury To
       Award Damages In This Case.............................................................................. 15

A.    Mr. Weinstein's Damages Testimony Should Have Been Excluded
      Or Stricken ............................................................................................. 15

B.    VirnetX's Principal Damages Theory Is Legally Insufficient
      Because It Uses The Entire Value Of Apple's Products As A
      Royalty Base Without Complying With The Entire Market Value
      Rule ....................................................................................................... 16

C.    No Substantial Evidence Supports VirnetX's Proposed 1% Royalty
      Rate ........................................................................................................ 21

D.    VirnetX's "Nash Bargaining Solution" Evidence Does Not
      Redeem—And In Fact Exacerbates—Its Violation Of The Entire
      Market Value Rule .................................................................................. 22

E.    VirnetX Provided No Damages Theory To Match Its Theories Of
      Direct Infringement Of The '504, '211, and '135 Patents................................... 23

F.    At The Very Least, Damages Should Not Be Awarded For Periods
      Prior To The Patents' Assertion In This Litigation ............................................ 25

IV.   The Evidence Compels A Finding That The Asserted Claims Are
      Anticipated By The Kiuchi Reference................................................................... 27

# TABLE OF AUTHORITIES

## Cases

*Akamai Techs., Inc. v. Limelight Networks, Inc.*,
   692 F.3d 1301 (Fed. Cir. 2012)....................................................................... 14

*American Med. Sys., Inc. v. Medical Eng'g Corp.*,
   6 F.3d 1523 (Fed. Cir. 1993)........................................................................... 25

*Apeldyn Corp. v. AU Optronics Corp.*,
   831 F. Supp. 2d 817 (D. Del. 2011)................................................................ 12

*Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*,
   262 F.3d 1258 (Fed. Cir. 2001)......................................................................... 7

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*,
   509 U.S. 209 (1993)......................................................................................... 15

*Chaney v. Dreyfus Serv. Corp.*,
   595 F.3d 219 (5th Cir. 2010) .......................................................................... 13

*Daubert v. Merrell Dow Pharms., Inc.*,
   509 U.S. 579 (1993)......................................................................................... 15

*DSU Med. Corp. v. JMS Co.*,
   471 F.3d 1293 (Fed. Cir. 2006)....................................................................... 14

*Garretson v. Clark*,
   111 U.S. 120 (1884)......................................................................................... 20

*Global-Tech Appliances, Inc. v. SEB S.A.*,
   131 S. Ct. 2060 (2011)............................................................................... 12, 13

*Grain Processing Corp. v. American Maize-Prods. Co.*,
   185 F.3d 1341  (Fed. Cir. 1999)...................................................................... 22

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
   694 F.3d 51 (Fed. Cir. 2012)...................................................................... 21, 23

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
   481 F.3d 1371 (Fed. Cir. 2007)....................................................................... 27

*Loral Fairchild Corp. v. Victor Co. of Japan, Ltd.*,
   906 F. Supp. 813 (E.D.N.Y. 1995) ................................................................. 26

*Maxwell v. J. Baker, Inc.*,
    86 F.3d 1098 (Fed. Cir. 1996) ................................................................................. 25

*Maxwell v. KMart Corp.*,
    880 F. Supp. 1323 (D. Minn. 1995) .......................................................................... 25

*Mirror Worlds, LLC v. Apple, Inc.*,
    784 F. Supp. 2d 703 (E.D. Tex. 2011), *aff'd*, 692 F.3d 1351 (Fed. Cir. 2012) ......... passim

*MONEC Holding AG v. Motorola Mobility, Inc.*,
    __ F. Supp. 2d __, 2012 WL 4340653 (D. Del. Sept. 20, 2012) ..................................... 13

*Moore U.S.A., Inc. v. Standard Register Co.*,
    229 F.3d 1091 (Fed. Cir. 2000) .................................................................................. 7

*Riles v. Shell Exploration & Prod. Co.*,
    298 F.3d 1302 (Fed. Cir. 2002) ................................................................................ 22

*Streck, Inc. v. Research & Diagnostics Sys., Inc.*,
    665 F.3d 1269 (Fed. Cir. 2012) ................................................................................ 27

*U.S. Steel Group v. United States*,
    96 F.3d 1352 (Fed. Cir. 1996) .................................................................................. 18

*Uniloc USA, Inc. v. Microsoft Corp.*,
    632 F.3d 1292 (Fed. Cir. 2011) ........................................................................... 16, 23

*Zygo Corp. v. Wyko Corp.*,
    79 F.3d 1563 (Fed. Cir. 1996) ................................................................................. 22

## Statutes

35 U.S.C. § 271(c) ............................................................................................................. 15

35 U.S.C. § 287(a) ....................................................................................................... 25, 26

## Rules

Federal Rule of Civil Procedure 50(a) ................................................................................. 1

Federal Rule of Evidence 702 ........................................................................................... 15

## Treatises

7-20 Chisum on Patents § 20.06[2] (2012) ........................................................................ 21

Pursuant to Federal Rule of Civil Procedure 50(a), Defendant Apple Inc. respectfully moves that the Court grant judgment as a matter of law (JMOL) on all of VirnetX's claims because VirnetX has failed to offer evidence sufficient to permit a reasonable factfinder to find in its favor. Apple also moves that the Court grant JMOL in Apple's favor that the asserted claims of the patents-in-suit are invalid, because the evidence compels a conclusion that they are anticipated by the Kiuchi reference.[1]

## ARGUMENT

JMOL is appropriate on a given issue when, taking the record in light most favorable to the non-moving party, "'a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue.'" *Mirror Worlds, LLC v. Apple, Inc.*, 784 F. Supp. 2d 703, 710 (E.D. Tex. 2011) (quoting Fed. R. Civ. P. 50(a)), *aff'd*, 692 F.3d 1351 (Fed. Cir. 2012). This standard is met here, because the jury has no legally sufficient evidentiary basis to rule for VirnetX on any issue in this case.

## I.      VIRNETX HAS NOT ADDUCED EVIDENCE SUFFICIENT TO SUPPORT A FINDING OF DIRECT INFRINGEMENT

### A.      The '135 and '151 Patents

#### 1.      No Reasonable Factfinder Could Conclude That Apple Or Its Customers Perform The "Determining" Limitation

All of the asserted claims require "determining whether" a DNS request is requesting access to a secure web site or corresponds to a secure server (as opposed to a non-secure web site

---

[1]      The Court allowed Apple's unopposed request to treat its Rule 50(a) motion at the close of VirnetX's case-in-chief as timely made, with the arguments to be developed in this Rule 50(a) motion at the close of all evidence. 11/2/12 a.m. Tr. 128:12-21.

or non-secure server).[2]   The asserted claims all specify that certain actions will be taken depending on the result of the "determination" whether the DNS request is requesting access to a secure web site or corresponds to a secure server. 11/1/12 p.m. Tr. 12:1-21, 13:1-14:6.   For example, the asserted claims require that, based on the determination whether the DNS request is requesting access to a secure web site or corresponds to a secure server, a VPN or encrypted channel is "automatically initiat[ed]" or "automatically creat[ed]."  11/1/12 p.m. Tr. 12:1-14:6; 11/1/12 a.m. Tr. 74:6-14, 52:16-53:8.

