1

```
 1                 IN THE UNITED STATES DISTRICT COURT
                   FOR THE EASTERN DISTRICT OF TEXAS
 2                         TYLER DIVISION

 3
    VIRNETX, INC.                )
 4                                    DOCKET NO. 6:13cv211
        -vs-                     )
 5                                    Tyler, Texas
                                )  1:30 p.m.
 6  APPLE, INC.                       August 15, 2013

 7

 8                  TRANSCRIPT OF MOTION HEARING
                   BEFORE THE HONORABLE LEONARD DAVIS,
 9              UNITED STATES CHIEF DISTRICT JUDGE

10

11                    A P P E A R A N C E S

12

13   (SEE SIGN-IN SHEETS DOCKETED IN THE MINUTES OF THE HEARING.)

14                          *****

15                          SPEAKERS

16
    FOR THE PLAINTIFFS:
17

18  MR. BRADLEY W. CALDWELL
    MR. JASON CASSADY
19

20  FOR THE DEFENDANTS:

21  MR. ERIC ALBRITTON
    MR. DANNY WILLIAMS
22

23  COURT REPORTER:        MS. SHEA SLOAN
                           shea_sloan@txed.uscourts.gov
24
    Proceedings taken by Machine Stenotype; transcript was produced
25  by a Computer.
```

```
 1                    P R O C E E D I N G S

 2               THE COURT:  Please be seated.

 3               All right.  Ms. Ferguson, if you will call the

 4    case, please.

 5               THE CLERK:  Court calls Case No. 6:13cv211,

 6    VirnetX, Inc. v. Apple, Inc.

 7               THE COURT:  Announcements.

 8               MR. CALDWELL:  Your Honor, good afternoon.  Brad

 9    Caldwell on behalf of the plaintiff, VirnetX.  I would like to

10    introduce the CEO of VirnetX, Mr. Kendall Larson, who is with

11    us here today.  Also, is Jason Cassady and Austin Curry from my

12    firm.  Mr. Pearson back there.  And Charlie Ainsworth.

13               THE COURT:  Thank you.

14               MR. CALDWELL:  Plaintiff is ready, Your Honor.

15               THE COURT:  Thank you.

16               MR. ALBRITTON:  Good afternoon, Your Honor.

17    Eric Albritton, Danny Williams, Matt Rodgers, Drew Kim for

18    Apple; and we are ready.

19               THE COURT:  Okay.  Very well.  Anybody else wish

20    to enter an appearance?

21               All right.  We're here on the issue of ongoing

22    royalty, and the Court will hear from VirnetX first.

23               MR. CASSADY:  One moment, Your Honor.

24               (Pause in proceedings.)

25               MR. CASSADY:  May it please the Court?
```

1                    THE COURT:  All right.

2                    MR. CASSADY:  As the Court is aware, we are here

3    to discuss the ongoing royalty request by VirnetX in the

4    VirnetX/Apple case.  So just to get started, I think nobody is

5    surprised by a quote like this about ongoing royalties but:  An

6    ongoing post-verdict royalty is appropriately higher than the

7    jury's pre-verdict reasonable royalty.

8                    So what we are here today to ask the Court is to

9    assess a higher royalty on the post-verdict royalties for the

10   use of VirnetX's technology by Apple.

11                   Now, before we get into a number of issues that

12   both parties disagree with one another on, I'm hoping --

13                   THE COURT:  And y'all have had no progress as

14   far as resolving this by agreement?

15                   MR. CASSADY:  We have attempted to resolve by

16   agreement.  I'm not going to point any fingers.  We haven't

17   resolved.  That is about the best I can tell you, Your Honor.

18                   My next slide, though, so I can show you -- I am

19   hoping Mr. Williams can tell me he does agree with this.  Based

20   on the pleadings in this case my understanding is these three

21   issues are not contested by the parties.

22                   The first one is that the jury award calculates

23   out to a .52 percent running royalty.  That was done based on

24   Mr. Weinstein, VirnetX's expert's royalty and the finding of

25   the jury.  And that is the number that both parties in this

1  case have used to assess what the royalty should be in a future

2  royalty context.

3          Additionally -- and I apologize for the

4  wordiness of next couple of bullets, Your Honor, but I will

5  break it down.  The second bullet point basically says that all

6  products until April 5th are still using both functionalities.

7          So up until April 5 of this year, iOS and Mac

8  products used the features that were in this case.  So all the

9  iOS products that used VPN on Demand and FaceTime that were

10  still in this case.  And then the Mac products used FaceTime up

11  until April 5th, 2013.

12          The third bullet is a little more simple.  That

13  one is that all Apple iOS products are still using today the

14  VPN on Demand feature that was adjudicated in our case.

15          So the point of that is to inform the Court of

16  kind of the dates where one feature may have become contested

17  with regards to whether or not it infringes; whereas, the VPN

18  on Demand is staying uncontested at being used exactly the same

19  way it was in the verdict until the design-around happens, it

20  sounds like sometime in September, by Apple; at least that is

21  what we are hearing from them right now.

22          So I wanted to give that Bedrock to Your Honor

23  to start from because that is kind of where both parties jump

24  off of for their negotiation in the hypothetical negotiation.

25          THE COURT:  Okay.  Do you agree that they have

1  achieved a design-around on the non-iOS devices.

2              MR. CASSADY:  Actually, no, Your Honor.  Right

3  now VirnetX is in the position of not having the discovery it

4  needs for both the relay scenario and for the VPN on Demand

5  scenario in order to totally understand whether or not those

6  non-infringing alternatives are truly non-infringing

7  alternatives and are not somehow -- fall under the not

8  colorably different standard.  We are seeking that discovery.

9              For instance, we subpoenaed Akamai which runs

10  the relays, and we have asked Apple to give us the beta source

11  code for their VPN on Demand design-around.  That discovery is

12  still ongoing.  It is still part of the process.  We are not

13  really here to ask the Court to adjudicate those non-infringing

14  alternatives.

15              What we are actually here to talk about is just

16  the royalties that would apply, you know, if and when those

17  rates may -- if and when those non-infringing alternatives were

18  to come into being.

19              THE COURT:  So you are saying that what you are

20  here to argue today is what the rate should be, assuming and

21  until -- assuming for whatever period of time that you do not

22  agree that a non-infringing alternative has been implemented?

23              MR. CASSADY:  I think that is fair.  I think,

24  Your Honor, I think our position is whether or not they

25  implement a non-infringing alternative, the rate is the rate.

1  If they do initiate one, they don't pay.  If they don't

2  initiate one and the Court finds that it is not more than

3  colorably different, then they pay the rate the Court

4  previously determined.

5           So rather than kind of stall out fighting about

6  the non-infringing alternatives that are not fully implemented

7  or there is still ongoing discovery on, we thought the rate was

8  appropriate to talk about now.

9           THE COURT:  Okay.  So you are not -- your

10  position is that the rate should not change, depending upon

11  whether they do or do not have a non-infringing alternative;

12  that if they have a non-infringing alternative, then the rate

13  just doesn't get applied to that revenue stream?

14           MR. CASSADY:  Yes, Your Honor.  What we would

15  say that if a product has a functionality in it that has an

16  accused functionality that is infringing, then the rate

17  applies.  And if it doesn't have one, it doesn't.  But we are

18  not here to talk about whether some feature falls in and out of

19  that right now.

20           THE COURT:  And that will either be decided by

21  agreement between the parties, if it can be agreed, or by

22  motion of the Court by one party or the other to -- for it to

23  apply or not apply?

24           MR. CASSADY:  Yes, Your Honor.  That is mainly

25  because of the infancy of these design-arounds.  We are in the

 1  scenario where we just don't have the eyeballs on the exact

 2  source code and exact versions that are going to happen.

 3            Rather than wait a month or two months to get

 4  the discovery and start the process, we decided it was better

 5  to get in front and let's determine the royalty and talk about

 6  the non-infringing alternatives later.

 7            THE COURT:  Okay.  Mr. Williams, not to put you

 8  on the spot but just to see if we are all on the same page

 9  here, do you agree or disagree that these three issues that he

10  has put on the screen are not contested?

11            MR. WILLIAMS:  I do not agree.  There are some

12  contests here.  We are not disputing the .52 percent

13  calculation for the purposes of the ongoing royalty because we

14  believe that is -- if you take what the jury awarded by the

15  revenue stream, that is what it comes out to.  We think that

16  the case law says that is the appropriate starting point for

17  determining the ongoing royalty post-judgment.

18            THE COURT:  The 3.1 (sic) then --

19            MR. WILLIAMS:  With the caveat that we have

20  stated in our papers, and that is we don't think that number is

21  correct; and that will be the subject of the appeal that we

22  have made.

23            THE COURT:  Right.

24            MR. WILLIAMS:  But subject to that caveat, that

25  is correct.

1              Now, with respect to the second two bullet

2   points I would say -- with respect to the second bullet point,

3   the FaceTime, he is including non-adjudicated products released

4   later.

5              Now, the Court made very clear -- in fact, there

6   was a dispute between -- well, I don't know if it is was really

7   a dispute -- but before the trial in this first case VirnetX

8   would not indicate whether, for example, iPhone 5 was in the

9   case or not.  They just wouldn't make the statement.  We had

10  that argument here in the courtroom.  And the Court stated

11  specifically iPhone 5 is not in that case.

12             So what we think is appropriate for this ongoing

13  royalty -- by the way, when VirnetX filed its follow-on case

14  the night of the verdict and they have since given us

15  infringement contentions, they are including all those

16  products; that is, the later released products in the

17  subsequent case.  And we think those are most appropriately to

18  be kept there.

19             Now, there is not necessarily a clear line

20  between the product and iOS depending on the feature that you

21  are talking about, but that is how they have sought to

22  structure their cases.  So what we would say on the second

23  bullet point is it would be the products that were adjudicated

24  as infringing that are used in FaceTime, up until the April

25  5th, 2013 date, which is when Apple fully went to the 100

1  percent relay.

2              Now, let me say that in response to what Mr.

3  Cassady said, they have, in fact, gotten the source code for

4  that relay, all related to design-around.  In fact, it was

5  produced in a parallel ITC case and then subsequently produced

6  in this ongoing royalty proceeding when they asked for it.  So

7  they have had that source code and they have been able to

8  determine whether they are going to say that it is infringing

9  or not.

10             Now, we know in spades -- and we are going to

11  cover this in my presentation, that the Court itself recognized

12  they conceded that the relay calls are not, in fact,

13  infringing.