VirnetX has failed to provide any evidence that the accused VPN On Demand functionality infringes the "determining whether" element of the asserted claims.   VPN On Demand allows users to configure an Apple iOS device (iPhone, iPad, iPod touch) to communicate with a remote server (IPSEC or SSL server).  It is undisputed that a user can enter into the configuration file domain names that correspond to "non-secure web sites" or "public web sites."  11/1/12 p.m. Tr. 17:19-25.   For example, a user may create and install a configuration file that includes www.ebay.com, a public web site, which is on the public Internet and may be accessed by anyone without any authorization requirement. 11/1/12 p.m. Tr. 21:8-24:19.   If the user then enters the public web site into Apple's Safari browser, the VPN On Demand feature will initiate a VPN simply because a match is found in the configuration file; no "determination" is made as to whether the site is secure.  *Id.*  In fact, Apple's VPN On Demand feature will even establish a VPN connection when a fake or non-existent web site is entered, as

---

[2]      VirnetX has asserted claims 1, 3, 7, and 8 of U.S. Patent No. 6,502,135 (the '135 patent) and claims 1 and 13 of U.S. Patent No 7,490,151 (the '151 patent). Claim 1 of the '135 patent is representative of the asserted claims from that patent and requires "*determining whether* the DNS request transmitted in step (1) is requesting access to a secure web site."  (Emphasis added.)  The Court construed "secure web site" to mean "a web site that requires authorization for access and that can communicate in a VPN." Dkt. No. 266 at 21.  Claim 1 of the '151 patent is representative of the asserted claims from that patent and requires "*determining whether* the intercepted DNS request corresponds to a secure server." (Emphasis added.)  The Court construed "secure server" to mean "a server that requires authorization for access and that can communicate in an encrypted channel." Dkt. No. 266 at 24.

long as the user has previously entered that site into the configuration file.  11/1/12 p.m. Tr. 35:11-36:12.  Conversely, VPN On Demand will *not* establish a VPN connection when the user enters a secure web site or secure server into the browser that has not been entered into the configuration file, *even though* the web site or server is actually a secure web site or server. 11/1/12 p.m. Tr. 27:14-28:25.  The evidence thus conclusively establishes that VPN On Demand does not (and cannot) "determine whether" the requested web site or server is secure and that the decision to establish a VPN connection turns not on the security of the target web site or server, but merely on whether the user has *chosen* to include the given web site or server into the configuration file.  11/1/12 p.m. Tr. 30:3-31:15.

None of the evidence cited by VirnetX's infringement expert Dr. Jones suggests anything to the contrary.  In fact, Dr. Jones's evidence confirmed that VPN On Demand merely compares, using "simple string matching," a requested domain name with a list of names previously entered into the configuration file.  11/1/12 p.m. Tr. 29:20-32:22; PX30 at 14; PX39 at 35.  VirnetX offered no evidence that simple string matching is capable of "determining whether" a domain name that is in the configuration file is associated with a "secure web site" or "secure server" that "requires authorization for access."

Dr. Jones's only response was to suggest that the "determining whether" limitation could be satisfied if the system compared the target web site or server to information the user entered into the configuration file.  11/1/12 p.m. Tr. 34:2-3 ("determining based on what somebody told me there in that case").  But nothing in the claims supports this reading.  Rather, the claims require that the actual *security* of the requested web site or server be "determined."  *See* '135 patent cl. 1 ("determining whether the DNS request transmitted in step (1) *is requesting* access to a *secure web site*" (emphasis added)); '151 patent cl. 1 ("determining whether the intercepted

3

DNS request *corresponds to a secure server*" (emphasis added)); '151 patent cl. 13 (determining

whether a DNS request sent by a client *corresponds to a secure server*" (emphasis added)).

Dr. Jones cited some Apple documents that refer to VPN On Demand setting up access to

a "private network" or a "corporate network." 11/1/12 a.m. Tr. 56:5-61:9 (citing PX265, PX185,

PX488, PX266). But these documents do not suggest that VPN On Demand identifies a "private

network" or "corporate network" by *determining* whether the requested web site or server is

*secure*. Rather, these documents indicate, at most, that VPN On Demand would initiate VPN

connections to private or corporate networks if the user so chose, regardless of their security.

Moreover, such documents cannot overcome the undisputed evidence of how VPN On Demand

actually functions.[3] Dr. Jones admitted on cross-examination that VPN On Demand will initiate

VPN connections when unsecure or even nonexistent web sites or servers are entered and will

not initiate VPN connections when a secure web site or secure server is entered that has not been

previously included in the configuration file. *See supra* pp. 2-3. This confirms that the actual

functioning of VPN On Demand does not "determine" a target web site's or server's security, but

rather turns only on what the user has entered into the configuration file.

Accordingly, no reasonable factfinder could conclude that Apple or its customers directly

infringe the asserted claims of the '135 or '151 patents.

> **2.**     **VirnetX Has Failed To Demonstrate That The Alleged Domain Name Service "Returns An IP Address For A Requested Domain Name To The Requester" As Required By The '135 And '151 Patents**

The Court construed "domain name service" to mean "a lookup service that returns an IP

address for a requested domain name to the requester." Dkt. No. 266 at 15. VirnetX has alleged

---

[3]     Indeed, PX266 relates to the *2005 version* of VPN On Demand, a version that predates the accused version by several years and that Dr. Jones called the "antithesis" of the claimed invention. 11/1/12 p.m. Tr. 38:12-41:2.

that the "requester" is Apple's Safari browser, the "domain name" is the name the user enters into Safari, and the domain name service is Apple's VPN On Demand functionality.  11/1/12 a.m. Tr. 47:21-48:8.  But VirnetX has offered no evidence that VPN On Demand (the alleged "domain name service") returns an IP address "for a requested domain name" (the name entered into Safari) to "the requester" (Safari).  Accordingly, VirnetX has not proven that any asserted claim of the '135 and '151 is infringed.

### 3.   VirnetX Has Failed To Demonstrate A "Secure And Anonymous" Communication As Required By The '135 Patent

The Court's construction of "virtual private network" requires the communication between the computers (*e.g.*, client and target computers) to be "both secure *and* anonymous." Dkt. No. 266 at 8 (emphasis added).  The Court also clarified that "between the computers" in this respect means that the VPN "extends from the client computer to the target computer."  *Id.* at 26.  Accordingly, the asserted claims of the '135 patent require that a secure and anonymous communication extend from the client computer to the target computer.

Dr. Jones' only basis for alleging "anonymity" is that the private addresses of the communicating devices (iPhone and the device on the other end on a private network) are encrypted.  11/1/12 a.m. Tr. 33: 4-8, 46:9-18.  But the private addresses are encrypted only between the iPhone *and the VPN server*; the communication between the VPN server and the target on the private network is not encrypted.  Indeed, Dr. Jones admits that the private network behind the VPN server on which the target resides is not necessarily encrypted, and certainly does not allege that Apple encrypts that private network.  11/1/12 a.m. Tr. 33:9-16.  Dr. Jones also does not contend that Apple makes the private network (and hence the communication extending to the alleged target computer) "secure" in any way.  Thus, there is no evidence of anonymity *and* security between the iPhone (the alleged client) and the alleged target, and in

particular over the path from the VPN server to the target.   No reasonable factfinder could conclude that any of the asserted claims of the '135 patent is infringed.

### 4.   VirnetX Has Failed To Demonstrate That Apple's VPN On Demand Application Transmits "From The Client Computer" A DNS Request, As Required By The '135 Patent

The Court construed the '135 patent's requirement of "generating from the client computer a DNS request" phrase to mean "generating and *transmitting from the client computer* a DNS request." Dkt. No. 266 at 27.  VirnetX has shown no evidence that, in Apple's VPN On Demand feature, the DNS request is transmitted from the client computer.  According to VirnetX, the alleged "client computer" is the iPhone, and the DNS request is a domain name that a user enters into the Safari web browser. 11/1/12 a.m. Tr. 48: 1-5.  Dr. Jones asserted that the alleged DNS request is "transmitted" because it "is passed through an API call to the iOS" of the iPhone.  11/1/12 a.m. Tr. 48:6-8.  But that transaction occurs wholly within the iPhone (the alleged client computer); it does not show that a DNS request is transmitted *from* the client computer.  Accordingly, no reasonable factfinder could find infringement of the '135 patent.