14             So the point that I would make on the second

15  bullet is, number one, the non-adjudicated products released

16  later should be a part and, in fact, are a part of the second

17  case already.  And I'd say let's leave those there.  Let's deal

18  with the products that are adjudicated as infringing in the

19  first trial, and let's figure out what the ongoing royalty for

20  those products should be.

21             And that is true.  The April 5th date would be

22  the cutoff date on that for FaceTime royalty.

23             The third Apple iOS devices, that, again,

24  addresses the question of whether we should rope in products

25  that were not adjudicated as -- in the first case.  We would

1   say, again, let's deal with the products that were subject to

2   the first case.  They have interjected these later products,

3   the other products into the second case.  Let's let that play

4   out the way it should be played out.

5                   And, in fact, in terms of a non-infringing

6   design, I will address that a little bit more later; but we

7   have given them documentation to suggest what that will be.  It

8   is not, in fact, a final design at this point, so we don't have

9   final source code to produce to them.  But, again, that is a

10  part of the follow-on case and should be dealt with in that

11  case.

12                  THE COURT:  All right.  Mr. Cassady, let me ask

13  you to reply to the major difference it sounds like that y'all

14  have; and that is whether the non-adjudicated products should

15  be included in this case or in the subsequent case.

16                  MR. CASSADY:  Your Honor, I am actually quite

17  shocked about that.  The iPhone 5 is the main product that we

18  are talking about.  There are other variations of the iOS

19  products, but the iPhone 5 is mainly what we are talking about.

20                  In the briefing, both our primary brief and our

21  reply we said Apple should not get away with not paying on

22  iPhone 5 because it is exactly the same product unless they

23  were to show otherwise.

24                  And the scenario we were in was in the response

25  they didn't respond to that, and in their surreply after we

1  entered our reply, again, said they are not contesting that

2  similar products should not be included in the base.  They,

3  again, in the surreply didn't contest it.  So candidly, Your

4  Honor, I didn't come here prepared to argue that because it was

5  a non-issue in the briefing and I assumed we were done --

6              THE COURT:  Is that the only non-adjudicated

7  products that you are referring to in your slide are the iPhone

8  5 products?

9              MR. CASSADY:  It is the iPhone 5 and the updated

10 iPad and the iPad mini.  That is the general category of

11 products is those three.

12             THE COURT:  Response, Mr. Williams?

13             MR. WILLIAMS:  Yes, Judge.  I don't believe that

14 Mr. Cassady is entirely surprised, he would be shocked.  I

15 would raise this point because if you look at what his own

16 expert submitted -- or they submitted by their expert in this

17 ongoing royalty case, his own expert did not include iPhone

18 5.

19             MR. CASSADY:  Let's just ask a different

20 question, Mr. Williams:  Does the iPhone 5 FaceTime work

21 differently than the other products in this case?

22             MR. WILLIAMS:  Well, let me say two things, Your

23 Honor, and I will speak this to the Court.

24             First of all, if it works exactly the same as

25 iPhone 4, then we are not going to be in the second case,

1  subject again to the appeal of the first case.  We are not

2  going to be contesting whether it infringes, but let me put it

3  this way:

4            We are not going to contest in the second case,

5  which is ongoing at this time, an identical functionality that

6  was accused of infringement -- or even basically the same

7  functionality that was accused of infringement.  We are not

8  going to argue that again, subject to the appeal again.

9            But, secondly, I would say that this Court said,

10 in fact, that product is not in the case.  And the reason the

11 Court took that position, Your Honor, is because VirnetX

12 refused to accuse it prior to the trial.  We had that

13 discussion.  Mr. Cassady and I had that very discussion as we

14 stood here, before this Court.

15           I asked him, are you accusing iPhone 5?  We need

16 to know.  You are the plaintiff.  He refused to take a

17 position, and the Court said iPhone 5 is not in this case.  So

18 they have chosen to structure their cases, for whatever reason,

19 the way they are structured.  I think we follow that structure

20 and it keeps things much simpler, frankly.

21           THE COURT:  Response?

22           MR. CASSADY:  Your Honor, I didn't -- in the

23 hearing arguing that, I did not say that iPhone 5 is not more

24 than colorably different than the rest of the products.  I

25 didn't say that the iPhone 5 could never be part of any

1  functionality that was in this case.

2              What I said was that they had refused to give us

3  the discovery on it, so we were in the blind in the trial where

4  they could get up and say whatever they wanted without cross on

5  how it worked, and we wouldn't know.  And to this date in the

6  motions they made it clear they are not contesting the iPhone 5

7  works the way the other products do.  That is why we are saying

8  it should be included.  And like I said, the reason I am

9  surprised is if they really thought it worked differently, they

10 would have said it in the briefing.  Now I think they are just

11 coming in to say something different.

12             Candidly, Your Honor, I don't want to get bogged

13 down to this issue, but it is an important one.  I guess what I

14 would ask from Mr. Williams -- I think my client would be okay

15 with this.

16             You are saying you are not going to argue about

17 the infringement of the iPhone 5 in the new case if the appeal

18 goes right, but what about the royalty rate?  If Judge Davis

19 gives a royalty rate, are you going to contest that rate in

20 that upcoming trial?  If you can say you are just going to live

21 with what is here, I think we may be able to work that out.

22             THE COURT:  Well, y'all can meet and confer and

23 discuss that.

24             But I guess, Mr. Williams, I do have a question

25 whether the functionality of the iPhone 5 is colorably

1   different than the functionality that was proven at trial?  Do

2   you have a position on that at this time?

3                    MR. WILLIAMS:  Your Honor, I don't think I have

4   an official position on that.  When we asked them in the

5   beginning -- I mean the iPhone 5 came out, if you will recall,

6   shortly before the trial.

7                    THE COURT:  Right.

8                    MR. WILLIAMS:  Not too long.  Hence, the

9   problem.  Of course, it was well after discovery.  The question

10  was, should we provide discovery on an accused product?  We

11  couldn't get a straight answer out of them.  They just wouldn't

12  take a position.  And so this Court said it was not in the

13  case.  So as far as we were concerned it was a dead issue at

14  that point.

15                   MR. CASSADY:  Your Honor, not to beat a dead

16  horse -- I think we are getting there.  But the data that they

17  just produced to us in the 211 case in this matter about future

18  royalties, included the iPhone 5 in the data.  So they clearly

19  thought it was.

20                   THE COURT:  Let's go on with your argument.  I

21  think we know what y'all do agree on and what you don't agree

22  on.

23                   MR. CASSADY:  Thank you, Your Honor.

24                   So, basically, we ran through a George-Pacific

25  and Read analysis in the briefing.  And, Your Honor, I don't

1  want to belabor by going through every little factor for Your

2  Honor.  What I do have is a number of issues that I would like

3  to talk to the Court about today that may or may not fall in

4  the Georgia-Pacific factors, but I think they are more

5  important to focus on those than to walk through the factors.

6  I think you can rely on the briefing for those.

7            With that I think this is really a question of

8  fundamental fairness, Your Honor.  And here in front of us is

9  the three large reasons that VirnetX believes that the

10 reasonable royalty should be enhanced and should be enhanced to

11 a large amount.

12           The first one is, the case we are in now we have

13 a verdict and we have a judgment, we had a finding of validity

14 on the patent in that case.  Unlike other cases, we actually

15 have a finding of validity in two other trials related to these

16 patents that aren't Apple's but other defendants.

17           And so in this case, as usual, it is the case

18 that, absent unusual circumstances, a defendant's continued

19 infringement after it is an adjudicated infringer, is willful

20 even before appeal.  This is because a defendant is acting in

21 the face of an unjustifiably high risk of harm if it continues

22 to infringe in light of a jury verdict and judgment of

23 infringement.  So we contend that Apple is willful.

24           Now, one of Apple's positions is that we didn't

25 accuse Apple of willful infringement in the jury trial and,

1  therefore, we can't piggyback off of our verdict in order to

2  get willfulness after the trial.

3            Your Honor, the Mondis case that is right in

4  front of us still goes right to that point.  In that case, the

5  case went to trial with the willfulness on the verdict form,

6  and the jury found willfulness.  But Judge Ward actually

7  took -- in that case Judge Ward JMOL'd the willfulness finding

8  and said there wasn't enough evidence of willfulness prior to

9  verdict.

10           But still in assessing the future royalty, Judge

11 Ward assessed willfulness against the defendant in that case.

12 And so what Judge Ward said was even if you don't have

13 willfulness before, you are absolutely willful after a judgment

14 and a verdict in a case.  And here we talk about -- this is,

15 again, a quote from Mondis, Apple -- again, I am just

16 supplementing the defendant here.

17           Apple would have the Court effectively adopt a

18 standard that a party is not a willful infringer until after it

19 has resolved all its rights on appeal and has lost.  Implicit

20 in this argument is Apple's obvious lack of respect for the

21 jury's verdict or the Court's judgment.

22           And, Your Honor, I think that is a situation we

23 have here is that Apple is arguing they have some other

24 defenses that are down the road and, therefore, they are not

25 willful.  And I think the District and Fed Circuit has kind of

1   dealt with this issue, and willfulness is usually found after a

2   jury finding and after a judgment.  But Apple contests that.

3   That is why I wanted to talk about that a little bit with Your

4   Honor.  So that is the willfulness issue with regards to the

5   appeal.

6             But then they also say we have the reexams.

7             Let me skip forward a little bit.

8             They say we have the reexams.  So, again, I went

9   to find the cases in this district.  Here is another one:  The

10  Court rejects the contention that Apple's continued

11  infringement is not willful merely because the asserted claims

12  in the patents have been rejected in the pending reexams.

13            Again, Your Honor, we have got three juries have

14  said these patents are valid; or at a minimum have found them

15  not to be invalid.  Then in addition, we have the one in this

16  very case, and the pending reexams are basically another what I

17  call excuse as to getting out of the willfulness.

18            At this point they have got a jury verdict and

19  judgment and they are willful.  And Your Honor I believe -- in

20  the next slide -- Your Honor has found the same holding in the

21  Fractus case just a couple months ago.

22            Your Honor, that leads me to the second point I

23  had, which was the licenses that are -- Your Honor --

24            There you go.

25            That is the holding I really wanted you to read.

1    I apologize, Your Honor.

2                    And so the next point I have here -- Your Honor,

3    are you done with that slide?

4                    THE COURT:  Yes.

5                    MR. CASSADY:  I don't want to interrupt you.

6                    The next slide has to do with, again,

7    fundamental fairness of the licensees that have come before and

8    after Apple.  This in front of you is a chart that shows the

9    average future royalty on top, for the licensees that have

10   future royalties.  And just for Your Honor's sake of full

11   disclosure, I gave you the average, including Microsoft at the

12   bottom using their effective royalty rate.