### 5.   VirnetX Has Failed To Demonstrate An Encrypted Channel Between The Client *And* The Secure Server As Required By The '151 Patent

The asserted claims of the '151 require an encrypted channel or secure channel between the client and the *secure server*.  VirnetX admits that Apple does not literally practice this element because the path from the VPN server to the target server is not encrypted. 11/1/12 a.m. Tr. 75:3-18.  There is also no evidence that a private network is necessarily "secure," and, even if there were, there is certainly no evidence that Apple secures it.  Accordingly, like claim 1 of the '151 (which calls for "encrypted channel"), there can be no infringement of claim 13.

VirnetX's reliance on the doctrine of equivalents for this limitation fails, as the proposed equivalent would vitiate the claim limitation requiring a secure or encrypted channel "between

6

the client and the secure server," *i.e.* extending all the way to the secure server. *See Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1280 (Fed. Cir. 2001) (finding that a claim limitation requiring two unidirectional channels would be vitiated if equivalents included a device that allowed bi-directional communication over a single channel). For similar reasons, VirnetX's proposed equivalent fails the function-way-result test because at least the function and result are substantially different: the claim envisions an encrypted channel protecting communications from end to end, whereas the proposed equivalent permits the communication to be rendered vulnerable to attacks, thus defeating the very purpose of the end to end communication. *E.g., Moore U.S.A., Inc. v. Standard Register Co.*, 229 F.3d 1091, 1106 (Fed. Cir. 2000) ("It would defy logic to conclude that a minority—the very antithesis of a majority—could be insubstantially different from a claim limitation requiring a majority.").

## B.     The '504 and '211 Patents

### 1.     No Reasonable Factfinder Could Conclude That Apple Or Its Customers Perform A "Direct" Communication

Each of the asserted claims of U.S. Patent Nos. 7,418,504 and 7,921,211 (the '504 and '211 patents) includes a limitation requiring "an indication that the domain name service system supports establishing a secure communication link." '504 patent cl. 1 (representative claim).[4] The Court construed "secure communication link" to mean "a ***direct*** communication link that provides data security." Dkt. No. 266 at 13 (emphasis added). The parties agree that "direct communication" requires direct addressability, that is, the data must be addressed directly to the intended recipient. 11/1/12 p.m. Tr. 51:3-5.

---

[4]     VirnetX has asserted claims 1, 2, 5, 16, 21, and 27 of the '504 patent and claims 36, 37, 47, and 51 of the '211 patent. Minor differences in the phrasing of "indicating" in claim 1 of the '504 patent and "indicate" in claim 36 of the '211 patent are immaterial.

VirnetX has failed to provide any evidence that the accused FaceTime functionality provides a "direct communication link" between Apple devices that are located behind other devices providing network address translator (NAT) functionality.  NATs—like relay servers, which VirnetX concedes preclude "direct" communication links (11/1/12 p.m. Tr. 51:21-52:24)—alter or readdress the IP address of data packets and thus interrupt any "direct" communication. 11/1/12 p.m. 46:11-14; 11/1/12 a.m. 99:20-100:1.  Indeed, Dr. Jones confirmed that, in his own experiments, the NAT functionality readdressed the incoming packets by replacing the NAT's public IP address with the private IP address of the intended device. 11/1/12 p.m. Tr. 47:9-49-7.  Dr. Jones also conceded that incoming packets must be addressed to the NAT's public IP address, not to the intended device's private address.  11/1/12 p.m. Tr. 49:9-13; 43:10-44:14.    This is conclusive proof that communication through a NAT—like communication through a relay server—is not "direct" and therefore does not infringe.

Dr. Jones reliance on "transport addresses" (11/1/12 p.m. Tr. 45:9-46:17, 49:14-50:11) is a misdirection because, as even Dr. Jones ultimately agreed, the transport address is a combination of the IP address and the port.  11/1/12 p.m. Tr. 49:22-50:11.  Accordingly, when the NAT functionality changes the public IP address, it necessarily changes the transport address as well, of which the IP address is a part.  *Id.*  That is, a "packet coming out [of the NAT] is going to have a different IP address on it and destination IP address." 11/1/12 p.m. Tr. 46:14-17.

VirnetX has not provided any evidence of FaceTime calls completed without use of either a relay server or a device providing NAT functionality.  Accordingly, no reasonable factfinder could conclude that Apple or its customers directly infringe the '504 or '211 patents.

### 2.    No Reasonable Factfinder Could Conclude That Apple's FaceTime Servers Meet The "Lookup Service" Requirement

All of the asserted claims of the '504 and '211 patents require "a domain name service system configured to be connected to a communication network."   '504 patent cl. 1 (representative claim).   The Court construed "domain name service" as *a lookup service that returns an IP address for a requested domain name to the requester."   Dkt. No. 266 at 15 (emphasis added).   VirnetX has failed to provide sufficient evidence to allow a reasonable factfinder to conclude that Apple's FaceTime servers meet this limitation.

Apple's FaceTime servers include the registration server, the push notification server, and the invitation server. 11/1/12 p.m. Tr. 58:19-59:5, 59:13-18.   They do not include the additional CommNAT server, which allows a device (e.g., iPhone, iPad, iPod) to determine its IP address. 11/1/12 p.m. Tr. 59:19-60:14; 11/1/12 p.m. Tr. 62:16-22; 11/1/12 a.m. Tr. 108:21-109:13.   Once the device determines its IP address, it sends the IP address to the FaceTime servers for the purpose of establishing a call. 11/1/12 p.m. Tr. 60:15-61:10.   That is, the device's IP address is "not provided by the registration or a PNS or the push notification servers [(i.e., the FaceTime servers)]"; instead, the device determines its IP address via the CommNAT server. 11/1/12 p.m. Tr. 61:8-9, 62:16-22 ("Q. It doesn't go to the FaceTime servers there, the registration, invitation, or push notifications to get its IP address for FaceTime call, does it?  A. Not at that point, not to those three servers.")   Accordingly, the FaceTime servers do not qualify as a "lookup service," because they do not return a device's IP address to the requesting device. 11/1/12 p.m. Tr. 61:11-13.   In fact, it is the device that supplies its IP address to the FaceTime servers, and the FaceTime server does not change the IP address it receives from the device.

11/1/12 p.m. Tr. 63:8-19. No reasonable factfinder could conclude that Apple or its customers directly infringe the '504 or '211 patents.[5]

### 3. No Reasonable Factfinder Could Find An "Indication" That Apple's FaceTime Servers "Support Establishing A Secure Communication Link"

With respect to the limitation, present in all asserted claims of the '504 and '211 patents, of an "indication" that the system "support establishing a secure communication link," VirnetX points to the "accept message" returned to the caller by the push server. 11/1/12 a.m. Tr. 122:9-23. Dr. Jones testified that the accept message contains the following information: the IP address, type of NAT, and port information for the other party, a session ID for the call, and a certificate name. *Id.* VirnetX does not provide any evidence that any of this information necessarily indicates that the system supports establishing a *secure* communication link; indeed, the same information is used for unsecure communications as well.[6] This information accordingly cannot satisfy the claim requirement of an indication that the accused DNS system supports establishing a *secure* communication link.

Additionally, VirnetX has failed to provide any evidence that the accused FaceTime servers include an indication supporting establishment of a secure communication ***link***. There is a difference between encrypting data and transmitting the encrypted data over an *insecure* link (which is not claimed) and establishing a secure communication link over which the data is transmitted securely (which is claimed). Indeed, while Dr. Jones testified that the *payload* of the

---

[5]     Dr. Jones incorrectly concluded that the FaceTime servers meet the "lookup service" limitation because they send a push token to the device. 11/1/12 a.m. Tr. 112:2-15. But it is undisputed that the push token is merely used to contact the device, and the IP address used to contact the device is not the IP address used to establish the FaceTime call. 11/1/12 p.m. Tr. 61:21-62:4.