13                   As Your Honor is aware, there is another case

14   outstanding against Microsoft for the breadth of infringement

15   they have with regards to VirnetX's patents.  So, therefore,

16   Microsoft's effective royalty is actually not the whole story;

17   but I put it in there anyways to show Your Honor that the

18   licensees that have come before Apple and after -- Siemens and

19   Avaya are both after the verdict in this case -- have all given

20   royalty rates that are much higher than the rates that

21   effectively came out of the jury in this case.

22                   THE COURT:  How did those parties compare, you

23   know, from a royalty base standpoint?

24                   MR. CASSADY:  From a volume basically?

25                   THE COURT:  Yeah.

1            MR. CASSADY:  Your Honor, Astra, Mitel, and NEC

2  were relatively smaller, relatively smaller.  Siemens was

3  relatively smaller.  But the most recent one, Avaya, Avaya was

4  on a larger magnitude -- I don't want to seal the Court right

5  now, Your Honor.  I don't know if I want to approach or just

6  tell you, but we did submit the license to you.  I didn't want

7  to give out the number, but they are much larger than the other

8  licensees.  They are smaller than Apple.

9            I mean, obviously, Apple is the second largest

10  company in the world.  So they are smaller than Apple.  I would

11  say Avaya was, you know, decently smaller than Microsoft; but

12  much bigger than the other licensees.  And, candidly, Your

13  Honor, Avaya signed that license after what we believe to be

14  Cisco's inappropriate arguments won that jury trial back in

15  March.  Avaya still agreed to the royalty rates that VirnetX

16  proposes out there.  So, really, we think it is one of those

17  fundamental --

18            THE COURT:  What percentage of Apple's volume

19  would you say Avaya is?

20            MR. CASSADY:  The volume -- just a royalty

21  base -- if I do the numbers -- let me -- give me one second in

22  my head, Your Honor.

23            (Pause in proceedings.)

24            MR. CASSADY:  Your Honor, I would say -- I mean,

25  I would say Avaya may be ten percent of Apple.

```
 1                    THE COURT:  Okay.  Thank you.

 2                    MR. CASSADY:  Yeah.  Depending on how you

 3   calculate it, but I think that is about right.  Microsoft would

 4   be clearly the larger in between both -- in between Avaya and

 5   Apple.  And so Siemens and Avaya, like I said, were after that

 6   trial; and their rates were much larger.

 7                    So we are in the scenario here where we have a

 8   situation where companies that have the same argument Apple

 9   did, they contended the patents were not infringed, they

10   contended they were invalid, they contended everything that

11   Apple did, and in some cases more than Apple did; and they all

12   voluntarily signed up for these licenses for these rates.

13                    And Apple comes in here after losing a verdict

14   and losing on judgment and wants to get a rate that is

15   fractional of these rates.

16                    THE COURT:  Write on a piece of paper what their

17   rate is and pass it up to the Clerk.

18                    MR. CASSADY:  Whose rate are you looking for?

19                    THE COURT:  Avaya.

20                    MR. CASSADY:  Avaya.  Yes.

21                    THE COURT:  Show it to opposing Counsel.

22                    MR. CASSADY:  I will, Your Honor.

23                    (Pause in proceedings.)

24                    THE COURT:  That will save us having to clear

25   the courtroom.
```

 1                     MR. CASSADY:  I'm sorry, Your Honor?

 2                     THE COURT:  That will save us having to clear

 3  the courtroom.

 4                     MR. CASSADY:  Fair enough.

 5                     (Pause in proceedings.)

 6                     MR. CASSADY:  My handwriting -- I'll just make

 7  the number a little more defined.  I will show you again

 8  because my handwriting is off a little bit.

 9                     (Shows opposing Counsel the document.)

10                     MR. CASSADY:  May I approach, Your Honor?

11                     THE COURT:  Yes, you may.

12                     MR. CASSADY:  My wife always yells at me about

13  my handwriting.

14                     (Shown to the Court.)

15                     THE COURT:  Thank you.

16                     All right.

17                     MR. CASSADY:  So, again, Your Honor, with

18  regards to those parties who voluntarily signed licenses, their

19  voluntary rates are higher than both what the jury put forward

20  and what Apple is suggesting should be the rate in this case.

21                     And, again, I will say that these parties all

22  had the same defenses, they were all in the same position.

23  Obviously, Microsoft was in the position of having a verdict

24  against them as well.

25                     THE COURT:  Let me ask you another question:  Is

1  Avaya doing any type of design-around?

2           MR. CASSADY:  My understanding is, no, Your

3  Honor.  My understanding is they are going forward, and they

4  are going to use the features.

5           THE COURT:  Okay.  Thank you.

6           MR. CASSADY:  Candidly, Your Honor, I don't know

7  what their design-around would be.  So the point is, in the

8  process of mediating with them, I'm not aware of anything in

9  them telling us they are going to go around the patents.

10          THE COURT:  Okay.

11          MR. CASSADY:  And then, again, Your Honor, I go

12  back to the point of the before and after.  So Astra, Mitel,

13  NEC, and Microsoft were before the jury; and Apple makes a big

14  deal that that is already baked into the royalty rate that came

15  out of the jury verdict.

16          Two points to that, Your Honor.  One, Siemens

17  and Avaya were both after the verdict.  Those rates were --

18  what they are, Your Honor has one of them in front of him.  The

19  Siemens' rate was very similar to that rate; not the pre-volume

20  but the rate they agreed to.

21          Also, Your Honor, it goes to my next point is

22  that -- the third point, which is what I would consider the

23  false non-infringing alternative data.  What I would tell Your

24  Honor on a high level is these royalties here are the royalties

25  that VirnetX's patents demand.  That is what those royalties

1  are.

2               The .52 percent that came out of the verdict,

3  that, I believe, has been toxified or lowered by the false data

4  that was provided regarding Apple's non-infringing

5  alternatives.  And I can point you to some specifics, Your

6  Honor.  Here is one piece of testimony crossing Mr. Weinstein,

7  VirnetX's expert.  And he was being asked:

8               If those costs of Apple implementing its relay

9  FaceTime non-infringing alternative were, let's say, 5 million,

10  do you think that a rational company would pay 700 million for

11  something they can do for 5?

12              Then Mr. Weinstein answered:  If those costs

13  were five, I would have expected them to have done it by now.

14              Now, you know, Mr. Weinstein's response was a

15  little cheeky, but the point is they go in front of the jury

16  and they tell the jury it is 5 million dollars to design around

17  this system and our patents aren't worth anything.

18              And the whole story he told at trial was about

19  how our patents weren't worth much; they were one of a tiny,

20  tiny feature in a big ecosystem and we could design around them

21  because we are Apple, and it is cheap.

22              They use that in regards to VPN on Demand, as

23  well.  Your Honor noted in the judgment that Apple had

24  contended one thing in front of the jury and contended one

25  thing after, when we got to the injunction stage of the trial.

1                  Your Honor, what I would tell you now is it is a

2    lot worse than it was when we were doing the injunction

3    hearing.  Here is a couple of things I want to show you.

4                  Here -- you can see the number on the bottom

5    right is the 50 million dollar payment that Apple made to

6    Akamai for a 20-month term or a 21-month term on their relay

7    servers for a very specific amount of bandwidth.  I think it

8    was 125 gigabits, Your Honor.

9                  So that comes out to -- I did the math up at the

10   top -- comes out to $2,422,000 a month.  So they sat in front

11   of this jury and told them 5 million dollars; and under that

12   math right there, 5 million dollars gets them two months, in

13   two months.  And, Your Honor, we were talking about a feature

14   that was years old at that point when we were in trial, so that

15   is years of amount of money that we would have to spend to

16   relay around --

17                  THE COURT:  And this figure, the 50 million

18   fees, that is for how many months?

19                  MR. CASSADY:  That is for 21 months, Your

20   Honor.

21                  THE COURT:  For 21 months of --

22                  MR. CASSADY:  Of relay.

23                  THE COURT:  -- of relay service.

24                  MR. CASSADY:  But what is important, Your Honor,

25   is that is at the 125 gigabits.  So that is 125 gigabits.  So

1   that is assuming they don't ever climb over that number, it

2   wouldn't get any more expensive.

3                Your Honor, this was renegotiated with Akamai

4   after the verdict.  So this number probably would have been

5   higher if it would have been a number of years ago.  But the

6   point is, that is the number that we know they are paying.  We

7   know they paid that number.

8                But it gets more interesting than that, Your

9   Honor.  So here is an email we just recently received -- we

10  have been asking for this discovery, and we have been having a

11  hard time of getting ahold of it.  We finally got ahold of

12  stuff, and here is one of the emails.  The gist of this email

13  is this is Akamai emailing Apple and telling Apple that by the

14  end of this month they need to be up to at least 150, and by

15  the end of the year they need to be up to 250 gigabits.

16               So what Akamai is telling Apple is, this is an

17  ever-increasing problem.  This relay solution is not going to

18  be easy.  It is not going to stay as low.  It is going to be

19  ever changing and ever getting more expensive.

20               And we have another piece of data, Your Honor,

21  to show, this is what Apple has to pay in addition to that 50

22  million dollars in order to meet up with the gigabits that they

23  need.

24               So just here, Your Honor, for example, up to 250

25  gigabits -- which it looks like they are going to get to in a

 1   couple of months, up to 250 gigabits is another 3.2 million

 2   dollars a month on top of the 2 million a month they already

 3   had.

 4           So we are talking about one month is the number

 5   they told the jury was the life of the relay, non-infringing

 6   alternative.  Five million a month is what they are going to

 7   start spending.  And they told the jury it was 5 million

 8   dollars in total to do this non-infringing alternative.

 9           So -- but it doesn't end there, Your Honor.  So

10   now we've got more information from them about their

11   projections for what the relay servers are going to look like

12   next year.

13           This is a slide here, Your Honor.

14           It is a little hard to read up here; but the

15   gist of it is, there is a little green line underneath all

16   those bars on the bottom.  That is their current capacity.

17   They think in the next -- in the next year, in 2014 that their

18   capacity is going to jump up to a minimum of 300; and if you

19   look at the top, Your Honor, up to possibly a terabit of data

20   they are going to need on a monthly basis; a terabit.

21           So they are going to need a terabit of relay

22   data.  I'm sure they will get a volume discount.  But I know it

23   is going to be more than 5 million.  It is probably more than

24   10 million.  It may be more than 20.  But the point is it is

25   not five in total.