[6]     The session ID only identifies the particular call (session) being made, whether secure or not, and the certificate name is just the name of the party being called.

data packets (which he called audio/video *streams*) are encrypted (*e.g.*, 11/1/12 a.m. Tr. 110:4),

that is not the same as establishing a secure communication *link*.  For instance, Dr. Jones did not

testify that the *headers* of the audio/video data packets are encrypted, which would be necessary

to a secure communication "link."   Per the Court's construction, a secure communication link is

"a direct communication link that provides data security."  Dkt. No. 266 at 13.  Here, there is no

evidence that the link itself provides security through encryption.[7]   No reasonable factfinder

could conclude that Apple's FaceTime servers meet the claim requirement of an indication that

the system supports establishing a secure communication link.

> **4.    No Reasonable Factfinder Could Conclude That Email Addresses Or Telephone Numbers Are "Names"**

The Court construed the term "domain name" as "a *name* corresponding to an IP

address."  Dkt. No. 266 at 16 (emphasis added).  VirnetX asserts that telephone numbers and

email addresses qualify as "domain names."  11/1/12 a.m. Tr. 114:9-115:6.  But even assuming

that telephone numbers and email addresses may correspond to an IP address, VirnetX has

provided no evidence that either is a "name."[8]   Accordingly, no reasonable factfinder could

conclude that this term, which figures in all asserted claims of the '504 and '211 patents, is met.

## II.    VirnetX Has Not Adduced Evidence Sufficient To Support A Finding Of Indirect Infringement

> **A.    No Reasonable Factfinder Could Conclude That Any Third Party Performed Any Infringing Acts**

Induced infringement depends on proof that the defendant encouraged a third party to

perform, and the third party actually did perform, each and every limitation of an asserted claim.

---

[7]      Dr. Jones suggested that the UDP connection corresponds to the secure communication link.  11/1/12 a.m. Tr. 117:6-119:22.  But there is no evidence that the UDP connection itself provides security through encryption either.

[8]      Dr. Kelly testified that a telephone number and an email address are not domain names.  11/2/12 p.m. Tr. 51:7-52:1.

*See, e.g., Mirror Worlds, LLC v. Apple Inc.*, 692 F.3d 1351, 1360-1361 (Fed. Cir. 2012).  As shown in Part I above, VirnetX failed to prove any act of direct infringement.

### B.     No Reasonable Factfinder Could Conclude That Apple Knew (Or Knows Now) That Its Customers' Actions Infringe The Asserted Claims

To prove inducement, VirnetX must also show that Apple acted with "knowledge that the induced acts constitute patent infringement." *Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060, 2068 (2011); *see also* Dkt. No. 569.[9]

At trial, VirnetX did not attempt to show that Apple actually knew that customers' use of VPN On Demand or FaceTime infringed VirnetX's patents.  At most, it relied on a theory of "willful blindness," which requires "(1) the defendant must subjectively believe that there is a high probability that a fact exists and (2) the defendant must take deliberate actions to avoid learning of that fact."  *Global-Tech*, 131 S. Ct. at 2070.  In other words, "a willfully blind defendant is one who takes deliberate actions to avoid confirming a high probability of wrongdoing and who can almost be said to have actually known the critical facts."  *Id.* at 2070-2071.

VirnetX's evidence on this critical element is cursory and consists entirely of the following:  (1) "Apple understands how its products work"; (2) Apple received "notice of the patents"; and (3) certain Apple engineers "have taken steps to not look at the patents."  11/1/12 a.m. Tr. 95:18-25, 139:17-20.  This evidence in no way shows that Apple believed in a high probability that its customers infringed or took deliberate actions to confirm such a high probability of wrongdoing.  *See Apeldyn Corp. v. AU Optronics Corp.*, 831 F. Supp. 2d 817, 831 (D. Del. 2011) (no factual issue of willful blindness under *Global-Tech* even though defendant's

---

[9]      The Court sustained Apple's objection to VirnetX's expert's testimony to the extent it relied on a lower "should have known" standard.  11/1/12 a.m. Tr. 8:24-25; Dkt. No. 577.

patent prosecution department would not collect patents unless directed to do so by counsel and company "has 'not tried to gain knowledge'" regarding the asserted patent; such evidence "[at] best" framed defendant "as a reckless or negligent defendant—not a willfully deliberate one"); *see also Chaney v. Dreyfus Serv. Corp.*, 595 F.3d 219, 241-242 (5th Cir. 2010) (declining to take steps that "would likely detect" money laundering "at worst rose to the level of recklessness" and would not "support a jury finding that DSC's managers were subjectively aware of a high probability that its funds would be used for illegal purposes"). Notably, VirnetX pointed to nothing suggesting that Apple suspected a "high probability" of infringement *before* VirnetX filed suit. And since this case began, Apple developed and has maintained reasonable (and correct) noninfringement positions, which foreclose any argument of knowledge that its customers *were* infringing.

**C.    No Reasonable Factfinder Could Conclude That Apple Knew Of The Patents Prior To Their Assertion In Litigation Against Apple**

VirnetX is also required to show that Apple had knowledge of the patents' existence. *Global-Tech*, 131 S. Ct. at 2067-2068. There is no evidence that Apple actually knew of the patents before they were asserted against Apple in this litigation.

Again, VirnetX claims willful blindness, but the evidence does not support it. VirnetX asserts that Microsoft's license from VirnetX was public and that Microsoft and Apple are competitors. 11/1/12 a.m. Tr. 91:7-16. But "it is not a plausible argument to charge Defendants with knowledge of from among hundreds of cases involving their competitors' products." *MONEC Holding AG v. Motorola Mobility, Inc.*, __ F. Supp. 2d __, 2012 WL 4340653, at *6 (D. Del. Sept. 20, 2012). Nor does Apple's response to a request for admission that specified no timeframe (11/1/12 a.m. Tr. 56:9-13), and which Apple answered in July 2012, allow a

reasonable factfinder to infer that Apple knew of VirnetX's patents before VirnetX asserted them in 2010 or 2011.[10]

Finally, VirnetX relies on testimony that various Apple engineers did not review VirnetX's patents or show any interest in doing so. 11/1/12 a.m. Tr. 92:21-93:19. But VirnetX showed no evidence that Apple's engineers would *normally* identify or review patents yet took "deliberate steps" not to do so in this context; to the extent the matter was addressed at all, the deponents testified that it was *not* their job to review patents. 11/1/12 a.m. Tr. 93:3-9; 11/2/12 a.m. Tr. 31:18-32:1. That these particular employees did not look at patents during depositions *after* the complaint was filed does not show that Apple as a company was willfully blind to the patents' existence *before* the complaint was filed.

### D.   No Reasonable Factfinder Could Conclude That Apple Specifically Intended To Encourage Infringement Of The Asserted Claims

VirnetX's attempt to show that Apple encouraged infringement was also sparse and did not even suggest that Apple "possessed *specific intent* to encourage another's infringement." *Akamai Techs., Inc. v. Limelight Networks, Inc.*, 692 F.3d 1301, 1308 (Fed. Cir. 2012) (en banc) (quoting *DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1306 (Fed. Cir. 2006) (en banc)) (emphasis added).   For VPN On Demand, VirnetX's expert Dr. Jones simply pointed to instructions on "how to set it up and how to put those domain names in there" and to "documents that describe ... how to use this within your business." 11/1/12 a.m. Tr. 94:4-11.  But while these documents instruct on the *use of VPN*, that is not the same as instructing the use of the *claimed invention*, which VirnetX concedes requires more than simply establishing a VPN. The evidence is similarly absent for FaceTime: Dr. Jones relies only on "how they have told people

---

[10]     The relevant dates are August 11, 2010 for the '135 and '151 patents; February 4, 2011 for the '504 patent; and April 5, 2011 for the '211 patent.

how to use it" (11/1/12 a.m. Tr. 138:22-24), but again, VirnetX's patents do not claim every use of FaceTime. Accordingly, merely instructing users on FaceTime does not show "specific intent" to encourage infringement of the patents-in-suit.