1          So the reason I bring all that up and back to
2  fundamental fairness is, whether or not the licenses were in
3  front of the jury, this toxic information was in front of the
4  jury.  At best it was either just a huge mistake; and at worse
5  a fabrication.  And that is a scenario we are in.  Those were
6  put in front of the jury, and the licenses were drawn down in
7  rates because Apple got to go in front of the jury and say this
8  feature is not important.
9          I mean, Your Honor, if I was in front of that
10  jury arguing this again today with this data, I don't think
11  damages would be much of a question in that case.  The jury
12  hears that Apple's only non-infringing alternative is going to
13  cost them millions and millions of dollars a month and it is
14  only going to get worse over time, I don't think a jury starts
15  questioning the licenses at that point.
16          I think a jury looks at that and says -- even
17  Apple says this is expensive, so it must be important; and it
18  changes the way that a jury sees that.
19          THE COURT:  Remind me what was argued at the
20  injunction stage.
21          MR. CASSADY:  At the injunction stage, Your
22  Honor, it was -- I want to say it was a couple million dollars
23  a month number.  And it wasn't any more than that.  Basically,
24  it was the contract price of 50 million and not the increases
25  that are now going to start occurring because the feature is

1   more and more popular with regards to the bandwidth it needs.

2                   As they add more devices, they add more people,

3   they need more volume.

4                   THE COURT:  Okay.

5                   MR. CASSADY:  And so, Your Honor, that is

6   actually not the whole picture though.  So they also told the

7   jury that nobody cares whether this relay -- the relay works

8   just as well as direct.  It doesn't matter.

9                   Your Honor, I will tell you as a person who uses

10  FaceTime, it has gone downhill since they went to all relay.

11                  THE COURT:  Wait a minute.  Do you want to be

12  put under oath?

13                  MR. CASSADY:  No, Your Honor, I don't.  That's

14  why I brought you some evidence.  So just last night, just last

15  night -- or maybe it was the night before last, one of my

16  colleagues -- I won't put him on the stand either, was on a

17  call on FaceTime and it did this (indicating).  This is

18  reconnecting.

19                  You will notice, Your Honor, up on the top right

20  there is still some color, so one connection is still there;

21  but the relay has lost one side of the video feed.

22                  I will tell you, Your Honor, I am fairly

23  confident this happens a lot since the relay server has

24  happened.  Dr. Jones at the trial kind of made a couple

25  references to possible delays in the connections, but we didn't

1  go as far as to explain to the jury what we thought the massive

2  problem with the relay servers would be, other than the volume

3  and expense.  And these kind of things are starting to show up.

4              Your Honor, we tried to get some discovery on

5  FaceTime to bring in front of Your Honor on this issue, and we

6  had some discovery disputes about an AppleCare database, that

7  is, the phone calls into Apple complaining about FaceTime.  At

8  this point it sounds like Apple and I -- we have agreed to get

9  access to that database.

10              But, Your Honor, candidly, I haven't been able

11  to see that database other than for maybe 30 minutes at one

12  point.  And it has got over 500,000 entries in it.

13              So my hope is to bring in front of Your Honor

14  more complaints from that database -- I am pretty sure they are

15  in there -- regarding the functionality of FaceTime.

16              While a user may not understand that it is the

17  relay causing this, he will understand or she will understand

18  that it is disconnecting on them; that it takes longer to

19  connect; and that it is just not working as well.  So that is

20  with regards to FaceTime, Your Honor.  But it doesn't stop

21  there.

22              So during the injunction stage, Apple told the

23  Court that they were designing around VPN on Demand, and then

24  they put out this press release.

25              I will step away from that and try to speak up.

1           They put out this press release, and they

2   basically skewer VirnetX:  Due to a lawsuit by VirnetX, Apple

3   will be changing the behavior of VPN on Demand for iOS devices

4   using 6.1 or later.

5           THE COURT:  I'm sorry.  I can't hear you.

6           MR. CASSADY:  I will step back to the mic, Your

7   Honor.  It says:  Due to a lawsuit by VirnetX, Apple will be

8   changing the behavior of VPN on Demand for iOS devices using

9   6.1 and later iOS.

10          And then it goes on to say they are going to

11  remove the OAS, which has been the issue of the case with

12  regards to -- excuse me -- with regards to VPN on Demand.

13          That was during the injunction stage of the

14  litigation -- or of the pleadings.

15          Well then, 20 days later, Your Honor, after --

16  which was after Your Honor denied the injunction request, we

17  got this one:  Apple no longer plans to change the behavior of

18  the VPN on Demand feature of iOS 6.0 for devices that have

19  already been shipped.

20          So now they are not going to change it.

21          I am not faulting them for saying they are going

22  to change it and then deciding not to change it because an

23  injunction may come down.  But, again, this is one of those

24  issues where they told the jury it would take five minutes and

25  we would just remove that little functionality and nobody would

1  care.  Then when it came time to put your money where your

2  mouth is, they are not interested in making that change.

3            Now, there has been seven iOS updates since the

4  verdict; and that feature hasn't changed; seven.  And they are

5  saying that the next update they are going to put out is going

6  to change it.  I understand that is to be in September.

7            Your Honor, sitting here today I actually

8  believe that, based on just supposition of what they are

9  telling me they are going to do, we are pretty sure it is not

10 more than colorably different and it is going to be infringing.

11 But -- that we haven't seen the code, we haven't seen enough to

12 really understand that.  So the point is, it is still not out.

13 That is not coming out until September at the earliest.

14            And when we asked for discovery on this, we got

15 a number of complaints and pieces of information from them

16 about people calling Apple and complaining about this change.

17 We got a lot of Government entities emailing Apple saying you

18 can't make this change.  We've got business entities emailing

19 and saying you can't make this change.

20            But a more important one to the issue we are

21 here in front of you, Your Honor, today is, one of the Apple

22 Customer Care guys -- and it is this next slide, and I'll do my

23 best to read it to Your Honor because it is not as clean as I

24 would like it to have been -- the client says:  I believe Apple

25 is very secure, and that's why I am so concerned about this --

1  in reference to the change about VPN on Demand.  They are

2  making a change to something they had over the other guys and

3  for money.  It didn't say they were making the change because

4  it was more secure.  It said because of the lawsuit.  And that

5  makes me very, very upset.

6              And the agent says:  Yes, I understand.  From

7  what I understand, Apple was sued and lost the lawsuit.

8  Because of that we were forced to change how VPNs worked

9  temporarily.

10              So now their agents are telling their customers

11  that the change they are now seeing is temporary.  And so that

12  is kind of -- gets me to the next issue with the Court is that

13  they are going to say we are going to make the change.  Because

14  we are going to make the change, Your Honor should give us a

15  lower royalty rate.

16              I would suppose that once the lower royalty rate

17  was given, they may change back to infringing.  That is because

18  that is not the purpose, in our opinion, of these changes.

19  These changes are band-aids meant to put them in a better

20  positions for appeal and for the argument here in front of Your

21  Honor; and they are not truly meant to be design-arounds of any

22  real temper.

23              But let's assume they are good design-arounds.

24  Let's assume that they are going to use them.  They are

25  irrelevant is what I would tell Your Honor.  If they have

1   design-arounds they can go to for the purpose of assessing a

2   royalty, I would say to Your Honor they are irrelevant.

3                  Because if they have a choice in the matter,

4   then the rate for using it should be irrelevant to them.  It

5   shouldn't matter.  They should have moved to their new feature,

6   and the rate applying to infringing products should not be

7   reduced because they have an option.

8                  The reason for that, Your Honor, is in the

9   hypothetical negotiation in the past, you didn't have a choice.

10  We are talking about a hypothetical -- we go back in time.  We

11  say they could have done something else if they knew they were

12  infringing.  That is why you go back and you make it a stopgap

13  in the back for saying it would have been 5 million to design

14  around, 5 million is your damages.

15                 But in the future since that day of that

16  verdict, they had a choice and they made it.  They have to live

17  with it.  They chose to use the feature.  They chose to

18  continue to use the feature.  That is where they lived, and

19  they have got to pay for it.  The point they are trying to make

20  now is because we have a non-infringing alternative, we would

21  like to eat our cake and have it too.  We would like to have a

22  lower royalty, so if we chose to go back to that, we would have

23  a lower royalty.  And we want to use our design-arounds to

24  argue that is why we get to go over there.

25                 But the reality is, if you have a design-around,

1  get to it.  The rate should be higher.  If you don't have a

2  design-around, the rate should be higher because you can't get

3  off -- avoid this technology.  And I think the reason why that

4  position is different than it is for the past, is, again,

5  because someone in the past didn't have the choice to change

6  their behavior.  Someone now does.

7           And so the scenario if you were in a true

8  negotiation with Mr. Larson and Apple sit down at a table and

9  they talk about this, and Apple says it is going to take me a

10  year to get off of your feature but I'm going to get off your

11  feature, I would assume that Mr. Larson would say you are going

12  to pay for that year you are on my feature, and I'm not going

13  to get you -- you are not going to get off easy because you

14  couldn't get off early.  You have got to pay for using the

15  feature.  You have to pay what other people have paid.  That is

16  where it goes back to the fundamental fairness issue.

17           So, Your Honor, I have got some cases here.  I

18  believe many of these are from some of your cases, Your Honor:

19           It is wrong as a matter of law to claim that

20  reasonable royalty damages are capped at the cost of

21  implementing the cheapest available acceptable non-infringing

22  alternative.

23           That is in the DataTreasury case.  I believe

24  that one was Folsom.

25           The next one, Affinity Labs:  It is hard to

1   predict the exact duration of Apple's ongoing infringement.

2   The fact that Apple may be able to quickly cease their

3   infringing conduct, actually supports the imposition of a

4   higher enhancement.  A higher ongoing royalty will not be

5   especially harmful if Apple can quickly be free to the

6   obligation to pay it.

7              Then I have one more, Your Honor.  It is from

8   Affinity as well:  On the other hand, should Apple choose to

9   continue its ongoing infringement for the life of the patents

10  despite the alleged availability of the non-infringing

11  alternatives, its culpability level would be high, which would

12  support a higher enhancement.

13             Your Honor, the reason I kind of harp on this is

14  because it does sound a little odd compared to the past

15  hypothetical negotiations.  But like I said, the reality is you

16  have the choice now.

17             We are not in the time of, gosh, if I only knew

18  back then, I would do something different.  You know now, and

19  you can do something different.  If you want to, you can do it.

20  Otherwise, you have to pay.

21             So with that, Your Honor, the request that

22  VirnetX has in this case is that the royalty rate be 1.52

23  percent for products past the verdict.  That comes out to,

24  based on an average selling price of the smallest saleable unit

25  of the iOS devices, it comes out to $6.49 a device for iOS, and

1  it comes out to 44 cents per Mac computer.