### E.    VirnetX Offered No Evidence Of Contributory Infringement

VirnetX did not offer any evidence of contributory infringement under 35 U.S.C. § 271(c). Indeed, Dr. Jones expressly limited his "indirect infringement" theory to one of "inducing others to infringe." 11/1/12 a.m. Tr. 89:21-22. There is accordingly no basis for a finding of contributory infringement.

### III.    VIRNETX HAS PROVIDED NO LEGALLY SUFFICIENT BASIS FOR THE JURY TO AWARD DAMAGES IN THIS CASE

#### A.    Mr. Weinstein's Damages Testimony Should Have Been Excluded Or Stricken

Apple renews its objection that the testimony of VirnetX's damages expert, Roy Weinstein, should have been excluded or stricken under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), for the reasons Apple has previously explained. *See* Dkt. No. 445; 11/1/12 p.m. Tr. 85-86, 88, 230-231. Of course, even if the testimony was properly *admitted*, that does not mean that it is legally sufficient to support a verdict. *See, e.g., Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993) ("When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict."). As the remainder of this section shows, Mr. Weinstein's opinion was insufficient to support VirnetX's requested damages award, or indeed any damages award.

15

**B.      VirnetX's Principal Damages Theory Is Legally Insufficient Because It Uses The Entire Value Of Apple's Products As A Royalty Base Without Complying With The Entire Market Value Rule**

Mr. Weinstein indisputably used the entire market value of Apple's iPhone, iPads, iPod Touch and Mac OS software upgrades as a royalty base, totaling over $70 billion. 11/1/12 p.m. Tr. 129:20-130:2, 130:19-24. As a result, VirnetX was required to prove that the patented technologies "create the 'basis for customer demand' or 'substantially create[] the value of the component parts' in the accused software and hardware products." *Mirror Worlds*, 784 F. Supp. 2d at 726 (quoting *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1318 (Fed. Cir. 2011)). VirnetX utterly failed to do so.[11]

Mr. Weinstein admitted that neither Apple's VPN On Demand nor its FaceTime applications—much less the limited aspect of those applications assertedly covered by VirnetX's patents—creates the basis for demand for Apple's products:

> Q.      And *you're not here to offer the opinion that either … FaceTime or VPN On Demand, either one of them is the basis for demand* for the Apple products; the iPhone, the iPad, the Mac computers, the iPod Touch. Correct?
>
> A.      *No.* The way I would put it is these, VPN On Demand and FaceTime, *contribute to the sales* of -- of the products we've been talking about.
>
> …
>
> Q.      Okay. You're not here, Mr. Weinstein, offering the opinion that the basis for demand of Apple's products are either the basis -- okay, the one -- the basis for demand for the sale of all those units that you've included in your royalty base.
>
> *You're not saying that the basis for the demand of all those products was either FaceTime or VPN On Demand.  Correct?*

---

[11]      Mr. Weinstein purported to offer a "reasonable royalty" theory and a separate "entire market value rule" theory—a legally incoherent presentation, given that the entire market value rule describes a limitation on the royalty base that a patentee can use in calculating a "reasonable royalty." *See Uniloc*, 632 F.3d at 1318 (entire market value rule describes the "only" situation in which a patentee may "assess damages based on the entire market value of the accused product"). What Mr. Weinstein called his "reasonable royalty" theory clearly used the entire market value of the products as a royalty base. 11/1/12 p.m. Tr. 129:20-130:2, 130:19-24. Both of Mr. Weinstein's entire-market-value-based theories are therefore discussed in this section. In *neither* context did Mr. Weinstein identify evidence that the patented technology created the basis for customer demand.

16

    A.    *No.* What I'm saying is that FaceTime and VPN On Demand ***contribute to the sale*** of those products. ***They're not the exclusive basis.***

11/1/12 p.m. Tr. 170:21-171:21 (emphasis added); *see also id.* 112:1-3 (asserting only that FaceTime and VPN On Demand "contributed to Apple's ability to sell these products"), 222:10-11 ("contributed to the success"). Of course, even if Mr. Weinstein had testified that *FaceTime and VPN On Demand* created the basis for customer demand for Apple's products—and he did not—that would prove nothing as to the effect of *VirnetX's patented technology*. VirnetX's patents at most cover a very limited aspect of FaceTime and VPN On Demand. There is no evidence that those particular implementations drove customer demand, or even "contributed to the sales of," an entire iPhone, iPad, iPod Touch, or Mac OS software upgrade. Mr. Weinstein's assumption that the VirnetX patents "enable FaceTime" such that "absent those patents, there would not be FaceTime" (11/1/12 p.m. Tr. 215:21-22) is unsupported and, indeed, refuted by VirnetX's concession that FaceTime does not infringe if used over a relay server, a concession Mr. Weinstein ultimately accepted (11/1/12 p.m. Tr. 208:7-10).

    Moreover, a mere "contribution" to sales, even if proven, falls far short of demonstrating that FaceTime or VPN On Demand (much less the claimed inventions) form "the basis" for customer demand or "substantially create" the products' value. Apple's products are indisputably complex and multifaceted; numerous features that VirnetX did not invent thus "contribute" to their demand. Mr. Weinstein himself admitted that at least one other development "contributed to increasing the sales" of the iPhone during the same time period, namely the possibility of using the iPhone with carriers other than AT&T. 11/1/12 p.m. Tr. 223:18-19.

    Mr. Weinstein's efforts to substantiate the "contribution" made by FaceTime and VPN On Demand to the sales of Apple products only reinforce his concession that they do not form

"the basis" for customer demand.  From his statement that iPhone sales have increased from 7 million in 2008 to about 40 million in 2012, he concluded that that temporal coincidence "shows that the inclusion of VirnetX's technology has certainly contributed to Apple's ability to sell these products."  11/1/12 Tr. 112:1-3; *see also id.* 221:22-222:5.  That is unjustifiable given that Apple added numerous other features and improvements to the iPhone during the same period.  11/1/12 p.m. Tr. 223:18-19; *see U.S. Steel Group v. United States*, 96 F.3d 1352, 1358 (Fed. Cir. 1996) ("[T]o claim that the temporal link between these events *proves* that they are causally related is simply to repeat the ancient fallacy: *post hoc ergo propter hoc*.").

The conclusions Mr. Weinstein draws from Apple "surveys" are likewise unsupported by the actual documents.  To begin with, the surveys inquire about *FaceTime*, not about the patented technology, which even under VirnetX's theory only covers the use of certain limited aspects of FaceTime without a relay server.  Moreover, the surveys do not even show that *FaceTime* formed the basis for customer demand for Apple products.  Mr. Weinstein relied primarily on a single iPod Touch survey, from which he concluded that "for 18 percent of the purchasers, FaceTime was the most desired feature."  11/1/12 Tr. 148:24-149:1 (discussing PX283 at APP_VX0703896).  But the survey question at issue was not asked of *all* iPod Touch purchasers, but only of "57% of iPod touch buyers," namely those who "mentioned wanting a new feature as a reason for purchase."  PX283 at APP_VX0703896.  Accordingly, this survey *at most* suggests 10.26% (18% of 57%) of iPod Touch purchasers stated that FaceTime was "a reason" for their purchase.  And even that does not show that FaceTime was the *primary* reason for the purchase, but simply "a reason."  Yet Mr. Weinstein inferred from this survey answer that "but for this feature, those purchases would not have been made" (11/1/12 Tr. 149:12-13)—a completely speculative leap that no reasonable factfinder can make.  *See Mirror Worlds*, 784 F. Supp. 2d at

726 ("[T]he surveys cannot simply be translated to encompass Apple's various hardware, all which have exponentially more features with varying attributes that are unaccounted for.").[12]

Mr. Weinstein's further efforts to evade the entire market value rule fail. VirnetX's self-serving "policy" that it expects to be "paid for additional features that are associated with the products that it licenses" (11/1/12 Tr. 128:21-22) does not excuse it from satisfying the entire market value rule. *See Mirror Worlds*, 784 F. Supp. 2d at 726 (applying entire market value rule "[d]espite Mirror Worlds' protestations that the entire market value rule does not apply"). Nor did Mr. Weinstein validly "apportion" his royalty base by using the cheapest model of each product. That method may have eliminated *one* unclaimed feature—the "additional memory" present in more expensive models (11/1/12 p.m. Tr. 128:16-18)—but even the cheapest model of each product indisputably contains hundreds of features not covered by VirnetX's patents.