2              Now, Your Honor, I gave you this other slide,

3  the next slide in your deck, in case you wanted to do the

4  arithmetic, here this is the average price.  It is 4 dollars --

5  427 dollars for each iOS device is the average weighted

6  smallest saleable unit, and 29 dollars for each Mac computer.

7              I gave that to Your Honor in case -- obviously,

8  if you decided to go with a different rate, the 1.3 or some

9  other rate, you have got this data to work upon if Your Honor

10  was interested in applying a cash price instead of a percentage

11  price.

12             I have got one more thing.  I want to show you

13  this quote, Your Honor.  I think this is important.  It is from

14  Your Honor's ruling -- I read it just -- I guess it was two

15  months ago:  The Court must consider the change in the legal

16  relationship between the parties to avoid incentivizing

17  defendants to fight each patent infringement case to the bitter

18  end, because without consideration to the changed legal status,

19  there is essentially no downside to losing.

20             And, Your Honor, that is what I am saying is

21  happening here.  They told the jury one thing.  They got a

22  royalty rate -- and I'm not being negative about that royalty

23  rate.  I'm just saying they got the royalty rate they did,

24  which was much lower than we proposed as a royalty in the case,

25  and they did it based on misinformation.  And to allow them to

1  walk away with that same rate, is a scenario they get to walk

2  away in a better position than anybody else was.

3              And they did it because they fought to the

4  bitter end, and they are going to fight to the bitter end.  And

5  what is going to keep them from going back off these

6  non-infringing alternatives?

7              Your Honor, that is the majority of my argument.

8  I do have one thing I want to refer to real quickly because I

9  believe it will come up.  Apple argues that the jury must have

10 stacked the royalty in this case -- or actually they don't

11 argue that.  They say that Vellturo suggested -- their expert

12 suggested his royalties would be stacked.  So for VPN on

13 Demand, it is one royalty; for FaceTime it is another.  And in

14 some cases those stacked on top of one another.

15             So they are arguing that when one of their

16 non-infringing alternatives gets implemented, that they should

17 get the rate cut.

18             And I bring that up, Your Honor, because it is

19 very important.  The rate that the parties agreed to in this

20 case is based on Mr. Weinstein's analysis.  So the .52 percent

21 is based on taking Mr. Weinstein's number and applying it to

22 the jury verdict.  And that is where the .52 percent comes

23 from.  It is not from taking Apple's expert, whose analysis was

24 much different.

25             Both parties agree on the .52 percent.  The

1  reason why that is important is Mr. Weinstein did not stack the

2  royalties.  Mr. Weinstein conservatively in this case applied a

3  rate that said whether it is one feature or two, you are going

4  to pay the full rate.  That is what Mr. Weinstein did.

5              And since we are talking about Mr. Weinstein's

6  rate, that is what should apply.  It should not be a scenario

7  where you get to pick and choose and cut the rate in half just

8  because you took one feature out or another, especially given

9  the fact that we are all starting from Mr. Weinstein's analysis

10  in this scenario we are talking about.

11             It was the one thing that Mr. Williams actually

12  agreed to in the very first part where I had my three bullets

13  was that we were starting with that .52 percent.  And that

14  comes from Mr. Weinstein's analysis, and he did not stack.

15             But also just for Your Honor to see, you know,

16  Mr. Weinstein independently proved up his numbers based on

17  either VPN on Demand or FaceTime.  That is what this quote here

18  is.  I think that is on my direct.  If the jury determined that

19  only VPN on Demand infringed, what would the damages be?  The

20  damages would be 703 million dollars.

21             And so, Your Honor, that number is the number

22  minus three million dollars in damages for the Mac operating

23  system products because they didn't have VPN on Demand in them.

24             My point in showing you that is to say our total

25  ask was supported by either feature.  It was not a stacking of

1   the features in order to get to that amount.  So it is

2   important when they argued we should cut the rate in half

3   whenever the -- when one non-infringing alternative may have

4   been implemented we should cut the rate in half, that is

5   inappropriate based on the way the analysis was done in this

6   case.

7                   And more importantly, Mr. Vellturo agreed, he

8   says:  It is entirely unclear whether the jury applied an

9   implicit or explicit royalty rate for both the 504 and 211 or

10  the 135 and the 151, what it viewed as the smallest saleable

11  unit corresponding to each product or how it computed damages.

12                  And the point of this quote is that Mr. Vellturo

13  said he has no idea how the jury computed it, but we are all

14  relying on Mr. Weinstein's analysis to get to our number.  And

15  more importantly, Your Honor, is that any doubts with regards

16  to whether or not there was stacking here -- any doubts

17  regarding the ongoing royalty amount should be resolved against

18  the infringer.

19                  Apple is the infringer in this case.  Their own

20  expert can't say the jury is stacked, and that should weigh in

21  favor of VirnetX because VirnetX is the analysis we are all

22  using.  It wasn't stacked.  And that is the reason why we think

23  it is not appropriate to cut it.

24                  But even if Your Honor was to cut it based on a

25  scenario where Apple designed around one feature versus

1  another, I would tell Your Honor, the jury trial did not -- it

2  was not a 100 percent of the products do both features, which

3  means a 50 percent cut when you take a feature out, is

4  inappropriate.

5           A large portion of that model or the models in

6  the case were VPN on Demand phones like an old 3G or 3GS, these

7  are devices that didn't have FaceTime.  So, therefore, they

8  didn't get hit with two royalties.  So a .52 percent cut in

9  half, that is just mathematically wrong to cut that rate in

10  half in order to get to a one-feature royalty rate.

11           So with that, Your Honor, I will go ahead and

12  concede the floor to Mr. Williams.  Thank you, Your Honor.

13           THE COURT:  Thank you.

14           MR. WILLIAMS:  Your Honor, let me start with a

15  point that we started this hearing off on, and that is, what

16  would be appropriately included?  I think the reason that we

17  are arguing about what should be included in a reasonable

18  royalty award in terms of products is because if you look at

19  what VirnetX is asking for, the way they frame it is they say

20  essentially -- and this is not a direct quote from their

21  papers -- but they say, essentially, anything running an iOS

22  3.0 operating system or later.

23           And the effect of that, of course, is there is

24  no stopping point to the point that it would even include the

25  products that have been released today and would, perhaps,

1  extend the products that are released next year and on and on.

2                What we are trying to do is say let's put a stop

3  at some point on this, all right?  Let's define specifically

4  what is there.  Let's not assume everything is going to go

5  forward in the future infringing because the second point I

6  want to make is the effect of what they are trying to do is

7  shift to Apple a burden of showing non-infringement of some new

8  design.

9                And we know from the case law that even in the

10 ongoing royalty context, that is inappropriate.  The burden is

11 on and remains on the patentee to show infringement.

12               So I believe that the parties can work this out,

13 and we will be able to submit something to the Court in terms

14 of what products will be included.  I truly believe we will be

15 able to do that.  So I think it is going to become a non-issue,

16 but I just wanted to point out to you why I believe, in fact,

17 there is an issue; and that is because of their complete

18 open-endedness in terms of what they are trying to incorporate.

19               Okay.  Go ahead.

20               Now, as I see it here, there are two basic

21 issues that need to be addressed.  And one is -- well, let me

22 first say that the parties agree on two points.  The two points

23 they agree on for sure explicitly from their papers is that a

24 hypothetical negotiation would have taken place March 1st of

25 2013.  That is the day after the judgment was entered.

1              And that hypothetical negotiation would have

2  been conducted to determine what would be the royalty going

3  forward from the date of the judgment.

4              The second thing that we agree on explicitly is

5  that what you look at -- the focus on that analysis is on

6  changed circumstances.  So you would look at what new evidence,

7  for example, would tend to push up or push down the royalty

8  that the jury found because the case law tells us that what the

9  jury found is a good starting point to decide what the

10  post-judgment ongoing royalty should be.

11              Your Honor, I don't know if this mic is cutting

12  out.  The speaker seems to be cutting in and out on me.

13              THE COURT:  It does.  You might just try

14  adjusting it.  Maybe you are a little too close to it.

15  Sometimes it does that.

16              MR. WILLIAMS:  All right.  So, again, we agree

17  the reasonable royalty date is March 1st of this year.  We

18  agree you focus on the changed circumstances; and that should

19  be determining -- those are the factors to consider in

20  determining what would be the reasonable royalty, and that is

21  the changed circumstances.  So I think that is the best place

22  to start.

23              Now, there are going to be two issues I want to

24  talk about, first of all.  I want to talk about what

25  circumstances, in fact, were representing changes as of March

1  the 1st of this year and in particular things that the jury did

2  not consider that are rolled up into its determination that .52

3  percent effectively was the rate.

4            And the second thing I want to focus on is this

5  notion that because Apple was adjudged to infringe these two

6  features, that they should thereafter be automatically, and I

7  believe the word that he used was absolutely willful.  So that

8  is the second issue that I want to touch on.

9            In fact, I think the issue of Apple's

10  willfulness, if any willfulness is involved, is another one of

11  these possible changed circumstances that should be taken into

12  account in determining what the ongoing royalty post-judgment

13  should be.

14            Next slide.

15            So as I said, the parties agree on the March 1st

16  hypothetical negotiation date; and that you must account for

17  and take into account the changed circumstances.  In fact, that

18  is the focus of this hypothetical negotiation.

19            So I think the place I want to start is let's

20  look at that date.  What circumstances, in fact, have changed

21  relative to a prior negotiation and in particular focusing on

22  evidence that the jury did not have when it decided effectively

23  that the rate for two features infringing four patents was .52

24  percent.

25            Now, just as an aside, the .52 percent is not

1    Mr. Weinstein's analysis.  That is what comes from the jury

2    deciding that two features infringed four patents.  That is

3    what that number comes from, in fact.

4              So at the time, March 1st of 2013, at that time

5    Apple had signed an agreement with Akamai to provide relay

6    servers, services for 100 percent of the FaceTime calls because

7    if you will remember -- and the last bullet point goes to this,

8    and the Court even incorporated it in its final judgment, that

9    VirnetX concedes that this feature of FaceTime does not

10   infringe if calls are routed through a relay server because

11   there is no direct communication through a relay server.

12             So Apple on March 1st of this year had signed an

13   agreement with Akamai to provide relay services for 100 percent

14   of FaceTime calls.

15             Apple had developed the code which was going to

16   be run on the servers that were required to implement this 100

17   percent relayed FaceTime calls as of this March 1st date.  That

18   code was up and running at that time.

19             Akamai was in the process of staging this

20   additional server capacity to Apple as of March 1st.  So the

21   number was going up from whatever calls were relayed.  It was

22   escalating toward 100 percent as of March 1st.