Mr. Weinstein's claim that he did "as much as [he] can" to remove the revenue allocated to unpatented features (11/1/12 p.m. Tr. 128:18-19) rings hollow, given his assertion elsewhere that he was able to compute the "the incremental or additional profits that are associated with the use of the patented technology"—a figure he calculated as $3.4 billion. 11/1/12 Tr. 138:12-14, 144:21-24. Although even that number overstates a proper royalty base (*see infra* Part III.D), it at least shows that Mr. Weinstein had available to him an apportioned value for the patented technology that was over 20 times lower than the figure he used. Alternatively, he could have used as a starting point the $29 price of the Mac OS software upgrade that gave Mac computer users access to FaceTime—which, at the very least, would have removed *some* of the value of

---

[12]    Mr. Weinstein mentioned another survey reporting that 56% of respondents ranked FaceTime as "very important" or "somewhat important" to the decision to buy an iPhone 4, but there is no evidence that respondents ranked FaceTime as more important than any *other* iPhone features. PX386 at APP_VX0814876. Indeed, the survey concludes that, compared to other features, the "[i]mportance of FaceTime video calling was relatively low." PX386 at APP_VX0814853. He also provided no basis for disregarding other surveys in which respondents assigned much lower importance to FaceTime. *E.g.*, 11/1/12 p.m. Tr. 221:1-19.

many unpatented features associated with Apple's products.  Instead,  he assumed that Apple

would have paid over 20 times more for FaceTime on mobile devices than on Mac computers, an

entirely unjustified assumption that does not realistically reflect the outcome of a negotiation

between sophisticated parties. 11/1/12 p.m. Tr. 180:12-23, 206:14-207:10.  Mr. Weinstein could

also have removed from his royalty base the hundreds of dollars per unit that he conceded was

paid not by customers, but by *cellular carriers* "like AT&T or Verizon" because "they then sign

your friends and others up to contracts" (11/1/12 p.m. Tr. 125:25-126:9)—a consideration that

Mr. Weinstein nowhere suggested was attributable to FaceTime or VPN On Demand.

Mr. Weinstein thus did not remove from his royalty base the value of numerous features

in Apple's products that VirnetX's patents do not cover, nor did he show that the patented

features create the basis for customer demand for Apple's products.  Accordingly, "it could not

be pretended" that the entire value of Apple's products—even the cheapest models—"was

attributable to the feature patented." *Garretson v. Clark*, 111 U.S. 120, 121-122 (1884).

Mr. Weinstein's principal damages theory is also legally insufficient because it does not

use the "smallest salable patent-practicing unit" as required by *LaserDynamics, Inc. v. Quanta*

*Computer, Inc.* 694 F.3d 51, 69 (Fed. Cir. 2012).  As set forth in *LaserDynamics*, it is incumbent

on the patentee to assess and value the accused patented feature distinctly from the overall

product containing that feature.  This burden is not excused simply because the accused feature is

not sold separately, that it is impractical, or that economic necessity compels using the entire

product price as the royalty base.  For his royalty base, Mr. Weinstein used the base price of each

accused Apple product without separately assessing the value of the patented features within

those products, despite the fact that he at least purported to isolate what he believed to be the

incremental revenue attributable to the patented technology when performing his Nash Bargaining Solution analysis.  As a result, his principal damages theory is legally insufficient.

### C.     No Substantial Evidence Supports VirnetX's Proposed 1% Royalty Rate

Mr. Weinstein's testimony that Apple would have agreed to a 1% running royalty rate on its products is likewise unsupported by substantial evidence.  At the time of the hypothetical negotiation in June 2009, VirnetX did not have any comparable license with remotely similar terms.  The In-Q-Tel agreement predated even the *conception* of the claimed inventions.  11/1/12 p.m. Tr. 186:2-8.  The SafeNet/SAIC license predated the issuance of the patents-in-suit and was a software license (which Mr. Weinstein conceded "can have higher rates"), and was canceled without SafeNet making any payment under it.   11/1/12 p.m. Tr. 186:9-187:12.   The SAIC/VirnetX agreement involved exchanges of multiple rights, including a complete assignment of the patents-in-suit.  And the remaining 2012 licenses all postdated the hypothetical negotiation by several years and did not involve a potential royalty stream remotely approaching VirnetX's claim here.  11/1/12 p.m. Tr. 202:5-205:12.

Mr. Weinstein relied heavily on VirnetX's licensing "assumptions," which were not in place at the time of the hypothetical negotiation and simply reflected what VirnetX "hoped for."  11/1/12 p.m. Tr. 161:5-6.   The document certainly does not indicate what VirnetX actually *received* for its patents at the relevant time. 11/1/12 p.m. Tr. 161:10-13.  Nor does it reflect an "established royalty," which requires proof of a royalty rate "paid or secured before the infringement complained of" and "for comparable rights or activity under the patent."  7-20 Chisum on Patents § 20.06[2] (2012).  Mr. Weinstein also improperly did not consider Apple's ability to design around the patents, whether by using relay servers to implement FaceTime or to

incorporate a user action (such as entering a password) before initiating a VPN connection.   But these non-infringing alternatives are highly relevant to the reasonable royalty analysis.   *E.g.*, *Riles v. Shell Exploration & Prod. Co.*, 298 F.3d 1302, 1312 (Fed. Cir. 2002) ("[U]nder the constraints of the hypothetical negotiation, the market could not award Riles a royalty for his method divorced of all relation to a potential non-infringing alternative method. The economic relationship between the patented method and non-infringing alternative methods, of necessity, would limit the hypothetical negotiation."); *Zygo Corp. v. Wyko Corp.*, 79 F.3d 1563, 1571-1572 (Fed. Cir. 1996) ("Wyko would have been in a stronger position to negotiate for a lower royalty rate knowing it had a competitive noninfringing device 'in the wings.'").   VirnetX has not shown that the noninfringing alternatives are in any way unsatisfactory; indeed, Mr. Weinstein agreed that "there's no reason to believe that the consumers could tell any difference at all" between calls processed using relay servers and calls processed without them.   11/1/12 p.m. Tr. 210:7-12.[13]

### D.   VirnetX's "Nash Bargaining Solution" Evidence Does Not Redeem—And In Fact Exacerbates—Its Violation Of The Entire Market Value Rule

Mr. Weinstein submitted an "alternative" damages theory for FaceTime that he asserted rested on the "Nash Bargaining Solution."  That theory does not justify a damages award either. First, as Mr. Weinstein acknowledged, a proper Nash analysis would have begun with "the incremental or additional profits that are associated with *the use of the patented technology*." 11/1/12 Tr. 138:12-14 (emphasis added); *see also id.* 140:23-24 ("the profits that are linked directly to the use of the invention").   But Mr. Weinstein did not do that.  Instead, he calculated