23             As of April the 5th of this year, Apple had 100

24   percent of FaceTime calls went through the relays.  So as of

25   March 1st there was major changed circumstance relative to the

 1  prior situation; and that is, that Apple was in a month and

 2  five days of no further -- admittedly, no further infringement

 3  of two of the four patents.  So one of the two features was

 4  dropping off the scene within a month.

 5            THE COURT:  Let me ask you this, Mr. Williams:

 6  What is your response it may be dropping off the scene at what

 7  cost to Apple in your response to plaintiff's Counsel's

 8  arguments about the differences between the non-infringing use

 9  testimony at trial, the injunction, and later -- and what,

10  according to plaintiff, the discovery is showing is an

11  increasing monthly cost?

12            MR. WILLIAMS:  Well, of course, everything that

13  he gave falls within -- along those lines falls into one of two

14  categories:  Pure speculation, that is, what it is going to be

15  many years down the line.  And, two, projections, either

16  projections by Apple or Akamai.  But, again, what is going to

17  happen in the future?  And we don't know for sure what is going

18  to happen in the future.  We really don't.

19            I will say this; that there are certainly

20  possibilities that Apple will be able to decrease its reliance

21  upon relay servers without infringing.  So I want to make sure

22  that what we are clear on or the Court is clear on here is just

23  because a call may not be relayed -- let me make sure I say

24  this right.

25            To make sure that a call -- just because a call

1  is not relayed, does not mean it is infringing.  I hope I made

2  that right.

3          THE COURT:  So you are saying there may be

4  another non-infringing alternative that you are considering for

5  the future other than the relay non-infringing alternative?

6          MR. WILLIAMS:  Absolutely.  And I will represent

7  to the Court that obviously, I mean, Apple continues to

8  redesign and change features in its phone.  And it does not

9  exclude VPN on Demand or FaceTime.  So I just want to make sure

10 that that is clear; that there is not going to be a going back,

11 if you will, to what was adjudged infringement.

12          THE COURT:  Do you agree, though -- I mean, I

13 believe those were Apple documents that show this initial

14 contract for 50 million dollars for 20 months.  I believe that

15 is what it was.  So about two-and-a-half million a month; is

16 that correct?

17          MR. WILLIAMS:  Your Honor, I had done a

18 different calculation.  I thought it was lower than that, but I

19 don't know for sure whether that is correct or not.  By my

20 calculation it was somewhat lower than that, but I am not going

21 to stand up here and quibble at that point.  But I will say

22 that let's assume it is the 2.4 million a month, they want a

23 million dollars a day.

24          So the 2.4 million a month would be significant

25 downward pressure on a royalty of one million dollars per

1  day.

2              THE COURT:  So you are saying that based on the

3  volume at their 1.5 percent, that would relate to one million

4  dollars per day.

5              MR. WILLIAMS:  Roughly.  And the reason I say

6  that is because -- I have a slide up here right now -- is the

7  Court awarded a post-verdict pre-judgment royalty of

8  approximately $300,000 a day.  I think it is slightly more than

9  that, actually three thirty or something to that effect.  They

10 essentially want that trebled.  I think it was three thirty if

11 I am not mistaken, but the record will reflect exactly what

12 that was.

13             They want that trebled.  So they are looking for

14 a million dollars a day.  And what we would submit is that

15 let's assume the 2.4.  I think it is actually lower.  But let's

16 assume 2.4.  That represents a significant down pressure --

17 downward pressure under a George-Pacific analysis, on a royalty

18 as compared to one million dollars per day.

19             And, again, we are looking at March 1st of 2013,

20 what are the circumstances?  So Apple would have had that

21 information.

22             Now, if Apple didn't have the information

23 before, sobeit.  The relevant inquiry that both parties agree

24 to is that March 1st is the date.  March 1st is the date that

25 we look at.

1            So let's assume 2.4.  That represents a
2   significant down pressure and in fact --

3            THE COURT:  Let me ask you, though, to comment
4   on what they -- and I thought that graph that they showed
5   through 2014, was that an Apple graph or was that a plaintiff's
6   graph?

7            MR. WILLIAMS:  I don't know, Your Honor.  I
8   hadn't seen it.

9            MR. CASSADY:  Apple.  Apple, Your Honor.

10            THE COURT:  I would like you to respond to that
11  graph.

12            MR. WILLIAMS:  Again, like I said, it falls into
13  one of two things, either speculation or projection.  It is one
14  or the other.

15            THE COURT:  Don't you think projections have
16  some relevance to the Court, I mean, especially if they are
17  Apple's projections?

18            MR. WILLIAMS:  Oh, I certainly think they have
19  some relevance; but the question is would Apple continue along,
20  truly, along that path if they saw -- if management saw that
21  and said we are not going that route.  We will do another
22  non-infringing route.  Right?  So that assumes there is no
23  other change.  Like I said, I can tell the Court now that they
24  are, in fact, looking at other alternatives.

25            THE COURT:  Other than them looking at it, do

1  you have any evidence of any other non-infringing alternative

2  at this time other than the relay?

3              MR. WILLIAMS:  None that I can submit to the

4  Court, Your Honor.

5              THE COURT:  Okay.  Thank you.

6              Go ahead.

7              MR. WILLIAMS:  Can we go back to slide -- about

8  3, I think it is.  This next slide then.

9              So the circumstances as of March 1st --

10             Is the next slide, Matt?  Back me up one slide.

11 There we go.  Yeah, this is where we were.

12             As of March 1st the FaceTime design-around, this

13 would have been the situation.  They were asking for a million

14 dollars a day.  The post-verdict amount award was I think

15 actually 330,000.  And the payments to Akamai which they have

16 shown to be over the next 21 months, which they say is 2.4, is

17 a fraction of either one of those numbers.

18             So that fact alone, that change alone would have

19 represented downward pressure on the ongoing royalty.  And,

20 again, Apple is working toward its VPN on Demand design-around

21 in the fall.  And they knew that as of March 1st.  In fact,

22 both parties did.

23             Go ahead, Matt.

24             Another changed circumstance as of March 1st,

25 and that has to do with the reexamination.  And he said I was

1   going to raise it, and I absolutely am going to raise it

2   because that is a changed circumstance that the jury was

3   unaware of.

4              Relative to the first hypothetical negotiation,

5   as of March 1st of this year the PTO had rejected all claims.

6   In fact, those reexaminations at this point, two of them the

7   prosecution has been closed and the other two are about to be

8   closed.  So we are about to start the appeal route in the

9   Patent Office on those right now.  So Apple would have known

10  that and so would VirnetX.  So that fact would also represent a

11  changed circumstance which the jury did not have in their

12  pocket.

13             And Apple has also filed some IPR's, which are

14  interparties reviews, on those patents as well.

15             So go ahead, Matt.

16             This is very briefly -- this is the status --

17  well, I think we have submitted this to the Court for its

18  edification and information, but this is the reexamination

19  status which shows where things stand on those cases right now.

20             So the changed circumstances represent the

21  design-around activity and the recognition that their claims,

22  in fact, have all been rejected.  Not just asserted claims on

23  those four patents but all claims on those four patents.

24             Now, let me take an aside for a minute, a

25  tangent.  That is, Mr. Cassady says that we have run into some

1  problems in trying to implement some design-arounds.  And let's

2  throw in this business of VPN on Demand and FaceTime with the

3  relay servers.

4           The reason that we have run into problems, Your

5  Honor, is because we are trying to design away from what was

6  adjudged as infringing.  If we were standing on our hands and

7  saying, VirnetX, we don't care about this jury verdict, we are

8  going to continue on -- like in the Affinity Labs, the

9  quotation that he read for us awhile ago.  That is, if the

10  defendant there chose to continue infringing for the life of

11  the patents, maybe that is an indication of willful

12  infringement.

13           The problems we ran into were encountered why?

14  Because we were moving.  Did we encounter other problems and

15  issues.  We have encountered issues in trying to implement

16  things.  But we have cleared the hurdles on the FaceTime.  And

17  Apple intends to clear that hurdle this fall on the VPN on

18  Demand.

19           But the fact of the matter is we have continued

20  to move and we have been moving, which represents truly an

21  effort to get away from what was adjudged to be infringing.

22  And I submit to the Court that suggests, at least as far as

23  those factors are concerned, Apple is not a willful infringer;

24  and that the rate that the jury itself came up with -- not Mr.

25  Weinstein -- should be continued on the ongoing royalty basis

1  subject to potentially downward pressure and subject to the

2  implementation of the design-around of the FaceTime product.

3           So here is basically the second position, the

4  second point I want to argue.  That is, whether it is

5  appropriate once a defendant has been adjudged to be

6  infringing, he should be automatically or absolutely willful

7  from any infringement thereon.

8           I submit to this Court that the proper way to

9  view that is that any continued activity should be viewed in

10  its totality to determine whether any continued activity and to

11  what extent makes that infringer a willful -- that adjudged

12  infringer, a willful infringer.

13           And I am quoting here from the Presidio

14  Components case in the Southern District of California.  In

15  this case, Your Honor, you determined that no injunction was

16  appropriate in this case.  VirnetX failed to show entitlement

17  to injunction.  And here is what this Court said in that

18  scenario:

19           Where an injunction is found to be improper --

20  as is true in our case and was true in the Presidio case --

21  quote, the Court is hard-pressed to find in what material

22  respect the situation is different than it was at trial.  In

23  determining the reasonable royalty rate, both parties assumed

24  the patent at issue was valid and infringed.

25           So, in fact, that is an assumption that is not

1    uncertain.  At the first reasonable royalty the parties sat

2    there and hypothetically Apple would have known it was

3    infringing valid patents and that it, in fact, needed a

4    license.

5              So the Fresenius case that I quote here is one

6    that says:  The jury award is the significant starting point in

7    setting the ongoing royalty rate, absent changed circumstances.

8    And that is why we focused on the changed circumstances.

9              Next slide.

10             Now, VirnetX argues that this assumption of

11   infringement at the first hypothetical negotiation is somehow

12   strengthened or reinforced by the jury verdict.  But that

13   is -- if you think about what the law is on that, that is just

14   an incorrect statement of the law because infringement at that

15   hypothetical negotiation is, in fact, assumed without

16   uncertainty.

17             The parties are not at liberty -- in fact, the

18   expert sat on the stand and told the jury this.  So the jury

19   made its determination under the assumption that Apple was, in

20   fact, infringing; and valid patents.