---

[13]     Mr. Weinstein's testimony that a non-infringing alternative "has to be something that you actually do" (11/1/12 p.m. Tr. 228:23-24) is legally erroneous. *See, e.g.*, *Grain Processing Corp. v. American Maize-Prods. Co.*, 185 F.3d 1341, 1349  (Fed. Cir. 1999) (permitting "available alternatives - including but not limited to products on the market"); *see also Riles*, 298 F.3d at 1312 (citing *Grain Processing* in reasonable royalty context).

the alleged incremental profit from adding a *front-facing camera* to certain Apple products. 11/1/12 p.m. Tr. 218:4-11. But Mr. Weinstein admitted that customers use front-facing cameras for uses other than FaceTime. 11/1/12 p.m. Tr. 218:9-11, 22-25. Named inventor Dr. Short also admitted that VirnetX's patents "don't have anything to do with" the "cameras to take the video for FaceTime." 10/31/12 p.m. Tr. 15:16-18, 16:16-18. And as discussed above, there is no basis for assuming that the incremental profit due to *FaceTime* (much less to an entire front-facing camera) equals the incremental profit due to *the patented technology*, especially given VirnetX's concession that the use of FaceTime with a relay server does not infringe.

Second, Mr. Weinstein's suggestion that the Nash Bargaining Solution supported giving VirnetX 45% of the "incremental profits" was a mere *ipse dixit*. He offered no basis at all for choosing a 45% figure, rather than a lower figure. 11/1/12 p.m. Tr. 141:13-17. And that was even though he recognized that Apple "would have had additional bargaining power" at the time of the hypothetical negotiation. 11/1/12 p.m. Tr. 216:23-217:2. Mr. Weinstein's choice of 45% was "plucked out of thin air" and based on a "complete lack of economic analysis" that "echoes the kind of arbitrariness of the '25% rule' that [the Federal Circuit] recently and emphatically rejected from damages experts." *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 69 (Fed. Cir. 2012) (citing *Uniloc*, 632 F.3d at 1318).

### E.   VirnetX Provided No Damages Theory To Match Its Theories Of Direct Infringement Of The '504, '211, and '135 Patents

In the event that the Court rules that VirnetX has failed to prove one or more elements of inducement (as it should, *see supra* Part II), VirnetX has given the jury no basis to award damages for direct infringement of the '504 or '211 patents (asserted regarding FaceTime) or the '135 patent (asserted regarding VPN On Demand).

23

The '504 and '211 patents claim systems and media that—as VirnetX's infringement expert Dr. Jones repeatedly testified—are directly infringed, if at all, by Apple's making or use of its own FaceTime *servers*. 11/1/12 a.m. Tr. 137:9-11. But Mr. Weinstein offered no damages theory tethered to the making or use of FaceTime servers. Rather, Mr. Weinstein's evidence depended on the premise that Apple's *consumer devices*—iPhones, iPads, and iPod Touches— and *Mac OS upgrades* were the "infringing units." 11/1/12 p.m. Tr. 112:15-19. On cross-examination, although he admitted hearing Dr. Jones testify that Apple was accused of direct infringement based on the FaceTime *servers*, Mr. Weinstein nonetheless could not articulate any damages theory based on those products. 11/1/12 p.m. Tr. 164:23-166:20. Accordingly, if the Court rules that VirnetX has failed to prove that Apple actively *induced* infringement of the '504 and '211 patents by customers, then the jury has no basis other than speculation to award damages for direct infringement of those patents. *See Mirror Worlds*, 784 F. Supp. 2d at 724 ("Mirror Worlds' infringement theory was based on Apple's sales, and Mirror Worlds did not present sufficient evidence to allow the jury to determine liability resulting from Apple's own use (direct infringement) of the methods in the '227 and '313 patents.").

Similarly, with respect to the asserted method claims of the '135 patent, VirnetX's only direct infringement theory was that Apple "perform[s] the steps itself, say, through its own internal use and testing." 11/1/12 a.m. Tr. 88:22-23. But Mr. Weinstein offered no damages theory to cover Apple's "internal use and testing" of VPN On Demand. He certainly did not suggest that Apple would pay a royalty for "use and testing" that was based on sales of its consumer products. *See Mirror Worlds*, 784 F. Supp. 2d at 725 ("[B]ecause Apple's sales or

offers for sale do not infringe the asserted method patents, they cannot be the basis for damages.").[14]

**F.     At The Very Least, Damages Should Not Be Awarded For Periods Prior To The Patents' Assertion In This Litigation**

While VirnetX has shown no basis for any damages award in this case, it is at the very least disqualified from seeking damages for sales preceding its assertion of the relevant patents in litigation against Apple. Accordingly, damages cannot be assessed prior to August 11, 2010 for the '135 and '151 patents; February 4, 2011 for the '504 patent; and April 5, 2011 for the '211 patent. There are two reasons for this limitation on damages.

First, VirnetX has failed to show that Apple knew of the patents before their assertion in litigation, thus preventing any liability for induced infringement. *See supra* Part II.C.

Second, VirnetX has failed to comply with 35 U.S.C. § 287(a), which applies to all of the patents-in-suit. *See American Med. Sys., Inc. v. Medical Eng'g Corp.*, 6 F.3d 1523, 1538-1539 (Fed. Cir. 1993) (marking obligation also applies "[w]here the patent contains both apparatus and method claims" and "there is a tangible item to mark by which notice of the asserted method claims can be given"). Licensees of the VirnetX patents must also comply with the marking requirements, and VirnetX is required to make reasonable efforts to ensure compliance. *E.g.*, *Maxwell v. J. Baker, Inc.*, 86 F.3d 1098, 1111–1112 (Fed. Cir. 1996). Marking by licensees must be "substantial and continuous." *Maxwell v. KMart Corp.*, 880 F. Supp. 1323, 1336 (D. Minn. 1995) ("Compliance with the marking statute cannot be measured by the reasonable efforts of a

---

[14]     Dr. Jones' statement that Apple's "code" sold as part of its devices could directly "perform all of the steps" of a method claim (11/1/12 a.m Tr. 24-25) is legally erroneous. *See Mirror Worlds*, 784 F. Supp. 2d at 725 (holding that "sale of the apparatus is not the sale of the method" and is "thereby irrelevant in calculating liability for direct infringement"). The claimed steps are performed, if at all, by a customer who uses the VPN On Demand functionality in an infringing manner.

licensor alone as such efforts without substantial and continuous marking by the licensee provide no notice to the public").

Here, Mr. Larsen admitted that, although VirnetX believes that SAIC—which has retained a non-exclusive license to practice the asserted patents outside a defined field of use since March 12, 2008 (PX404 at VNET00220775)—may be practicing the asserted patents, VirnetX has undertaken no investigation to determine whether SAIC was substantially and continuously marking. 10/31/12 p.m. Tr. 158:9-18. A patentee cannot satisfy its burden of proof regarding § 287(a) merely by raising the prospect that certain products might not infringe. *Loral Fairchild Corp. v. Victor Co. of Japan, Ltd.*, 906 F. Supp. 813, 818 (E.D.N.Y. 1995) ("[The patentee] merely raised the prospect that the products might not infringe. [The patentee] cannot satisfy burdens of proof with prospects."). Thus, VirnetX's failure to offer evidence that SAIC has complied with its marking obligations, despite its knowledge that SAIC may be practicing the asserted patents, bars pre-suit damages under 35 U.S.C. § 287(a).