21             So that finding does not change the relative

22   positions of the parties with respect to a hypothetical

23   negotiation because that assumption was already being made and

24   not on some -- there is not some sliding scale, if you will, of

25   an assumption that you are infringing a valid patent.  There is

1  not a weak assumption and then a stronger assumption and so on

2  and so forth.

3           Now, we can certainly look at cases where

4  continued activity after infringement, resulted in an enhanced

5  award.  And I do believe that the Court should look at all of

6  the circumstances to determine whether infringement is willful.

7  But I do not believe it is a correct application of the law to

8  say once you are adjudged, that somehow strengthens this

9  assumption of infringement in a hypothetical negotiation such

10 that you are absolutely willful.

11          But even if you apply their reasoning, if you

12 apply their reasoning, then the finding that the asserted

13 claims by the Patent Office are all invalid, would likewise

14 undermine the presumption of validity.

15          So if these activities by the jury somehow

16 heighten an assumption of infringement, then it would work the

17 other way as well; that is, the subsequent finding by the

18 Patent Office that the claims are invalid would undermine the

19 presumption of validity.

20          I would submit that is not really the way that

21 the hypothetical negotiation under George-Pacific should be

22 structured.

23          Okay.  Next slide.

24          Now, let's talk about what VirnetX has done.  So

25 what we have shown here is that all of the relevant factors

1  basically point to downward pressure on the starting point or

2  the reasonably royalty.

3           Now, as you are going to see, we are not

4  suggesting that the Court start at a lower royalty.  We are

5  saying the .52 is effectively -- that is the effective rate the

6  jury itself awarded, so as the case says, we will start there.

7  And we are suggesting that would be the appropriate rate from

8  March 1st to April 5th of this year.  And I will get into that

9  in more detail in just a moment.

10          But VirnetX's methodology is not what

11  George-Pacific would dictate.  They suggest by submitting a

12  declaration of Mr. Weinstein, that he has done a George-Pacific

13  analysis.  But, in fact, it admits that what it has done -- and

14  we saw it in the slides today -- is they averaged just a simple

15  averaging of selected VirnetX licenses.  Not all of VirnetX's

16  licenses but selected VirnetX licenses.

17          In particular, we didn't hear anything about

18  Microsoft in the opening argument.  Why?  Because Microsoft

19  paid a much, much lower rate in similar circumstances to what

20  Apple was in the post-judgment phase.

21          So a simple unweighted averaging of these rates

22  for license amounts that are orders of magnitude --

23          THE COURT:  What was the Microsoft rate?

24          MR. WILLIAMS:  The Microsoft rate was disputed

25  between the parties; but according to Mr. Weinstein, their

1  expert, it was .24 percent.

2              Now, Mr. Vellturo -- and he explains this

3  somewhat in his declaration that we submitted in connection

4  with these papers, and I submit that gives a great synopsis of

5  this; but Mr. Vellturo said, well, the problem with Mr.

6  Weinstein's analysis is he did it on sort of worldwide basis;

7  whereas, it is appropriately .115 -- I think was the number

8  .115 percent was Microsoft.  A large company had been adjudged

9  an infringer.  In fact, negotiated a license.  And those were

10  the terms of the license.

11             So a simply averaging -- unweighted averaging of

12  these small amounts that are orders -- like I said orders of

13  magnitude less than the amount that Apple would pay, can't be a

14  correct tie to what the damages or reasonable royalty, in fact,

15  ought to be.

16             Now, Mr. Cassady handed up to you what the rate

17  was for the most recent license with Avaya.  And I think we

18  have seen their calculation on their slides as to what the --

19  basically, their average of these other rates were.  And it is

20  in the papers.  Each of these license rates I think is spelled

21  out in the papers, if I am not mistaken.

22             THE COURT:  What is your response to the Avaya

23  license?

24             MR. WILLIAMS:  My response to that license and

25  all license -- let me make it specifically as to Avaya at this

1 point.

2           The Avaya license is set up such that I would

3 say -- and I think future is going to bear me out on this

4 one -- it is highly unlikely VirnetX will ever collect a future

5 royalty under that license beyond -- any future royalty.  They

6 took some upfront money.

7           The reason I say that is because it is set up

8 very similarly -- well, first of all, it allows a significant

9 percentage -- I will just leave it at that -- a significant

10 percentage of increase every single year before there is any

11 royalty due at all.  And by that I mean increase in sales, a

12 significant increase in growth; and there is still no royalty

13 due.

14           It is not so different from the other licenses,

15 and I have got numbers that VirnetX has reported to us for

16 ongoing royalties that they have collected under all these

17 licenses, and I would very much like to pass that up to the

18 Court.  These are the numbers that they have reported to us

19 that they have collected ongoing royalties.  I will show it to

20 them first.

21           THE COURT:  All right.

22           (Pause in proceedings.)

23           (Shown to Counsel.  Shown to Court.)

24           THE COURT:  Also, just for the record, I am

25 going to mark but have it sealed, the document Mr. Cassady

1  handed up earlier.  I'm going to mark it as Avaya License

2  Plaintiff's Exhibit No. 1, and then I will mark yours as

3  Defendant's Exhibit No. 2.

4              Excuse me, are these dollar amounts that you

5  have handed me up?

6              MR. WILLIAMS:  Yes, sir.  And those came from

7  reports that VirnetX has produced to us that show the

8  reasonable royalties they have received.  If the Court would

9  like, I can post to the Court copies of those reports.  But

10 that is the numbers that came from the reports.

11             THE COURT:  That's all right.

12             MR. WILLIAMS:  So if you look at those numbers,

13 Your Honor, you'd say, should I really be considering these

14 licenses for any of the reasons that Mr. Weinstein wants me to;

15 commercial success -- I mean, we can look at those numbers --

16 comparable to Apple.  I think it has been made of record in

17 this case what the Microsoft license was and the amount of

18 money involved.

19             These are -- let's just leave it at quarters of

20 magnitude smaller than these licenses.  Not only that, these

21 licenses were considered by the jury when they decided to award

22 effectively .52 percent.

23             So if you look at what VirnetX is doing and what

24 Weinstein is doing, he is averaging and saying this average is

25 the rate the parties would have agreed to on March the 1st.  In

1 effect what he is saying is the jury got it wrong because he is

2 now saying that that average is what the parties would have

3 agreed to on March 1st.  He didn't even submit that.  He

4 submitted a one-percent rate at trial, and the jury rejected

5 that.

6            So he is simply disagreeing with what the jury

7 found to be the reasonable royalty in submitting his average,

8 and I submit that he --

9            THE COURT:  What is your response to Mr.

10 Cassady's argument that the jury made that award because it

11 was -- certain things were misrepresented such as the five

12 million dollar cost for a design-around when it is, according

13 to Mr. Cassady, at least 20 and moving skyward?

14            MR. WILLIAMS:  Well, I would say two things.

15 One, he has no idea what the jury based its award on.  But one

16 thing we can know is the jury didn't take that.  They didn't

17 accept either parties' numbers.  But he doesn't know.  I mean,

18 this is pure speculation.  I think I have heard it called rank

19 speculation.  There is nothing worse a speculation as rank

20 speculation.

21            But that is what it is, it is speculation.  We

22 can sit up here and speculate until the cows come home; and

23 that is not going to help us decide what the royalty should be

24 in this case.

25            What we do know is the jury awarded -- they were

1  instructed to award damages for the infringements.  They found

2  two infringements; FaceTime and VPN on Demand of four patents.

3  And they awarded effectively a .52 percent royalty.  I will

4  come to this halfing in just a moment and respond to Mr.

5  Cassady.

6              But that is my response.  We don't know what the

7  jury did.  All we know is what they -- I'm sorry, we don't know

8  what they thought.  What we know is what they did.  And what --

9  speculating on what they thought is not going to help us move

10  down the road in determining what the royalty should be here.

11             The Siemens and Avaya licenses, I will grant

12  you, were not before the jury, so they were not taken into

13  account.  But they are no different in terms of the royalty

14  rate, so they are in the same range of royalty rates that the

15  jury, in fact, did have with these other VirnetX licenses.

16             There is no reason to give those licenses any

17  greater weight in this post-judgment phase because that

18  information was considered by the jury in determining the .52

19  in the first place.

20             Go ahead, Matt.

21             So what would be a basis then for trebling the

22  jury's effective rate, which is exactly what VirnetX wants?

23  What they rely on is Apple being a willful infringer because we

24  were adjudged to be infringing.  But willfulness -- whether

25  Apple is willful, like I said in the very beginning, is really

1   simply one circumstance to take into account or one

2   consideration to make in deciding what the running royalty,

3   ongoing royalty should be.

4               If you look at all of the evidence, the evidence

5   of Apple's attempts and successes to design around and

6   reexaminations and all of the efforts that Apple has put

7   forward, I will submit to you that they are, in fact, not

8   acting as a willful infringer would act.  And there is no

9   greater assumption of infringement after the jury has spoken

10  than there would be at a George-Pacific hypothetical

11  negotiation.

12              So if you look at the relevant factors, they

13  suggest, in fact, a downward pressure on the jury's effective

14  rate at the post-judgment hypothetical negotiation because

15  VirnetX would be sitting there knowing they are about to lose

16  one feature and two patents in the negotiation, so they would

17  take what they could get.

18              Now, Mr. Cassady stood up here and said I think

19  VirnetX would do this.  I am here to say that I think VirnetX

20  under George-Pacific tells us what they would do.  And, that

21  is, given a short extent of time, they would take a lower rate.

22  That is what George-Pacific says they would do.

23              The actual implementation and the viability of

24  that FaceTime design-around greatly reduces their negotiating

25  power.  Under George-Pacific if the term of the license is

1  short, that is downward pressure, not upward pressure on the

2  royalty rate.  That is what George-Pacific says they will do.

3           Go ahead.

4           Now, this goes -- I want to touch a little bit

5  on what products ought to be included in any reasonable

6  royalty.  And so this first one basically goes to the question

7  of getting into arguments about what is no more than colorably

8  different.

9           All of those products that were not subject to

10 the first case -- in fact, some of the products that were in

11 the first case they have included in the follow-on case.  But

12 certainly all of the products that were not included in the

13 first case, VirnetX has voluntarily injected into the second

14 case.  And I submit that those products ought to be looked at

15 and thoroughly, fully vetted under that scenario.

16          There are changes coming on this iOS 7 that are

17 currently being tested.  Once things have been provided out and

18 commercialized -- and this is the way the parties have operated

19 from day one, I believe, in the discovery of this case -- we

20 will be producing that source code.  They have already seen the

21 relay-only source code for the FaceTime.  They have seen that

22 and had access to that.