Mr. Weinstein did not offer any figures that subtracted *all* pre-suit sales, i.e. between June 2009 and August 11, 2010. Although VirnetX's counsel asked him for such a calculation, Mr. Weinstein responded "I don't understand the question" and repeated his calculation for the *entire* period from June 2009 forward. 11/1/12 p.m. Tr. 134:18-135:6. When counsel asked again for a damages number that excluded all pre-suit sales, Mr. Weinstein said "I can't give you any more numbers than I've given you already," and counsel did not follow up. 11/1/12 p.m. Tr. 136:2-10. Accordingly, there is no basis other than speculation for the jury to award damages properly limited by the patents' assertion in litigation against Apple.[15]

---

[15]     Additionally, VirnetX's May 14, 2010 license to Microsoft does not obligate Microsoft to mark its products with patent numbers of the VirnetX patents to which it is licensed. PX409. Thus, VirnetX failed per se to comply with the marking requirement. *Tulip Computers Int'l B.V. v. Dell Computer Corp.*, No. 00-981-KAJ, 2003 WL 1606081, at *12 (D. Del. Feb. 4, 2003) (patentee "must suffer the consequences of its own failure to draft [a license]

**IV.    THE EVIDENCE COMPELS A FINDING THAT THE ASSERTED CLAIMS ARE ANTICIPATED BY THE KIUCHI REFERENCE**

A patent claim is invalid as anticipated under 35 U.S.C. § 102 if a prior art printed publication discloses every limitation of the claimed invention, either explicitly or inherently. *Liebel-Flarsheim Co. v. Medrad, Inc.*, 481 F.3d 1371, 1381 (Fed. Cir. 2007). Here, clear and convincing evidence establishes that the asserted claims of the patents-in-suit are invalid as anticipated by a 1996 publication (the "Kiuchi reference" or "Kiuchi"). DX-J 144. Indeed, because no reasonable jury could conclude that claims 1, 3, 7, and 8 of the '135 patent (PX-1), claims 1, 2, 5, 16, 21, and 27 of the '504 patent (PX-4), claims 1 and 13 of the '151 patent (PX-7), and claims 36, 37, 47, and 51 of the '211 patent (PX-10) are not invalid, judgment as a matter of law concerning the invalidity of those claims is warranted.[16]

Apple introduced the Kiuchi reference along with expert testimony from Dr. Peter Alexander concerning the invalidity of the asserted claims in light of Kiuchi. Dr. Alexander demonstrated that the Kiuchi reference was published in conjunction with the proceedings of a symposium held in February 1996 in San Diego, California concerning network and distributed system security, and thus publicly available in a manner sufficient to qualify as a printed publication under 35 U.S.C. §§102(a) and (b).   11/2/12 p.m. Tr. 147:1-151:15.   Dr. Alexander

---

to protect itself from the risk that its licensee would sell unmarked product."); *see also Loral Fairchild*, 906 F. Supp. at 818 (finding no compliance with Section 287(a) where the patentee failed to show that its license agreement required licensees to mark the products made under the licensed patent). Mr. Larsen admitted that Microsoft had no obligation to mark its licensed products and that VirnetX had no evidence that Microsoft complied with the marking requirement by substantially and continuously marking the licensed products. 10/31/12 p.m. Tr. 158:3-8. Should the Court find that VirnetX's violation of Section 287 applies only to the VirnetX-Microsoft license, and not the SAIC license, then VirnetX is barred from recovering damages from May 14, 2010 through August 11, 2010.

[16]    Because VirnetX did not pursue infringement contentions as to any other claims in the patents-in-suit, there is no longer any live case or controversy regarding the validity of such non-asserted patent claims. *See, e.g., Streck, Inc. v. Research & Diagnostics Sys., Inc.*, 665 F.3d 1269 (Fed. Cir. 2012). Apple has accordingly moved to dismiss the declaratory judgment counterclaim for lack of jurisdiction as to patent claims other than the 16 claims that VirnetX asserts are infringed by Apple. *See* Dkt. No. 589.

further showed that the system described by Kiuchi addressed the same network security concerns that, years later, the VirnetX named inventors attempted to solve in the military context. 11/2/12 p.m. Tr. 152:12-163:21. Dr. Alexander then demonstrated—on a claim-by-claim and element-by-element basis—how Kiuchi discloses each and every limitation of the asserted claims of the patents-in-suit. 11/2/12 p.m. Tr. 164:12-228:3. Dr. Alexander also established that the Patent Office was not provided with the Kiuchi reference when it issued the patents-in-suit. 11/2/12 p.m. Tr. 228:4-9.

VirnetX failed to introduce any contrary evidence that would permit a reasonable jury to find that the asserted claims are valid over Kiuchi. Instead, VirnetX relied entirely on the opinion testimony of Dr. Mark Jones. Dr. Jones's opinions, however, all fail to provide legitimate grounds for a jury finding of no invalidity, because: (1) they turn on limitations or requirements found nowhere in the asserted claims or the Court's construction; (2) they ignore the explicit teachings of Kiuchi; and/or (3) they hinge on the legally irrelevant premise that the express teachings of Kiuchi contain a mistake and should therefore be disregarded.

Dr. Jones conceded that Kiuchi discloses every element of independent claim 1 of the '504 patent and every element of independent claim 36 of the '211 patent, except for limitations concerning secure communication links and the storage of a plurality of domain names and corresponding network addresses. But the record irrefutably demonstrates that Kiuchi discloses these limitations. 11/2/12 p.m. Tr. 170:1-172:16, 174:6-177:20, 192:13-196:11. The record also confirms that Kiuchi discloses the additional limitations of dependent claim 27 of the '504 patent and dependent claim 51 of the '211 patent. 11/2/12 p.m. Tr. 188:8-190:25. And Dr. Jones himself conceded that Kiuchi discloses each additional limitation of dependent claims 2, 5, 16, and 21 of the '504 patent and dependent claims 37 and 47 of the '211 patent.

28

Likewise, no reasonable jury could find that the asserted claims of the '135 and '151 patents are valid over Kiuchi. VirnetX's expert, Dr. Jones, conceded that in his view the only reasons Kiuchi does not anticipate the asserted independent claims of the '135 and '151 patents are because it allegedly does not disclose the claimed client or the direct communication required by the claims. But the record indisputably demonstrates that Kiuchi meets these limitations and every other limitation of the asserted claims of the '135 and '151 patents. 11/2/12 p.m. Tr. 201:17-213:16, 214:12-227:4. Apple is therefore entitled to judgment as a matter of law that the asserted claims of the patents-in-suit are invalid as anticipated by Kiuchi.

## CONCLUSION

For the foregoing reasons, the Court should grant judgment as a matter of law in Apple's favor.

Dated: November 5, 2012

Respectfully submitted,

/s/ Danny L. Williams
Eric M. Albritton
Texas State Bar No. 00790215
ema@emafirm.com
Stephen E. Edwards
Texas State Bar No. 00784008
see@emafirm.com
Debra Coleman
Texas State Bar No. 24059595
drc@emafirm.com
Matthew C. Harris
Texas State Bar No. 24059904
mch@emafirm.com
ALBRITTON LAW FIRM
P.O. Box 2649
Longview, Texas 75606
Telephone: (903) 757-8449
Facsimile: (903) 758-7397

Danny L. Williams - LEAD ATTORNEY

State Bar No. 21518050
E-mail:  danny@wmalaw.com
Ruben S. Bains
Texas Bar No. 24001678
E-mail:  rbains@wmalaw.com
Drew Kim
Texas Bar No. 24007482
E-mail:  dkim@wmalaw.com
Scott Woloson
E-mail: swoloson@wmalaw.com
Texas Bar No. 24066305
Williams, Morgan & Amerson, P.C.
10333 Richmond, Suite 1100
Houston, Texas 77042
Telephone:  (713) 934-7000
Facsimile: (713) 934-7011

ATTORNEYS FOR APPLE INC.

## CERTIFICATE OF SERVICE

I do hereby certify that a true and correct copy of the foregoing document has been sent to counsel of record by E-Mail on November 5, 2012.

/s/ Mark Dunglinson
Litigation Paralegal