23          They voluntarily chose to pursue this remedy in

24 this follow-on case, and Apple is simply suggesting that the

25 Court ought to let that case play out and not include products

1  in this case that have not been adjudged to have been

2  infringing, is basically what the Court did in the Fractus

3  case.

4           What that would enable us to do, hopefully, is

5  avoid satellite litigation.  Like I said in the beginning, I

6  believe and I am hopeful that the parties will be able to agree

7  on what products ought to, in fact, be included within a

8  reasonable royalty award.

9           Go ahead, Matt.

10           So the ongoing rate, whatever it is, should

11  reflect Apple's complete design-around of the FaceTime patents

12  as of April the 5th.  There is no justification for continuing

13  a royalty due to FaceTime after that day.  Like I said, they

14  have had that code.  They have had the opportunities to inspect

15  it if they believed it is somehow non-infringing -- I mean,

16  infringing.  They could have spoken up.  Obviously, they

17  conceded throughout the entire first case that calls made

18  through the relays were not infringing.

19           There cannot be an economic justification for

20  the notion that Apple would continue to pay the same rate for

21  half the patents and half the features after April the 5th.

22  You look at the George-Pacific factors.  It tells us explicitly

23  what the patentee will do.  He will take a lower rate when

24  fewer features and fewer patents are involved.  That is the

25  commercial reality of the situation.

1              The ongoing rate as of April 5th then should be

2    no more than half the rate assessed prior to April 5th.  Now,

3    it should be no more than that.  There were products, in fact,

4    included in -- as FaceTime.  Let's say the Mac computers, for

5    example, that were only accused under the FaceTime feature but

6    not under the VPN on Demand.  So there should be no royalty

7    whatsoever due on any Mac computers following April 5th of

8    2013.

9              Go ahead, Matt.

10             So in conclusion, the period of March 1st until

11   April 5th because of what the jury did, the Court should impose

12   the same rate awarded by the jury because the only

13   circumstances that have changed since the original hypothetical

14   negotiation, favor Apple.  The FaceTime design-around, the

15   efforts in designing around for VPN on Demand, which are

16   coming, and the reexamination success.

17             Beginning April 5th that rate should be no more

18   than one-half because FaceTime is admittedly not infringing

19   beyond that date.

20             If the Court were, in fact, inclined to increase

21   the rate because Apple has been an adjudged infringer rather

22   than an assumed infringer -- and I, again, submit under the law

23   there is no distinction between the two for George-Pacific

24   hypothetical negotiation reasons -- the adjustment should be a

25   small one and reflective of Apple's ability to design around

1   the patents.

2                    Mr. Cassady stood up here awhile ago and argued

3   that, well, you know, if they can design around, that justifies

4   a higher rate.  That is directly contrary to what

5   George-Pacific tells us.  The presence of a design-around, in

6   fact, suggests the rate should be lower because otherwise the

7   patentee runs the risk that this is going to be the

8   design-around instead of taking a license and bearing the

9   royalty.

10                    I do want to address, because I think it is

11  important, I suggested earlier that Apple continues to look at

12  other designs not only with respect to FaceTime and VPN on

13  Demand but its other products as well.  I would say nothing is

14  permanent, Your Honor.  I think that goes without saying; that

15  because something is temporary does not mean that they are

16  going back to what was adjudged infringing.  And I can tell you

17  that Apple has no intention of going back to what was adjudged

18  infringing.  That does not mean we are not testing other

19  things, other ways to design around.  Quite likely we will

20  implement some of those things in the future.

21                    So all of those factors taken into account, we

22  believe that the rate that the Court should award in an ongoing

23  royalty would be .52 percent for the time from March 1st to

24  April 5th.  And thereafter it should be .2 percent.  The

25  parties I think will attempt and hopefully be successful in

1    deciding what products to submit to the Court on that.

2              Thank you, Your Honor.

3              THE COURT:  Thank you, Mr. Williams.

4              All right.  Any rebuttal?

5              MR. CASSADY:  Your Honor, I will be short.

6              If I may approach, Your Honor, I have got the

7    document that we relied on for the bandwidth projections, and

8    it has got Apple's Bates number.  I wanted to give it to you

9    now.

10             In full disclosure, Your Honor, I haven't taken

11   a deposition on these projections, so I know it has been

12   produced based on a request I made months ago; and they gave it

13   to us in the last two weeks.  But the point is, this is either

14   Akamai or it is Apple.  And Akamai is their agent with regards

15   to the relay.  As far as I am concerned, it is Apple.  But I

16   wanted to make sure in full disclosure purpose to Your Honor

17   that it may not be Apple itself who wrote it but Apple and its

18   agent Akamai is writing this.

19             So if I could approach, Your Honor?

20             THE COURT:  All right.

21             All right.  We will mark this as Plaintiff's

22   Exhibit No. 2 for the hearing.

23             MR. CASSADY:  And then, Your Honor, just a

24   couple of other points.

25             THE COURT:  Let me ask, is there any objection

1  to that?

2              MR. WILLIAMS:  Your Honor, I don't have an

3  objection to putting it in.  What I would ask, though, is that

4  we be given an opportunity to go back to submit a very brief

5  supplement just directly to this one document.  It would be

6  very brief and very quick.

7              THE COURT:  All right.  I will allow you to do

8  that within five days.

9              MR. WILLIAMS:  Thank you.

10             MR. CASSADY:  Your Honor, just so you know, in

11 the right front of that paper is projections -- the projection

12 I was referring to is the very bottom right, 900 gigabits is

13 one of the references there into 2014 like we were discussing.

14             If you look at the very last page, that is the

15 graph that was in my slide.  I want to make sure Your Honor

16 understood what we were relying on.  The very last page is the

17 2014 projections.  There is a little green line at the bottom

18 left that is the capacity they currently have, and they are

19 going to have to increase it if they don't get off this relay

20 method.

21             But the point of all that is whether or not

22 those projections are entirely air-tight or in the ballpark,

23 the reality is that what the jury heard was drastically

24 different than what is the reality.

25             Some of the numbers got thrown out to you that

1    we are asking for a million dollars a day.  I just did a quick

2    number.  What they told the jury was that their design-around

3    was $6,000 a day.  That is what they told this jury, five

4    million dollars for about two years, $6,000 a day.

5              So I wanted to put in perspective that what they

6    told the jury was so drastically different than what the

7    reality was.  That is our point, Your Honor, is that they told

8    the jury a much smaller number.

9              At the end of the day you get one juror who is

10   invaded with thinking this Apple, they are innovative and they

11   can do whatever they need to do and they are telling you it is

12   five million dollars, you know, Apple is a very popular

13   company.  I can see a juror very easily believing that.

14             Am I saying I am clairvoyant and I know they did

15   that, absolutely not, Your Honor.  But the point is this false

16   information through no fault of VirnetX's was put in front of

17   this jury, and I don't think Apple should be able to flaunt the

18   jury system, say what they want in front of the jury, and then

19   come out later with information that now helps them by saying

20   how detrimental the design-around is.

21             Then, finally, Your Honor, what I will say is

22   the royalty rate that all of the parties agree to is .52

23   percent.  I think it is very important to understand that came

24   from Mr. Weinstein's number.

25             The way that the .52 came was you took the 709

1   million from Mr. Weinstein's number, and you got the

2   relationship of that number to the number that the jury gave.

3   That is what we are all here talking about today.  We are not

4   talking about the number as of Vellturo's up to the 368.  We

5   all agreed we are talking about the 709 down to 368, which is

6   about 52 percent.

7            And Mr. Weinstein's analysis was a 1 percent

8   royalty in the case.  So if you go down to 52 percent, you are

9   looking at 52 bases points and .52 percent in a royalty.

10           Why that is important is Mr. Weinstein didn't

11  stack.  Mr. Weinstein didn't -- he conservatively didn't ask

12  for double royalties on these features, and he independently

13  proved up the infringement damages for each feature.

14           And now Apple wants to start at .52 and go down,

15  which I'm not sure I have ever heard another defendant say --

16  Your Honor, you obviously have more experience than I do with

17  what defendants say when it comes to royalty.  Maybe other

18  defendants have said lower.  But it has been pretty

19  well-established law that you take the rate from the jury and

20  go up after verdict.

21           That is what we are asking Your Honor to do is

22  to take the rate the jury gave and go up.  But we are also

23  asking Your Honor to deal with the misinformation that was

24  provided the jury that they can't possibly have understood the

25  misinformation with regards to that relay server and the fact

1  that the design-around for VPN on Demand was supposed to be a

2  matter of two weeks by an engineer.  I believe that was the

3  testimony at trial, two weeks by an engineer.

4             We are months past a verdict.  We are seven

5  updates, seven updates of iOS past the verdict; and they still

6  haven't put out this design-around they keep talking about with

7  regards to VPN on Demand.  If they can't put it out in that

8  amount of time, clearly it is more than two weeks engineering

9  time, part one.  And, part two, why would somebody as of March

10 1st have any understanding that Apple was actually going to

11 design-around when 20 days after making the announcement they

12 said they weren't going to do it anymore and started telling

13 customers, our bad, we are not going to do it?  It is just

14 temporary if we do do it.

15            THE COURT:  Good.  All right.  Thank you.

16            Anything further, Mr. Williams?

17            MR. WILLIAMS:  Very briefly, Your Honor.  I want

18 to address this quote, unquote, misinformation thing.  That is,

19 that was -- to the extent there was any, quote, misinformation

20 given to the jury, they, in fact, addressed that at trial.

21            I don't know if you will recall but they had

22 their guy do -- in fact, they had my witness, as I recall, on

23 cross-examination they led him through and say what if you

24 assume a certain amount of traffic through FaceTime so that

25 amount of relay service would have cost you 720 million

1  dollars; isn't that correct?  That is exactly how they

2  addressed -- they addressed that very issue in trial.

3              So to give the one side of the story and say --

4  speculate as to how that might have skewed something, is to

5  ignore what they, in fact, did at trial and it was addressed

6  that very situation.

7              To speculate that the jury did or did not stack

8  based on what Mr. Weinstein did, George-Pacific tells us how to

9  do this process.  I submit that is what they are ignoring.

10             THE COURT:  All right.  Thank you both very much

11  for your excellent arguments.  I will get you a ruling as soon

12  as I can.

13             We will be adjourned.

14             (Hearing adjourned.)

15                     CERTIFICATION

16

17             I HEREBY CERTIFY that the foregoing is a true

18  and correct transcript from the stenographic notes of the

19  proceedings in the above-entitled matter to the best of my

20  ability.

21
   /s/ Shea Sloan
22  SHEA SLOAN, CSR, RPR
   Official Court Reporter
23  State of Texas No.:  3081
   Expiration Date:  12/31/14
24

25