```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF TEXAS
 2                       TYLER DIVISION

 3   VIRNETX, INC., ET AL            )

 4                                   )    DOCKET NO. 6:10cv417

 5       -vs-                        )
                                          Tyler, Texas
 6                                   )    2:41 p.m.
     APPLE INC.                           September 30, 2016

 7

 8                  TRANSCRIPT OF JURY TRIAL
                      AFTERNOON SESSION
 9       BEFORE THE HONORABLE W. ROBERT SCHROEDER III,
                  UNITED STATES DISTRICT JUDGE
10
                    A P P E A R A N C E S
11
     FOR THE PLAINTIFFS:
12
     MR. BRADLEY W. CALDWELL
13   MR. JASON D. CASSADY
     MR. JOHN AUSTIN CURRY
14   CALDWELL CASSADY & CURRY
     2101 Cedar Springs Rd., Suite 1000
15   Dallas, Texas 75201

16   MR. T. JOHN WARD JR.
     WARD, SMITH & HILL PLLC
17   1507 Bill Owens Parkway
     Longview, Texas 75604
18
     MR. R. CHRISTOPHER BUNT
19   PARKER BUNT & AINSWORTH
     100 East Ferguson, Ste. 1114
20   Tyler, Texas  75702

21
     COURT REPORTER:     MS. SHELLY HOLMES, CSR-TCRR
22                       FEDERAL OFFICIAL COURT REPORTER
                         100 E. Houston Street
23                       Marshall, Texas 75670

24   Proceedings taken by Machine Stenotype; transcript was
     produced by a Computer.
25
```

```
 1    FOR THE DEFENDANT:

 2
      MR. GREGORY S. AROVAS
 3    MR. ROBERT A. APPLEBY
      MS. JEANNE M. HEFFERNAN
 4    MR. JOSEPH A. LOY
      MS. LESLIE M. SCHMIDT
 5    KIRKLAND & ELLIS LLP
      601 Lexington Avenue
 6    New York, New York 10022

 7
      MR. F. CHRISTOPHER MIZZO
 8    KIRKLAND & ELLIS LLP
      655 Fifteenth Street, N.W.
 9    Washington, D.C. 20005

10
      MR. AKSHAY S. DEORAS
11    KIRKLAND & ELLIS LLP
      555 California Street
12    San Francisco, California 94104

13
      MR. MICHAEL E. JONES
14    MR. JOHN F. BUFE
      POTTER MINTON
15    110 North College Avenue, Suite 500
      Tyler, Texas 75702
16

17    MR. JOHN M. DESMARAIS
      MR. MICHAEL P. STADNICK
18    DESMARAIS LLP
      230 Park Avenue
19    New York, New York 10169

20

21

22

23

24

25
```

|    |                                                                          |
|----|--------------------------------------------------------------------------|
| 1  | P R O C E E D I N G S                                                     |
| 2  | (Jury out.)                                                              |
| 3  | COURT SECURITY OFFICER:  All rise.                                        |
| 4  | THE COURT:  Be seated, please.                                           |
| 5  | On the -- the competing proposals on the prior art                       |
| 6  | issue, Mr. Arovas, the one that was submitted on behalf of               |
| 7  | Apple, I'm sort of having a hard time understanding how                   |
| 8  | there's been evidence introduced in -- in the case, testimony            |
| 9  | introduced in the case that relates to that clause or the                |
| 10 | argument that all aspects of the accused features are found              |
| 11 | in the prior art.                                                        |
| 12 | Can you help me with that?                                              |
| 13 | MR. AROVAS:  The attempt in the proposed                                 |
| 14 | instruction was to capture what a practicing the prior art               |
| 15 | defense is, which is to say that the accused product is the              |
| 16 | same as the prior art and then, therefore, it doesn't                    |
| 17 | infringe.  And so that's -- I mean, we don't believe that                |
| 18 | there is evidence they put in that there is a "practicing the            |
| 19 | prior art" defense or that the elements of the product match             |
| 20 | up with the prior art for the relevant elements of the claim.            |
| 21 | But our concern was just to say a "practicing the                        |
| 22 | prior art" defense -- or practicing the prior art is not a               |
| 23 | defense to the jury, is not going to be helpful to the jury              |
| 24 | because they're not going to know what that is.                          |
| 25 | Because in particularly in this case, Your Honor,                        |

1    with no invalidity, the jury is not being instructed on

2    really what the prior art is, what it, you know, means to

3    have, you know, products or features that match the prior

4    art.  And so you'll just have this one line kind of standing

5    out there, practicing the prior art is not a defense, and I

6    can't imagine what they're going to do with that.

7                 THE COURT:  Mr. Curry, are you going to argue that?

8                 MR. CURRY:  May I --

9                 THE COURT:  You may.

10                MR. CURRY:  Your Honor, seized and zeroed in on the

11   exact clause that we had a problem with, and that's that all

12   aspects of the accused function were found in the prior art.

13                Now, if you give that instruction, I guarantee what

14   we'll hear Apple say is no, we admit the -- the FaceTime

15   servers weren't in the prior art, but NATs were.

16                And in this way, it would perversely allow them to

17   continue making their improper argument that NATs or NAT

18   routers can't meet the anonymity requirement of the claims

19   because NATs were in the prior art.

20                Throughout this whole trial they've been acting

21   like that motion in limine on practicing the prior art didn't

22   exist.  We've been prejudiced by it.  And I think what's

23   appropriate at this point is an order from the Court that

24   they're not to make that argument anymore, and especially in,

25   I guess, at least --

1          THE COURT:  We're talking about the instructions

2  right now.

3          MR. CURRY:  For the instruction, I think what's

4  needed is a straightforward clear instruction of the law,

5  which is correct, which is what VirnetX provided, and not

6  something that defines what practicing the prior art is, and

7  a way for them to exploit that instruction that they want to

8  make the point that their arguments have somehow been valid.

9          MR. AROVAS:  I -- I have no intent of referring to

10  the instruction, Your Honor.  We're not asking for the

11  instruction.  We think that the instruction actually creates

12  issues in a case of no validity, no definition of prior art.

13  And to just throw out, you know, this one line that really

14  has no context or foundation for the jury.

15          So what we were attempting to do is at least if

16  we're going to put that in, which we don't think should be

17  necessary, is to say what that means to be -- have a

18  practicing the prior art defense, and that was really the

19  intent.

20          THE COURT:  Well, I think you can still make that

21  argument even -- even under the instruction as submitted by

22  VirnetX.

23  I'm sorry?

24          MR. CURRY:  If it's my turn?

25          THE COURT:  Yes.

1        MR. CURRY:  Prior art was given definition in the

2   preliminary jury instructions so it's not like this is going

3   to come completely out of context.  It will -- the jury will

4   understand based on the arguments that have been made in this

5   case what the Court's instruction means.  And ultimately,

6   Your Honor, it is a straightforward, true, correct statement

7   of law.

8        THE COURT:  Okay.  I'm going to -- I'm going to --

9   we're going to include the instruction as submitted by -- by

10  the Plaintiff.

11       MR. CURRY:  Thank you, Your Honor.

12       THE COURT:  And then there is the issue of the

13  non-infringing alternatives.  I understand the parties had --

14  I think I ruled that that was not going to come in, but as I

15  understand, the parties have made an agreement that the first

16  part of that section is agreeable; is that right?  I just

17  want to make sure there's no confusion here.

18       MR. MIZZO:  Absolutely, Your Honor.

19       Yes, Apple had made the proposal to include the

20  instruction.  VirnetX had originally objected and Your Honor

21  had ruled that way.  On the break, VirnetX had indicated that

22  it would -- it would be agreeable to including those three

23  sentences --

24       THE COURT:  All right.

25       MR. MIZZO:  -- with that modification of FaceTime

1    at the end.

2              THE COURT:  Just want to clarify and make sure

3    we're giving the right instruction.

4              All right.  Give us five minutes and we'll be back

5    out.  We'll have the final instructions and -- and we'll

6    start.

7              I think Mr. Summers has something he wants to say.

8              MR. SUMMERS:  Thank you, Your Honor.

9              There is just one more issue about the wording of

10   the new instruction that the Court put in for the one royalty

11   per device.  And before we broke for lunch, we weren't sure

12   what the Court was going to do with that instruction.  And

13   depending on what the Court chooses we would need to make a

14   record of what the Court ultimately --

15             THE COURT:  We struck that second sentence.

16             MR. SUMMERS:  Thank you, Your Honor.

17             THE COURT:  Okay.  We'll be back shortly.

18             COURT SECURITY OFFICER:  All rise.

19             (Recess.)

20             (Jury out.)

21             COURT SECURITY OFFICER:  All rise.

22             THE COURT:  Please be seated.

23             Well, actually, I guess we're ready to have the

24   jury brought in.  So stay standing.

25             COURT SECURITY OFFICER:  All rise.

1          (Jury in.)

2          THE COURT:  Please be seated.

3          Okay.  Ladies and Gentlemen of the Jury, you have

4    now heard all of the evidence in the case, and I will now

5    instruct you on the law that you must apply.

6          It is your duty to follow the law as I give it to

7    you.  On the other hand, you are the sole judges of the

8    facts.  Don't consider any statement that I may have made

9    during the trial or make in these instructions as an

10   indication that I have an opinion, any opinion, about the

11   facts of the case.

12         After I instruct you on the law, as I suggested

13   earlier, the attorneys will have an opportunity to make their

14   closing arguments.

15         Statements and arguments of the attorneys are not

16   evidence and are not instructions on the law.  They are

17   intended only to assist you in understanding the evidence and

18   what the parties' contentions are.

19         A verdict form has been prepared for you, and you

20   will take this form with you into the jury room.  When you

21   have reached a unanimous agreement as to your verdict, you

22   will have the foreperson fill in, date, and sign the form.

23         At the end of the instructions, I am going to take

24   you through the verdict form before the parties begin their

25   closing arguments.

1          You will answer each question -- there are two --

2    on the verdict form from the facts as you find them.  You

3    should not decide who should win and answer the questions

4    accordingly.

5          A corporation and all other persons are equal

6    before the law and must be treated as equals in a court of

7    justice.  With respect to each of the questions that are

8    asked, your answers and your verdict must be unanimous.

9          In determining whether any fact has been proven in

10   this case, you may, unless otherwise instructed, consider the

11   testimony of all the witnesses, regardless of who may have

12   called them, and all evidence received into evidence,

13   regardless of who may have produced them.

14         As you will recall, at times during the trial it

15   was necessary for the Court to talk with the lawyers here at

16   the bench out of your hearing or by calling a recess.  We met

17   at the bench or when you were in the jury room because during

18   trial sometimes things come up that do not involve the jury.

19         And you should not speculate about what was

20   discussed during such time.  You are the jurors, and you're

21   the sole judges of the credibility of all the witnesses and

22   the weight and the effect of all the evidence.

23         By the Court allowing testimony or other evidence

24   to be introduced over the objection of an attorney, the Court

25   did not indicate any opinion as to the weight or the effect

1   of such evidence.

2          In determining the weight to be given to the

3   testimony of a witness, you should ask yourself whether there

4   was evidence tending to prove that the witness false --

5   testified falsely concerning some important fact or whether

6   there was evidence that some -- that at some other time the

7   witness said or did something or failed to say or do

8   something that was different from the testimony the witness

9   gave before you during trial.

10         You should keep in mind, of course, that a simple

11  mistake by a witness does not necessarily mean that the

12  witness was not telling the truth as he or she remembers it

13  because people may forget some things or remember other

14  things inaccurately.

15         So if a witness has made a misstatement, you need

16  to consider whether that misstatement was an intentional

17  falsehood or simply an innocent lapse of memory.  And the

18  significance of that may depend on whether it has to do with

19  an important fact or with only an unimportant detail.

20         In deciding whether to accept or rely upon the

21  testimony of any witness, you may also consider the bias of

22  the witness.

23         Now, certain testimony in this case has been

24  presented to you through deposition.  A deposition is the

25  sworn, recorded answers to questions asked to a witness in

1   advance of the trial.

2           Under some circumstances, if a witness cannot be

3   present to testify from the witness stand, the witness

4   testimony may be presented under oath in the form of a

5   deposition.

6           Some time before this trial attorneys representing

7   the parties in this case questioned this witness under oath.

8   A court reporter was present and recorded the testimony.

9           This deposition testimony is entitled to the same

10  consideration and is to be judged by you as to the

11  credibility and weight and otherwise considered by you,

12  insofar as possible, the same as if the witness had been

13  present and had testified from the witness stand in the

14  courtroom.

15          While you should consider only the evidence in this

16  case, you are permitted to draw such reasonable inferences

17  from the testimony and exhibits as you feel are justified in

18  the light of common experience.

19          In other words, you may make deductions and reach

20  conclusions that reason and common sense lead you to draw

21  from the facts that have been established by the testimony

22  and evidence in this case.

23          The testimony of a single witness may be sufficient

24  to prove any fact, even if a greater number of witnesses may

25  have testified to the contrary, if after considering all the

1    evidence you believe that single witness.

2          Now, there are two types of evidence that you may

3    consider in properly finding the truth as to the facts in

4    this case.

5          One is direct evidence, such as the testimony of an

6    eyewitness.

7          The other is indirect or circumstantial evidence,

8    which is the proof of a chain of circumstances that indicates

9    the existence or non-existence of certain other facts.

10         As a general rule, the law makes no distinction

11   between direct and circumstantial evidence, but simply

12   requires that you find the facts from all of the evidence,

13   both direct and circumstantial.

14         The parties have stipulated or agreed to some facts

15   in this case.  When the lawyers on both sides stipulate to

16   the existence of a fact, you must, unless otherwise

17   instructed, accept the stipulation as evidence and regard

18   that fact as proved.

19         It has been determined that VPN on Demand infringes

20   Claims 1, 3, 7, and 8 of the '135 patent, as well as Claim 13

21   of the '151 patent.  Just like stipulated facts, this

22   instruction is binding, and you must regard it as proved.

23         However, VirnetX's infringement allegations as to

24   the FaceTime system are contested, and you must determine

25   whether those claims are infringed.  You may not assume or

1    infer that the FaceTime system infringes simply because VPN

2    on Demand infringes.

3           Therefore, whether or not the FaceTime system

4    infringes, is a completely different issue for you to decide.

5           Attorneys representing clients in courts such as

6    this one have an obligation in the course of the trial to

7    assert objections when they believe testimony or evidence is

8    being offered that is contrary to the Rules of Evidence.

9           The essence of a fair trial is that it be conducted

10   pursuant to the Rules of Evidence and that your verdict be

11   based only on legally admissible evidence.

12          So you should not be influenced by the objection or

13   by my ruling on it.

14          If the objection was sustained, you should ignore

15   the question.  If the objection was overruled, then you may

16   treat the answer to that question just as you would treat the

17   answer to any other question.

18          When knowledge of a technical subject matter may be

19   helpful to the jury, a person who has special training or

20   experience in that technical field is called an expert

21   witness and is permitted to state his or her opinion on

22   technical matters.  However, you are not required to accept

23   that opinion.

24          As with any other witness, it is up to you to

25   decide whether the witness's testimony is believable or not,

1    whether it is supported by the evidence and whether to rely

2    upon it.

3         In deciding whether to accept or rely upon the

4    opinion of an expert witness, you may consider the bias or --

5    you may consider any bias of the witness.

6         I will first give you a summary of each side's

7    contentions in this case.  I will then tell you what each

8    side must prove to win on these issues.

9         As I have mentioned, it's been determined that VPN

10   on Demand infringes Claims 1, 3, 7, and 8 of the '135 patent,

11   and Claim 13 of the '151 patent.  The parties agree that

12   VirnetX is entitled to damages for this infringement, but

13   disagree on the amount of those damages.

14        The amount of damages for infringement of VPN on

15   Demand is an issue you must decide.  The parties dispute

16   whether the FaceTime system infringes Claims 1, 2, 5, and 27

17   of the '504 patent and Claims 36, 47, and 51 of the '211

18   patent.

19        In response to VirnetX's infringement contentions,

20   Apple contends that it has not infringed these claims.

21   Because Apple contends that the FaceTime system does not

22   infringe the asserted claims of the '504 and '211 patents,

23   Apple contends that VirnetX is not entitled to damages for

24   infringement of these claims.

25        As I told you at the beginning of this trial, in

1    any legal action facts must be proved by a required amount of

2    evidence known as the burden of proof.  The burden of proof

3    in this case is on VirnetX.  VirnetX has the burden of

4    proving infringement and damages by a preponderance of the

5    evidence.

6         Preponderance of the evidence means the evidence

7    that persuades you that a claim is more likely true than not

8    true.  If the proof establishes that all parts of one of

9    VirnetX's infringement claims are more likely true than not

10   true, then you should find for VirnetX as to that claim.

11        In determining whether any fact has been proved by

12   a preponderance of the evidence, you may, unless otherwise

13   instructed, consider the stipulations, the testimony of all

14   witnesses, regardless of who may have called them, and all

15   exhibits received in evidence, regardless of who may have

16   produced them.

17        Before you can decide many of the issues in this

18   case, you will need to understand the role of patent claims.

19        The patent claims are the numbered sentences at the

20   end of each patent.  The claims are important because it is

21   the words of the claims that define what a patent covers.

22        The figures and text in the rest of the patent

23   provide a description and/or examples of the invention and

24   provide a context for the claims.

25        But it is the claims that define the breadth of the

patent's coverage.  Each claim is effectively treated as if it were a separate patent, and each claim may cover more or less than another claim.  Therefore, what a patent covers depends in turn on what each of its claims covers.

You will first need to understand what the asserted claims cover in order to decide whether or not there is infringement.  The law says that it is the Court's role to define the terms of the claims, and it is your role to apply these definitions to the issues that you are asked to decide in this case.

Therefore, as I explained to you at the start of the case, the Court has determined the meaning of certain claim terms at issue in this case.  And those definitions have been provided for you in your juror notebook.

You must accept the definitions of these words in the claims as being correct.  It is your job to take these definitions and apply them to the issues that you are deciding, including infringement.

The claim language that has not been interpreted for you in your notebook is to be given its ordinary and accustomed meaning as understood by one of ordinary skill in the art.

I will now explain how a patent covers -- how a patent claim cover -- sorry.

I will now explain how a patent claim defines what

1    it covers.  A claim sets forth in words a set of

2    requirements.

3           Each claim sets forth its requirements in a single

4    sentence.  If a device or system satisfies each of these

5    requirements, then it's covered by the claim.

6           In patent law, the requirements of the claim are

7    often referred to as "claim elements" or "claim limitations."

8           When a thing such as a feature, product, process,

9    or system meets all of the requirements of a claim, the claim

10   is said to "cover" that thing and that thing is said to

11   "fall" within the scope of that claim.

12          In other words, a claim covers a feature, product,

13   process, or system where each of the claim elements or

14   limitations is present in that feature, product, process, or

15   system.

16          Conversely, if the feature, product, process, or

17   system meets only some, but not all, of the claim elements or

18   limitations, then that feature, product, process, or system

19   is not covered by the claim.

20          This case involves two types of patent claims:

21   Independent claims and independent claims.

22          An "independent claim" sets forth all of the

23   requirements that must be met in order to be covered by that

24   claim.  Thus, it is not necessary to look at any other claim

25   to determine what an independent claim covers.  In this case,

for example, Claim 1 of the '504 patent is an independent claim.

Other claims in this case are "dependent claims." A dependent claim refers to another claim and includes all the requirements or parts of the claim to which it refers.

In this case, for example, Claim 2 of the '504 patent depends from Claim 1.  In this way, the claim depends on another claim.  The dependent claim then adds its own additional requirements.

To determine what a dependent claim covers, it is necessary to look at both the dependent claim and any other claims to which it refers.  A product, feature, method, or system that meets all of the requirements of both the dependent claim and the claim to which it refers is covered by that dependent claim.

The beginning portion, or preamble, to some of the claims uses the word "comprising."  "Comprising" and "comprises" means "including but not limited to" or "containing but not limited to."

Thus, if you decide that an accused feature includes all the requirements in that claim, the claim is infringed.  This is true even if the accused instrumentality includes components in addition to those requirements.

For example, a claim to a table comprising a tabletop, legs, and glue would be infringed by a table that

1    includes a tabletop, legs, and glue, even if the table also

2    includes wheels on the table's legs.

3         Patent law gives the owner of a valid patent the

4    right to exclude others from importing, making, using,

5    offering to sale, or selling the patented invention.  Any

6    business or -- or any person or business entity that has

7    engaged in any of those acts without the patent owner's

8    permission infringes the patent.

9         I will now instruct you as to the rules you must

10   follow in deciding whether VirnetX has proven that Apple

11   infringed the asserted claims.

12        If a person makes, uses, offers to sell, or sells

13   in the United States or imports into the United States

14   something that is covered by the patent without the patent

15   owner's permission, that person is said to legally -- I mean,

16   is to -- that person is said to literally infringe the

17   patent.

18        To determine literal infringement, you must compare

19   the accused FaceTime system with the asserted claims using my

20   instructions as to the meaning of those patent claims.

21        A patent claim is literally infringed only if an

22   accused feature, product, system, or method includes each and

23   every element in that patent claim.

24        If the accused feature, product, system, or method

25   does not contain one or more of the elements recited in the

1  claim, then that feature, product, system, or method does not

2  literally infringe that claim.

3        It is well established, however, that "practicing

4  the prior art" is not a defense to infringement.

5        If you find that the accused feature, product,

6  system, or method includes each element of the claim, then

7  that feature, product, system, or method infringes the claim,

8  even if such feature, product, system, or method contains

9  additional elements that are not recited in the claims.

10        A person may literally infringe a patent even

11  though in good faith the person believes that what it is

12  doing is not an infringement of -- of any patent and even if

13  it did not know of the patent.

14        Literal infringement does not require proof that

15  the person copied a patent or a product.  You must consider

16  each of the asserted claims individually.  You must be

17  certain to compare each accused feature, product, or system

18  with each claim that such feature, product, or system is

19  alleged to infringe.

20        Each accused feature, product, or system should be

21  compared to the limitations recited in the asserted claims,

22  not to any preferred or commercial embodiment of the claim

23  invention.

24        You must analyze each asserted claim separately.

25        If you find that VirnetX has proved by a

preponderance of the evidence that each and every limitation
of that claim is present in the accused feature, method, or
system, then you must find that such feature, method, or
system infringes that claim.

You have heard evidence about the way in which
Apple modified the design of FaceTime.  You are not to
consider this evidence in any way in determining whether
FaceTime has infringed any claim of VirnetX's patents.  This
evidence is relevant, if at all, only to the issue of damages
and only if VirnetX has otherwise proved infringement of
FaceTime.

I will now instruct you on damages.  You must
determine the amount of damages to which VirnetX -- VirnetX
is entitled for Apple's previously determined infringement
via Apple's VPN on Demand.

In addition, if you find that Apple has infringed
any of the asserted claims via its FaceTime system, you must
also determine the amount of money damages to which VirnetX
is entitled for that additional infringement.

The amount of damages must be adequate to
compensate VirnetX for the infringement.  At the same time,
your damages' determination must not include additional sums
to punish Apple or to set an example.

You may award compensatory damages only for the
loss that VirnetX proves was more likely than not caused by

1    Apple's infringement.

2         VirnetX seeks damages in the form of a reasonable
3    royalty.  Generally, a reasonable royalty is the reasonable
4    amount that someone wanting to use the patented invention
5    should expect to pay to the patent owner and the patent owner
6    should expect to receive.

7         Where the parties dispute a matter concerning
8    damages, it is VirnetX's burden to prove the amount of
9    damages by a preponderance of the evidence.  VirnetX must
10   prove the amount of damages with reasonable certainty but
11   need not prove the amount of damages with mathematical
12   precision.

13        However, VirnetX is not entitled to damages that
14   are remote or speculative.  In other words, you should award
15   only those damages that VirnetX establishes that it more
16   likely than not suffered.

17        A reasonable royalty is the amount of money a
18   willing patent owner and a willing prospective licensee would
19   have agreed upon at the time the infringement began for a
20   license to make, use, or sell the invention.  It is the
21   royalty that would have resulted from an arm's length
22   negotiation between a willing licensor and a willing
23   licensee.

24        This is known as the hypothetical negotiation.
25   Unlike in a real-world negotiation, all parties to the

hypothetical negotiation are presumed to believe that the
patent is infringed and valid.

In considering this hypothetical negotiation, you
should focus on what the expectations of the patent owner and
the infringer -- infringer would have been had they entered
into an agreement at that time and had they acted reasonably
in their negotiations.

In considering damages, you may only award one
royalty per device.  The reasonable royalty you determine
must be a royalty that would have resulted from the
hypothetical negotiation and not simply a royalty either
party would have preferred.

The parties agree that the date of the hypothetical
negotiation between Apple and VirnetX would have been in June
of 2009.  In making your determination of the amount of a
reasonable royalty, it is important that you focus on the
time period when Apple first infringed that patent and the
facts that existed at that time.

However, evidence of things that happened after the
infringement first began may be considered in evaluating the
reasonable royalty, only to the extent that the evidence aids
in assessing what royalty would have resulted from a
hypothetical negotiation.

Your determination does not depend on the actual
willingness of the parties to the lawsuit to engage in such

negotiations.  Your focus should be on what the parties'
expectations would have been had they entered into
negotiations for royalties in June of 2009.

In deciding what is a reasonable royalty that would
have resulted from the hypothetical negotiation, you may
consider the factors that the patent owner and the alleged
infringer would have considered or would consider in setting
the amount the alleged infringer should pay.

I will list for you a number of factors you may
consider.  This is not every possible factor, but it will
give you an idea of the kinds of things to consider in
setting a reasonable royalty.

As listed in this -- as used in this list, the term
"patented invention" refers to the patent claims that VPN on
Demand infringes and any additional patent claims you have
determined are infringed by FaceTime.

They are as follows:

The royalties received by the patentee for
licensing of the patents-in-suit proving or tending to prove
an established royalty.

Royalties paid for other patents comparable to the
patents-in-suit.

The nature and scope of the license as exclusive or
non-exclusive or as restricted or non-restricted in terms of
territory, or with respect to the parties to whom the

products may be sold.

Whether or not the licensor had an established policy and marketing program to maintain its patent exclusivity by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that exclusivity.

The commercial relationship between the licensor and the licensee such as whether they are competitors in the same territory, in the same line of business, or whether -- or whether they are inventor and promoter.

Whether being able to use the patented invention helps in making sales of other products or services.

The duration of the patent and the term of the license.

The utility and advantages of the patented invention over the old modes or devices, if any, that had been used for achieving similar results.

The nature of the patented invention.

The characteristic commercial embodiment of it as owned and produced by the licensor and the benefits to those who have used the invention.

The extent of the licensee's use of the patented invention and any evidence probative of that use.

The proportion of the profits that is due to the patented invention, as compared to the portion of the profit

1    due to other factors, such as unpatented elements or

2    unpatented manufacturing processes or features or

3    improvements developed by the licensee.

4           Expert opinions as to what would be a reasonable

5    royalty.

6           The amount that a licensor and a licensee would

7    have agreed upon if both sides had been reasonably and

8    voluntarily trying to reach an agreement -- that is, the

9    amount which the accused infringer would have been willing to

10   pay as a royalty and yet be able to make a reasonable profit

11   and which amount would have been acceptable to the patent

12   owner if it had been willing to create a license.

13          No one factor is dispositive, and you can and

14   should consider the evidence that has been presented to you

15   in this case on each of these factors.

16          In determining a reasonable royalty, you may also

17   consider whether or not Apple had a commercially acceptable

18   non-infringing alternative to taking a license from the

19   patent owner that was available at the time of the

20   hypothetical negotiation and whether that would have affected

21   the reasonable royalty the parties would have agreed upon.

22          The framework which you should use in determining a

23   reasonable royalty is a hypothetical negotiation between

24   normally prudent business people.

25          In considering the evidence of a reasonable

royalty, you are not required to accept one specific figure or another for the reasonable royalty.  You are entitled to determine what you consider to be a reasonable royalty based upon your consideration of all the evidence presented by the parties, whether that evidence is of a specific figure or a range of figures.

When determining a reasonable royalty, you may consider evidence concerning the amounts that other parties have paid for rights to the patents in question or for rights to similar technologies.

A license agreement need not be perfectly comparable to a hypothetical license that would have been negotiated between VirnetX and Apple in order for you to consider it.

However, if you choose to rely upon evidence from any license agreements, you must account for any differences between those licenses and the hypothetically negotiated license between VirnetX and Apple when you make your reasonable royalty determination, including the type of technology licensed, whether the license contained a cross license and/or similar patent protections, whether the license contained any value related to a release of liability, the date when the license was entered, the financial or economic conditions of the parties at the time the parties entered into the license, the extent of use, if

1    any, of any particularly -- or any particular licensed

2    patents, the number patents involved in the license, whether

3    or not the license covered foreign intellectual property

4    rights, the extent to which litigation may have affected the

5    license, and whether contrary to the hypothetical negotiation

6    the licensee in the real-world license at the time of

7    entering the license believed that the patents were either

8    not infringed or were invalid.

9           VirnetX has relied on license agreements in which

10   royalties were based on a percentage of the entire price of

11   the licensed end products.  But in determining a reasonable

12   royalty, you must not rely on the overall price of Apple's

13   accused products at issue in this case.

14          Damages for patent infringement must be apportioned

15   to reflect the value the invention contributes to the accused

16   products or features and must not include value from the

17   accused products or features that is not attributable to the

18   patent.

19          You must perform your duty as jurors without bias

20   or prejudice as to any party.  The law does not permit you to

21   be controlled by sympathy, prejudice, or public opinion.

22          All parties expect that you will carefully and

23   impartially consider all of the evidence, follow the law as

24   it is now being given to you, and reach a just verdict

25   regardless of the consequences.

1      You should consider and decide this case as a

2  dispute between persons of equal standing in the community,

3  of equal worth, and holding the same or similar stations in

4  life.

5      All persons, including corporations, and other

6  organizations stand equal before the law, regardless of size

7  or who owns them, and they are to be treated as equals.

8      After the closing arguments, when you retire to the

9  jury room to deliberate on your verdict, you will take a copy

10  of this charge -- or copies of this charge with you, as well

11  as the exhibits which the Court has admitted into evidence.

12      You will select your foreperson and begin your

13  deliberations.

14      If you recess during your deliberations, please

15  follow all of the instructions that I have previously given

16  to you about your conduct during the trial.

17      After you have reached your verdict, your

18  foreperson will fill in on the form your answers to the

19  questions.  You should not reveal your answers until such

20  time as you are discharged unless you are otherwise directed

21  by me.

22      Any notes that you may have taken during the trial,

23  of course, as we discussed at the beginning, are only aids to

24  your memory.  If your memory should differ from your notes,

25  then you should rely on your memory and not your notes.  Your

1    notes are not evidence.

2            A juror who has not taken notes should rely on his

3    or her independent recollection of the evidence and should

4    not be unduly influenced by the notes of other jurors.  Notes

5    are not entitled to any greater weight than the recollection

6    or impression of each juror about the testimony.

7            If you want to communicate with me at any time

8    during your deliberations, please give a written message or a

9    question to Ms. Mayes, our Court Security Officer, and we

10   will provide you with sheets of paper on which to do that,

11   and Ms. Mayes will bring that directly to me.

12           I will then respond as promptly as I possibly can,

13   either in writing or by having you brought into the courtroom

14   so that I can address you orally.

15           I will always first disclose to the attorneys what

16   your question was and my response before I answer your

17   question.

18           And then, finally, after you have reached a

19   verdict, you're not required to talk with anyone about the

20   case unless I order otherwise.

21           And I promise you, I was going to read through the

22   verdict form, which I will do.  You will, of course, have a

23   copy of the -- of the Court's instructions with you.  Each of

24   you will have a copy of that.  And then one verdict form will

25   go back with you.

 1              The verdict form reads as follows:

 2              In answering these questions, you are to follow all

 3    of the instructions provided by the Court in the Court's jury

 4    instructions.

 5              Your answers to each question must be unanimous.

 6              As used herein, '504 patent means U.S. Patent No.

 7    7,418,504, and '211 patent means U.S. Patent No. 7,921,211.

 8    And there are two questions on the verdict form, both of

 9    which must be answered.

10              The first question, Question No. 1:  Did VirnetX

11    prove by a preponderance of the evidence that Apple's

12    FaceTime infringed any of the following claims of VirnetX's

13    '504 and '211 patents?

14              Answer yes or no for each claim.

15              And then on the left side, there's '504 patent and

16    a column underneath that, which has a blank for Claim 1,

17    Claim 2, Claim 5, and Claim 27 -- four blanks, yes or no in

18    each of those blanks.

19              And then on the right side, the '211 patent.

20    There's a column there, and there are blanks for Claim 36,

21    Claim 47, and Claim 51.  Yes or no in each of those blanks.

22              And then you continue on to the second page.

23              Question 2 is:  What sum of money did VirnetX prove

24    by a preponderance of the evidence would fairly and

25    reasonably compensate VirnetX for Apple's infringement by VPN

1    on Demand and infringement, if any, by FaceTime?  And then

2    there is a blank for you to fill in the amount.

3          And the bottom reads as follows:  We, the jury,

4    unanimously answered the preceding questions by a

5    preponderance of the evidence as instructed for each

6    question.

7          And there's blanks to date and sign the verdict

8    form by the jury foreperson.

9          And that -- that's how the verdict form reads.

10   It's now time for the parties to present their closing

11   arguments.

12         And Plaintiff VirnetX will begin.

13         Are you going to split your time, Mr. Ward?

14         MR. WARD:  Yes.  Your Honor.

15         THE COURT:  Okay.

16         MR. WARD:  We're going to do 25 for me.  And if I

17   could have a five-minute warning before I get to that

18   25-minute mark?

19         THE COURT:  I'll do that.

20         MR. WARD:  Thank you.

21         May it please the Court.  Counsel.

22         Ladies and Gentlemen of the Jury, good afternoon.

23         I know there's lots of places you'd rather be on

24   this Friday afternoon.  Looks like we're going to have a

25   lovely evening, but you've got to bear with us just a little

bit longer.

I get to be the first one to thank you, and I want to thank you for your service.  I know this has been an imposition on you, but you have figured out by now that this is a dispute that would not be resolved unless we had eight able-bodied folks willing to come and serve like you all have.  And for that, we all thank you.

These issues seem pretty complex, and they are. The technology is complex.  You've got two parties before you taking polar opposites on both infringement and damages -- for infringement on FaceTime and then damages.  And I want to try and give you some help on (a) how can you answer these questions, and (b) what is the evidence that supports those answers.

We started this case when Mr. Caldwell spoke to you in the opening by telling you that actions speak louder than words.  And we mean that.  We've heard that our whole lives. And I want to highlight some things that I think illustrate this point.

First, the fact that Apple did not bother to show up for this trial.  Now, they sent lawyers.  They sent some experts.  But as I discussed with Mr. Bakewell, even as children, we learn that we go take responsibility.  They didn't even bother to show up when facing a damage claim of over $300 million.

1          And why is that?  That's because they know they

2     infringe, and they owe VirnetX money.  Owing VirnetX money is

3     undisputed in this case.

4          Now, who did show up?

5          Dr. Short showed up.  He sat here through this

6     entire trial.

7          Kendall Larsen showed up.  He -- he answered

8     questions.  And even though they told you that fact witnesses

9     really weren't important, they weren't going to waste your

10    time, they spent three hours cross-examining our fact

11    witnesses.  So apparently they thought our fact witnesses

12    were somehow important.

13         Dr. Short and Mr. Larsen told you about the history

14    of VirnetX, the history of these inventions.  They answered

15    questions.

16         Now, I heard a couple of interesting excuses during

17    the trial as to why Apple didn't show up.  One of them was,

18    oh, well, you all showed some licenses and they were marked

19    confidential and our -- our employees couldn't have been

20    present to see those.

21         We didn't seal the courtroom when we were showing

22    those licenses.  Lots of folks have seen those licenses.

23    That -- that's just an excuse that rings hollow.

24         The other excuse I heard was, well, there's not

25    really a dispute on how this system works, so we didn't bring

any technical folks down here to describe it to you, even though their own technical expert admitted that the Apple employees know this system better than anybody else.

The folks that know the system best didn't show up to answer questions.  And why is that?  Think about it.

So two questions.  Does FaceTime infringe?  And if so, how much money do they owe for the infringement of FaceTime and VPN on Demand?

Apple infringes.  We know they infringe the VPN on Demand with their "Always" mode.  That's not disputed.

And sometimes I worry that we didn't spend enough time talking about VPN on Demand because you can tell we've got limited time, and I know y'all are -- are happy about that.

We'd probably keep you here for two weeks if we could because after six years, we want to make sure we present all the evidence we can, so we had to focus on the issues that are in dispute, but this is a big deal that it's already been determined that VPN on Demand infringes.

Because Apple is a company that you now know will fight to the bitter end.  They will not admit anything.  They don't admit infringement of FaceTime, even though they admit they owe us at least $23 million for the infringement with this feature.  A company that won't admit anything can't stand before you and deny infringement.

1          And think about this when you're thinking about

2    what kind of parties you're dealing with:  A company that has

3    infringed Dr. Short's invention for six years.  Did you ever

4    hear anyone from Apple -- well, one of their lawyers, turn

5    and say, Dr. Short, we're sorry that we used your property

6    without permission and that we owe you $23 million?  We're

7    sorry about that.  Not even an "I'm sorry."  Maybe they'll

8    say it today for the first time.  We'll see.

9          Now, FaceTime infringes.  This is the -- the issue

10   that I really didn't know how much time I'd have to spend in

11   closing because I knew what Dr. Blaze had said under oath.

12   He said something different today, and we're going to talk

13   about that.

14          As His Honor just instructed you, we have the

15   burden of proof.  We've got to prove our case by a

16   preponderance of the evidence.  And that simply means the

17   greater weight of the credible -- credible evidence.  Is

18   something more likely true than not true?  If the scales tip

19   slightly in our favor, then VirnetX prevails.

20          I think we've tipped them greatly in our favor, and

21   I'm going to show you that, but that's our burden on both --

22   both infringement and damages.

23          Now, I want to talk about this instruction.  To

24   determine literal infringement, you must compare the accused

25   FaceTime system with the asserted claims.  Compare FaceTime

1  to the asserted claims.

2          Dr. Jones walked you through how the Apple FaceTime

3  system worked.  This is one of the animations that he showed

4  you during his direct, and you can see there's a lot of

5  things going on in this animation, because the patents in

6  dispute, they cover this entire system.

7          We've ended up focusing on this secure

8  communication link, but that doesn't just -- that's not the

9  invention by itself.  There's a lot of other things going on.

10          And I want to highlight this demonstrative from Dr.

11  Jones's testimony.

12          As you recall, he took you through a step-by-step

13  explanation and laid out exactly how Apple's FaceTime system

14  worked.  He went through each of these elements and -- and

15  showed you these things.

16          And it's important that he showed you all these

17  things, and it's important because even though Apple now acts

18  like, well, this is just a dispute about anonymity.

19          If you'll recall, Mr. Arovas was cross-examining

20  Dr. Jones, and he was -- got down and was talking about this

21  communication link.  And if you'll recall, Dr. Jones said, is

22  that all y'all are disputing?  Mr. Arovas did not answer that

23  question.  Because Apple said we admit nothing.  Prove

24  everything.

25          So we spent our time going through, proving it.

1    I'm glad we did because of this, because this system

2    functions altogether and that entire system functions and

3    Apple -- and Apple's FaceTime system infringes the entire

4    claim.

5            And you get down to this -- this last element, and

6    you see that we start talking about a network address and to

7    compare an indication that the domain name service system

8    supports establishing a secure communication link.  That's

9    the language from Claim 1, the last element because that

10   information that's being provided is specific information on

11   the type of NATs and the sender's IP address.  Apple

12   specifically configured their systems to use these NATs.

13           Did we invent NATs?  Of course not.  Did we invent

14   the Internet?  Of course not.  Did we invent servers?  Of

15   course not.  What we invented was a simple and secure way for

16   establishing these secure communication links.  And Apple

17   moved right in on top of it, just like they did for VPN on

18   Demand.

19           Now, after six years and $10 million in litigation

20   fees, we can figure out at the -- once Apple starts

21   presenting their case, that they're only going to challenge

22   one thing.  They're going to challenge anonymity.  We

23   suspected that's what it would be, but they put us to our

24   proof, and that's okay.  That's what we're down to,

25   anonymity.

1          Outside of this courtroom, in Plaintiffs' Exhibit

2   1068 -- this is Apple's iOS security document from October of

3   2012.  Now, no one came to explain this away.  But what are

4   they telling the world about the security of their FaceTime

5   system?  Talking about security.

6          Additionally, communication using FaceTime and the

7   Apple push notification server is fully encrypted and

8   authenticated.  Yet Dr. Blaze took the stand during questions

9   today and said:  We don't really care about anonymity at

10  Apple.  It's not really that important to us.  I'm sorry, to

11  Apple.  He's not us, is he?  Not really important to Apple.

12  Their own documents say something else.

13         And what did he say on the stand?

14         So you'll agree that NATs hide a person's private

15  IP address -- IP address?

16         He said:  That's right.  The private IP address is

17  never sent.

18         This question is important.

19         Apple specifically went out of its way to support

20  FaceTime calls originating behind a NAT and terminating

21  behind a NAT, correct?

22         And Dr. Blaze's testimony:  That's right.  There

23  are features in FaceTime intended to support that.

24         It's exactly how they designed their system.  The

25  fact that they use NATs that were around before, really

1    doesn't matter.  It's the way that they configure their

2    system to use those NATs.

3         Now, he said some different things on direct, and

4    Mr. Caldwell confronted Dr. Blaze with his prior sworn

5    testimony.  And I think this is the clearest example I can

6    show you of what his sworn testimony was before he got to the

7    courtroom, and he agreed with it today after saying something

8    different.

9         This is the question put to Dr. Blaze:  And you'd

10   agree, generally, wouldn't you, that sometimes you may be

11   able to tell that there's communications in a VPN or a secure

12   communication link, but not be able to correlate it to a

13   specific machine or person based on that information, right?

14        Answer:  That's right.

15        Next question:  And that is within the scope of

16   anonymity contemplated by these patents, isn't it?

17        Yes.  I -- that's an assumption that I'm starting

18   with.

19        And that was an assumption we thought he was

20   starting with until today.  So that'd be a question to Apple.

21        In their 45 minutes when they get up here to answer

22   questions, let's see if they can explain away Dr. Blaze's

23   sworn testimony about anonymity behind these NATs being the

24   scope of anonymity in these patents.

25        What about TARP?  We heard about TARP.  They're

1    comparing -- they were looking at TARP in the patent.  But

2    look at this question and answer:

3          There's some points I'd like it make, but let's

4    just kind of cut to the -- cut to the chase.  Anonymity in

5    this case does not require the use of TARP, does it?

6          And his answer:  Oh, no.

7          Well, he knows that, and Apple knows that.

8          And His Honor just instructed you on this, and this

9    is proved to you about who's wasting time in this courtroom.

10          On Page 9 of the instructions:  Each accused

11    feature, product, or system, should be compared to the

12    limitations recited in the asserted claims, not to any

13    preferred or commercial embodiment of the claimed invention.

14          Who was wasting your time talking about TARP?

15    How much protection do we need afforded?

16          Look at this answer:  Claims don't require any

17    particular anonymity.

18          Question:  And for purp -- and for purposes that

19    we're addressing in Court, you agree anonymity does not have

20    to apply against all possible attackers?  It just has to

21    apply against some reasonable threat model?

22          That's right.

23          So I don't know why we were talking about CIA

24    covert operations.  It's just reasonable threats.

25          And you recall this -- this comparison between the

```
 1   claim terms.  We know Apple infringes with their virtual
 2   private network because those communications are secure and
 3   anonymous.
 4          And then you've got those same terms appearing in
 5   the secure communication link.  Mr. Caldwell walked Dr. Blaze
 6   through his own example.  When you change these two things,
 7   he says:  This is anonymous.  But this is not.  Does that
 8   make any sense?  It doesn't.
 9          Damages.
10          We brought you Dr. Weinstein.  And I elevated him.
11   Mr. Weinstein.
12          We brought you Mr. Weinstein, and he talked to you
13   about these license agreements, and he told you that he
14   averaged these license agreements together and that the
15   average of the per-unit royalty, that's royalties that folks
16   are paying on each device was between $1.20 and $1.67.  Some
17   were higher, some were lower.  We're going to talk about the
18   ones that were lower, specifically Microsoft.
19          But there's one thing I want to talk to you about,
20   and I -- I don't ask you to write down many things, but this
21   might be helpful if you write this down because this is not
22   in dispute, all right, and this is the number of infringing
23   units.
24          VPN on Demand, which Apple admits they owe money
25   for.  There's 234,002,943 units that they admit infringe.
```

```
 1              Now, if you find that FaceTime infringes, as well,

 2    the total number of units for VPN -- VPN on Demand and

 3    FaceTime goes up by about 18 million, and the total number,

 4    if both infringe, is 252,023,292.

 5              You'll multiply that number, whichever one you find

 6    is appropriate, times a rate.  And so really the rate is the

 7    only thing that is in dispute for damages.  And to some

 8    extent -- there's a difference of 18 million units whether

 9    FaceTime infringes or doesn't infringe.  But the math is just

10    going to be the number of units that infringe times a rate.

11              And let's talk about the rate because this is from

12    Mr. Weinstein.  And he walked you through, and actually,

13    Mr. Bakewell agreed with all these calculations.

14              Remember, it was only a dispute about whether we

15    did the weighted average or a true average.  Mr. Weinstein

16    does a true average.  And think about this, with one

17    exception, the exception of Microsoft, all of these

18    companies, Mitel, NEC, Siemens, Aastra, and Avaya, they are

19    paying the rates that you see out here to the right.  They're

20    paying them in the past, they're paying them currently, and

21    they're going to pay them out until 2022.

22              Now, is one of these companies the -- the next

23    Apple?  I don't know.  They could be.  And if they are, guess

24    what, they're going to be paying VirnetX these rates as they

25    grow.
```

1          Might they fail?  They might.  And if they fail,

2     they won't pay VirnetX anymore.  But these are the rates

3     they're going to pay until the end of these patents in the

4     U.S. and only in the United States.

5          But what does Apple what?  They're Apple.  They

6     want the Microsoft deal, right.  And they -- they showed you,

7     and Mr. Weinstein and Mr. Bakewell actually agreed on the --

8     the rate would be 19 cents in the United States.  For U.S.

9     sales the rate would be 19 cents.  And they said, look at

10    Avaya, it's -- it's 34 cents.  But to assign that rate, you

11    have to completely ignore the other licenses.

12         All these other companies that have said, you know

13    what, we'll take a license and we'll pay for what we use, and

14    we'll pay for what we use until 2020, Apple says, don't look

15    at them.  Don't look at those license rates.  We want the

16    deal that Microsoft got, and we're going to bring you Mr.

17    Bakewell to tell you why that is the way things should be.

18         And I want you to consider the credibility of

19    Mr. Bakewell, because there are a couple of things that

20    happened during his examination.  And I'm a little hard of

21    hearing, I'll admit to you, and there was an instance

22    yesterday when I was cross-examining him and I was talking to

23    him about this Microsoft amended license, and I was talking

24    to him about the U.S. population.  And if you'll recall, he

25    was telling me how many registered users there would be in

1   the year 20 -- 2014, 193 million.

2           And I said:  Do you know what the population is

3   going to be in 2020?

4           He knew what his calculation was and he said:  500

5   million.

6           I said:  Okay.  500 million.  Do you know when the

7   U.S. Census Bureau is?

8           Yeah.

9           I show him the population is going to be 330

10  million, which is less than the folks he said would be

11  registered in the year 2020.

12          And I said:  Did you say 500 million?

13          And he goes:  No.

14          I don't know if you remember that, but I did.  I

15  had to go back and read the transcript because I thought I

16  had mis -- misheard him.  That man would flip that quick from

17  saying he said something, to he didn't say something.

18          Because he knew it sounded ridiculous.

19          Now, they want the Microsoft license.  You heard

20  Mr. Larsen tell you under oath that it was a one-time special

21  deal.  It was a first license.  It was limited in scope.  And

22  that Microsoft continued to deny that it infringed.  You saw

23  that in the license agreement.

24          It's not the situation we have here.  Apple has to

25  admit that it infringes for this hypothetical negotiation, it

```
 1    has to assume that.  Microsoft denied it.  And so to believe

 2    that this was not a one-time special deal, you've got to

 3    disbelieve Mr. Larsen.

 4          But the Court has instructed you that when looking

 5    at license agreements, it's appropriate for you when

 6    considering former license agreements or license agreements

 7    that go into this calculation, you may consider the financial

 8    or economic conditions of the parties.

 9          Now, they asked Mr. Larsen a lot of questions,

10    didn't they, on cross?  We brought him.  He took their

11    questions.  They talked to him about this 8-K.  He got a

12    bonus.  He got a raise --

13          THE COURT:  Mr. Ward.

14          MR. WARD:  -- in February of 2010.

15          THE COURT:  Mr. Ward, you have five minutes

16    remaining.

17          MR. WARD:  Thank you, Your Honor.

18          Remember those questions?

19          What did they not show him?  The 10-K from a month

20    later.  What were they telling the world while they were

21    having to negotiate with Microsoft?  We're devoting a

22    substantial amount of our financial and management resources

23    to the Microsoft litigation; and if we are unsuccessful in

24    this lawsuit, our financial condition may be adversely

25    affected, and we may not survive.
```

```
 1              Now, is that consistent or inconsistent with what

 2   Mr. Larsen told you under oath?  And did Apple bother to put

 3   that document in front of him and ask him questions about it?

 4   A document that was after the 8-K, a document that was cited

 5   in Mr. Bakewell's report, a document that they knew about.

 6              They didn't bother to ask him about it, though, did

 7   they?

 8              And for that reason, if you want to disregard the

 9   Microsoft license agreement, you're perfectly permitted to do

10   that, because it was negotiated under different

11   circumstances.  And if you did that, the rate would go up to

12   $1.41 versus the $1.20.

13              So I'm not telling you what to do, but that's why

14   there's a range that goes from $1.20 to $1.67.

15              Apple tells you that its sales are closest to

16   Microsoft, and they show you this chart.  I just want to

17   remind you that these are not dollars, these are units.  And

18   the 2 billion is a projection for worldwide sales until the

19   year 2020.

20              All right.  So that's past and future.  So if they

21   show you this chart, remember, they're showing you they've

22   sold 234 million phones during this four-year period, and

23   they're comparing it to worldwide sales from Microsoft out to

24   2 billion.

25              I'm going to quickly show you a couple of surveys.
```

1    They're in evidence.  Just about the importance of these

2    features.

3            Ease of use.  This is for the iPod, 93 percent of

4    folks in the United States said ease of use was important to

5    them.

6            Here's another one talking about ease of use,

7    92 percent of folks said that that was right at the top, ease

8    of use of the 4S.

9            And why am I showing you these surveys?  Because

10   these patented features, one of the things that you heard

11   from both Dr. Short and Mr. Munger, the thing that was

12   invented was the fact that they made these devices easy to

13   use.

14           Now, you saw this document and you saw it pretty

15   briefly.

16           It's Plaintiffs' Exhibit 1127.  And I want to

17   explain to you what it is real quick.

18           This is an email from Jeremy Butcher who works at

19   Apple.  You see the date on it, April 11, 2013.

20           And if you look in the -- the attachment it says:

21   iOS for IT infrastructure survey web architecture.

22           And I'm showing this to you because it's going to

23   be a survey, they're surveying IT professionals during the

24   pendency of this lawsuit, they're going to internally do a

25   survey, Apple internally is going to survey IT professionals,

1    who are the folks that know about VPN on Demand.

2              And what do they do in their survey?

3              They got a question.  While this lawsuit is

4    pending, they're going to ask IT professionals:  Do you use

5    VPN on Demand?  What does Mr. Butcher or somebody at his

6    direction write in there:  Remove this.  They don't want to

7    answer that question.  It will show up in this lawsuit, won't

8    it?  Let's just not develop the evidence.  Let's not bring

9    the people.  Standard thing for Apple.

10             We know that VPNs are important features.  They

11   told the world they were going to remove them.  And guess

12   what, their -- their customers revolted, and within a

13   two-week period -- look, April 14th, 2013, they say

14   they're -- they're going to remove this feature.  People

15   complain, and 10 days later, they say:  We take it back.  How

16   much complaining do you think there had to be to get Apple to

17   take it back within 10 days?

18             One last area, and this is the amount of money that

19   Apple spent trying to avoid infringement.  They got this

20   contract with Akamai.  And they said, oh, well, look, it was

21   for 21 months, $50 million, and they did some lawyer math to

22   show, well, that's just $4 million a month.

23             Well, then Mr. Bakewell said:  Oh, it was in the

24   ballpark of 50 million for five months.  He didn't want to

25   agree with that totally on the stand, but I showed him his

1    testimony, and they didn't explain that away.

2          And then Mr. Casanova testified by deposition.  He

3    said:  It was tens of millions, it might even be a hundred

4    million dollars.  So you've got 50 million to a hundred

5    million dollars on something that Mr. Blaze told you was --

6    Dr. Blaze told you was technically inferior.

7          How do we know it was inferior?  Because they came

8    back.  And just because those units aren't accused in this

9    case, don't worry about that.  They're being dealt with in

10   another matter at a future time.  It doesn't mean they don't

11   infringe.  They came back, but we're counting the units

12   between 2009 and 2013 in this case.  Technically inferior.

13         I've got to leave Mr. Caldwell some time, so I'm

14   going to end here and suggest to you that this -- these are

15   the answers to the questions on your form:  Yes for all

16   claims, both patents.  And there's the amount of money they

17   owe if you find it's $1.20 times the admit -- times the

18   admitted number of units -- I'm sorry, VPN admitted plus the

19   18 million FaceTime.  That's the amount you get, $302

20   million.

21         Thank you for your time.

22         MR. AROVAS:  Your Honor, may I have a moment just

23   to --

24         THE COURT:  Certainly.

25         MR. AROVAS:   -- set up?

1              THE COURT:  Certainly.

2              MR. AROVAS:  Thank you.

3              Your Honor, may I proceed?

4              THE COURT:  You may.

5              MR. AROVAS:  Thank you very much.

6              And good afternoon, Ladies and Gentlemen.  I want

7    to join Mr. Ward, everybody from VirnetX, and everybody from

8    Apple in thanking you for your time and attention to this

9    matter.  I know -- we all know it's a lot of work, and we

10   truly appreciate what you've done and your time here this

11   week.

12             Now, sitting through this trial for a week, you may

13   wonder why cases like this are presented to juries.  And

14   there's a long history in our case -- in our country

15   presenting patent cases to juries, and there's a good reason,

16   because juries have an ability to bring common sense to

17   complex disputes.

18             And the Judge is going to tell you, you're the

19   judge of the evidence.  You decide how to weigh the evidence,

20   and you decide what evidence to credit and what evidence is

21   just a sideshow or a distraction.

22             And on that point I actually want to pause for a

23   moment.  I was a little taken aback by some of the comments

24   made by Mr. Ward -- I actually am pretty surprised by them.

25   And he made this comment -- actually Mr. Caldwell made it in

 1   his opening statement, too, about actions speak louder than

 2   words.

 3        And why would Mr. Ward start with some of the

 4   things he's started about?  Surprise on the anonymity, that

 5   Dr. Blaze was going to say there's no infringement because of

 6   anonymity.  He knows full well we have believed since the

 7   very beginning, FaceTime was not designed to be anonymous.

 8   It was never designed to be anonymous.  He had that in

 9   written reports given to him by the orders of the Court on

10   the schedule that they were supposed to be given to him.  He

11   knew that.

12        And let me tell you something, if he thought he was

13   being surprised, he would have dealt with it and gone to the

14   Court and said, hey, there's something unfair going on here.

15   He knew since the very beginning.

16        The license agreements.  You heard that comment --

17   oh, that's an excuse.  The Apple people can't see the license

18   agreement.  That's just an excuse.  I showed that to you in

19   open court.  You know what that is?  Trial theatrics.  You

20   saw that stamp on the bottom.  That was put on by VirnetX.

21        It wasn't anybody from VirnetX here who said, oh,

22   yeah we give Apple consent to take those documents and show

23   them to Apple's in-house employees.  Mr. Ward knows that.

24        Mr. Ward knows how a protective order works; that

25   the Court enters a protective order that says we are ordered

1    by the Court not to share those documents.  They are given

2    confidentially, attorney's eyes only, and we're not allowed

3    to share them.

4           And so the fact that Mr. Ward decides to do it for

5    the first time here in Court, what is that?  That's not about

6    the merits of this case.  That's not about getting to the

7    right answer.  That's just trial theatrics.

8           Dr. Blaze's testimony has been consistent since the

9    beginning.  What Dr. Blaze explained, he explained it here,

10   he explained it in his reports that he gave him, he gave a

11   deposition, is that what FaceTime is doing.  And when I talk

12   about the details a little later, it's no different than

13   ordinary Internet communications.  It's no more anonymous

14   than the regular Internet; and that, frankly, the claim that

15   FaceTime is anonymous, doesn't make any technical sense.

16          So why are we here?  Well, VirnetX is trying to ask

17   Apple to pay 10 times more than its nearest competitor.  It's

18   trying to take patents that Apple passionately believes do

19   not apply to FaceTime, and apply them in this case.  And that

20   is why we are here.

21          And as I said at the beginning, there's actually

22   only two specific issues that we have to resolve in this

23   case:  Does FaceTime infringe two patents?  And what is a

24   reasonable royalty?

25          FaceTime, Ladies and Gentlemen, was designed to

1  work in a different way.  It is not something that was

2  designed for confidential business communications.  It wasn't

3  designed to allow people to hide on the Internet.  It wasn't

4  designed for those types of purposes.  There are other

5  features -- VPN on Demand.  VPNs, for example, are designed

6  to do those specific types of things, not FaceTime.  FaceTime

7  is a different type of feature.

8       Now, what does VirnetX say sort of in response to

9  Apple's evidence that FaceTime is not anonymous?  Well, what

10  VirnetX says and what they've been telling you in this case

11  doesn't make any sense.  They're telling you, don't worry

12  about those public IP addresses, they don't make any sense.

13       But, Ladies and Gentlemen, if a system that shared

14  the public IP addresses was actually anonymous, why is

15  everybody trying to hide them when they want anonymity?  Why

16  does every example in the patent hide IP addresses for

17  anonymity?

18       Why does Tor exist?  Dr. Blaze talked about it.  An

19  anonymity -- anonymity service.  It hides IP addresses.

20       Why do the VPNs hide and encrypt the IP addresses?

21  Everybody in the technical world who studies security and

22  anonymity wouldn't be out there encrypting and hiding IP

23  addresses when they wanted to design an anonymous system if

24  it didn't matter, and the IP addresses matter a lot.

25       Now, I had mentioned that there are three key facts

1    in this case to look at that resolve the two issues.  I'm

2    going to talk about the first two, and I am going to share

3    the floor with Mr. Jones who is going to talk about the last

4    one.

5              So let's jump into the first one which is the

6    VirnetX patents require anonymity and FaceTime is not

7    anonymous, the second one.

8              The first one is very easy.  We've all seen a lot

9    of this over the course of the case.  The patent ends with

10   word descriptions of what it covers and what it doesn't

11   cover.  The Court has given us a construction, a definition

12   that we must apply.  And what does that say, it says that

13   there must be data security and anonymity, not just one.

14             In fact, interestingly, if you look at the document

15   that Mr. Ward showed you about FaceTime, what did it say?

16   Encryption.  That's what it said.  It didn't say anonymity

17   because FaceTime is not anonymous.  Encryption, that is data

18   security, and that is not the same thing as anonymity.  It's

19   different.

20             So, obviously, as Mr. Jones -- as -- I'm sorry,

21   Mr. Ward pointed out, there's a dispute between the parties.

22   Apple believes it does not infringe the FaceTime patents, the

23   patents asserted against FaceTime.  And VirnetX says the

24   opposite.  That's the -- the '211 and the '504 patents.

25             And so how do you go about resolving this issue?

1    I'd like to encourage you to think about a couple things.

2            First of all, in the jury room, ask yourself what

3    evidence have you actually seen that FaceTime is anonymous?

4    Use your common sense, okay?  We have produced hundreds of

5    thousand of pages of documents in this case.  The products

6    have been around for six years.  Did any documents call

7    FaceTime anonymous?  Did you see anything?  Did any customers

8    call it anonymous?  Any articles call it anonymous?  Any

9    engineers call it anonymous?  Any blogs on the Internet?

10           I mean, Ladies and Gentlemen, if FaceTime was

11   anonymous, you would have seen a document or some piece of

12   evidence that said it for products that are sold as widely as

13   these products, that are studied as widely as these products.

14   And the fact is, you haven't seen it because it doesn't exist

15   because these products are not anonymous.

16           And I asked Dr. Jones about that, and we all agree,

17   if the jury concludes, if you conclude that anonymity is

18   missing, FaceTime does not infringe.

19           And so let's talk a little bit about what -- what

20   Dr. Jones said about anonymity and this issue of IP address,

21   the private and the public.

22           And so when Dr. Jones was testifying about direct,

23   he was asked:  What is your theory of anonymity?  Explain to

24   us why NATs provided anonymity.

25           And he said:  Well, there's the private addresses.

1    You see at the bottom, yellow, replace the public addresses

2    in the headers of the packets.

3              And then what does he say happens?

4              He says:  Well -- he's asked:  Are the private

5    address even sent across the Internet?

6              And he says:  Not in a secure communication link,

7    no, they're not.

8              So his basic point is, there are private addresses

9    in your home that go from the computer to that box that

10   connects to the wall, the public addresses that go over the

11   Internet.  He says the private addresses aren't sent, right,

12   so, therefore, there's no -- there's anonymity.  There's

13   infringement.

14             Now, I asked Dr. Jones about that.  And I said,

15   wait a second, that's not really correct, is it?

16             And I asked him, I said:  Well, after this link is

17   set up, there's some information sent, the SIP packet that

18   Dr. Blaze talked about, as well, and that private IP address

19   is actually sent over the Internet.

20             And if you look at the first quote at the bottom,

21   he said -- I asked him:  So the private IP address is

22   actually visible on the Internet, right?

23             And he says yes.

24             And it's on that peer-to-peer connection, the

25   connection that we're talking about in this case.

1          So what do we know -- and so I followed up, and I

2     said:  Well, wait a second, because his theory is the private

3     IP addresses are hidden, only the public are sent.

4          And I asked him:  But wait a second, the way

5     FaceTime is set up, the way FaceTime works, isn't it true

6     that the private IP addresses and the public IP addresses

7     will be visible on the Internet?

8          And he says:  Yes.

9          And then we drew a picture.  Let me put this over

10    here.

11         And you may recall that I went through this picture

12    on the document camera with Dr. Jones.  I said:  Okay, if

13    this is your theory, the private IP addresses are hidden and

14    not sent out, let's explore that.

15         And I said:  Well, we know the public IP addresses

16    over this link, they're clearly sent over the Internet.  We

17    know that.  And so anybody who wants to see them can see

18    them.

19         But also, when the call is set up, when this link

20    is set up, the private IP addresses over here are also sent.

21         So I confirmed with him in cross-examination

22    private IP addresses, public IP addresses, both visible on

23    the Internet.

24         So even if you believe that theory that Dr. Jones

25    was using, even if you believe that both the private and the

1   public IP addresses are being sent over the Internet, and

2   there would be no anonymity.

3          Now, why does this matter?  Well, because IP

4   addresses give a lot of information that is critical when

5   you're talking about the function of the Internet.  Dr. Blaze

6   explained it.

7          I won't go through the details, but it's basically,

8   you can think about it like a letter.  It's like putting the

9   address on the cover of the letter.  That's what takes the

10  information to your front door.

11         In the Internet, it's obviously not a physical

12  letter, it's a package or a packet, it's a package of digital

13  information, but it still has that address on the front that

14  takes the information to your front door.  And we know that

15  this information is one of the most important pieces of

16  information when you're talking about how the Internet works.

17         How do we know?  We know it is used for all of the

18  communications to get information across the Internet toward

19  the front door of somebody's house.

20         And so if you ever wondered, you get on the

21  Internet and you're on your computer, and you wonder how does

22  the computer or how does the Internet know so much about what

23  you do, right?  Those ads pop up.

24         So if you're shopping for a car one day, a week

25  later you see ads starting to come up about cars.  You're

1    shopping for fishing gear, you get fishing ads showing up,

2    those sorts of things.

3            Well, the reason and the way that works is the IP

4    address.  Every place you go, you drop -- you leave your IP

5    address.  That creates a digital record of everywhere you've

6    gone.  That's what IP addresses do.  And that's why when you

7    share your IP address, once you do that, there's no

8    anonymity.

9            Now, what does Dr. Jones say about this?  Well, he

10   wants to pretend the IP addresses don't really matter that

11   much.  And I don't know if you remember, but he had this

12   slide that he used, which showed the hacker on the top, you

13   may recall, and you had the Internet on the bottom.

14           He said:  Well, look, really, the issue of

15   anonymity is just eavesdroppers.

16           Now, when I talked to him about -- and I asked him

17   some questions on cross-examination, he said:  Well, actually

18   there's a lot more going on that's relevant.

19           So, for example, we know that it's not just really

20   about hackers.  It's about websites.  Websites will track

21   your IP address, will store your IP address, and use it.

22           We know, and I asked Dr. Jones about it, it's

23   actually well-known that IP addresses are also used by

24   advertisers, right, so advertisers are using IP addresses, as

25   well.

1          We asked him about the police.  The police use IP

2     addresses to track specific computers to specific people, as

3     well.  So the police are using IP addresses.

4          Your Internet service provider, same thing, uses IP

5     addresses.  They actually -- I asked Dr. Jones about that,

6     they will store them, sell them on digital mailing lists, and

7     use them for various commercial purposes.

8          IP addresses, Ladies and Gentlemen, are one of the

9     most critical pieces of information on the Internet when

10    you're using Internet communications.

11         Now, there was a juror question about this very

12    issue, and the question was to Dr. Jones:  I've noticed that

13    I receive targeted advertisements.  Do I need to worry about

14    that or do I need to beef up my security?

15         And the answer Dr. Jones gave, he explained a

16    couple different things you could do, but part of the answer

17    he gave actually kind of floored me because in this case,

18    we're talking about IP addresses, and what did he say?  It's

19    highlighted on the screen.  He said:  Another thing you can

20    do on browsers is there's a check box that you can check for

21    "do not track."

22         Well, what is "do not track"?  Okay.  If you go to

23    your computer, you click your computer, there's a place to

24    check something, and it says:  Do not track.  What "do not

25    track" does is telling the websites, don't track my IP

address.  This is specifically about tracking of IP

addresses.  That feature wouldn't be in browsers if sharing

your IP address wasn't significant for the issue of

anonymity.

It's very simple, Ladies and Gentlemen.  If you

want to be anonymous on the Internet, you shouldn't be giving

out your IP address.  That's why services exist like Tor,

like VPNs, to give you ways of concealing that.

Now, FaceTime works in a very different way.

FaceTime uses ordinary IP addresses in an ordinary way.  It

uses the normal addresses for the Internet just like you do

when you surf websites, when you do web shopping, or any of

the other normal activities.

The whole purpose of FaceTime is use ordinary

Internet connections in an ordinary way.

Now, if we go back to Dr. Jones, what does Dr.

Jones say about this?  Well, Dr. Jones, when he describes his

theory of anonymity, he says:  Well, wait a second.  So

anonymity is effectively the Internet plus these two NATs

that we've heard a lot about, the NATs.  He said, well, these

NATs create the anonymity because you don't see people behind

these NATs.

Well, we know from the testimony I showed you

earlier, in fact, the private IP address is shared and the

public IP address is shared.  But the other thing we know is

1    this structure, these NATs for the Internet, that's the basic

2    function of the Internet.   To say that this is anonymous is

3    effectively to say the Internet itself is anonymous, which we

4    know, of course, is not true.

5         If the Internet were anonymous already before the

6    VirnetX patents, you wouldn't need the VirnetX patents to

7    decide the problem of anonymity and security.

8         And we actually covered this issue with Dr. Short,

9    and -- this was a heavy board.   I got it.   We actually

10   covered this issue with Dr. Short.   And Mr. Appleby asked Dr.

11   Short some questions about what was the architecture of his

12   patent and what was the architecture of the basic Internet.

13        And I'm sure if you recall that, that was Day 2.

14        And what Dr. Short said is he said:   Well, this

15   basic approach of having the Internet with two NATs and two

16   houses, that is the basic architecture of the Internet.   And

17   if you were to compare that to FaceTime, what would you see?

18        Well, you would see that FaceTime is set up exactly

19   the same way as the ordinary Internet to do normal web

20   communications.

21        So on the left, you have basic Internet.   This is

22   what Dr. Short said was the basic architecture of the

23   Internet.   You have two NATs.   You have the Internet and two

24   houses, that basic approach.   That approach is identical to

25   the approach that's taken by FaceTime.   Houses with NATs

1   communicating through the Internet using encryption.  That's

2   what Dr. Short showed us was the background.

3          That was the basic structure of the Internet that

4   existed before the patent, and that was not -- that was not

5   his invention, right?  And that's what FaceTime uses.

6          And now Dr. Jones, we heard a little bit from Mr.

7   Ward talking about this.  He said:  Well, there's all that

8   other stuff going on, that NAT -- that comNAT server.  That

9   has nothing to do with the issues that we need to look at.

10         The only issue we need to look at is this link

11  here.  Is this link anonymous?  And that's what the Court

12  told us.  The Court told us, you have to look at the secure

13  communication link.

14         I asked Dr. Jones -- he said you have to look at

15  the secure communication link.  And that's what Dr. Blaze

16  said, you look at the secure communication link.  So, of

17  course, FaceTime is designed to work with NATs.

18         Why is FaceTime designed to work with NATs?  Well,

19  because the NATs were around when FaceTime was designed.  If

20  FaceTime wanted to work over the Internet, it had to work

21  with NATs.

22         So, of course, Apple designed the product that's

23  supposed to work over the Internet to work with the Internet

24  as it's designed, and that includes NATs.

25         But the key point here is the basic Internet is not

 1    anonymous.  The approach of FaceTime, of using NATs is no

 2    more anonymous than the Internet was before VirnetX's patents

 3    or the Internet is today.  The Internet is basically not

 4    anonymous.  That's why all these techniques to create

 5    anonymity exists.

 6            Now, just because FaceTime is not anonymous doesn't

 7    mean it doesn't protect the people who use it when they use

 8    the Internet.  But it takes a different approach.

 9            The FaceTime approach is to use encryption.  And so

10    how does FaceTime do this?  And you've heard a lot of

11    testimony about this over the course of this trial.  FaceTime

12    encrypts the audio and the vid -- and the -- the video

13    information that's sent between the two com -- computers that

14    are talking to each other so that information -- your

15    picture, the -- your voice, what you're saying, the video of

16    what you're doing is safe and secure.  That's encryption.

17    And that is how FaceTime protects the content.

18            What FaceTime does not do is add -- and as Dr.

19    Blaze explained, add any anonymity on top of that.  There was

20    no anonymity technique used whatsoever in FaceTime.  And you

21    can see in the document used by Mr. Ward, in the FaceTime

22    section on the FaceTime security, what does that say?  It's

23    protected by end-to-end encryption.  Uses encryption.

24            You can go through that entire document.  You won't

25    find anything about anonymity because that's not how FaceTime

1    is designed.

2         You heard from Dr. Blaze earlier today.  He is one

3    of the foremost experts in anonymity and security.  He's

4    devoted his life to studying anonymity and security.

5         And what did he tell us today?  If you look at the

6    bottom answer:  FaceTime uses conventional Internet

7    communications.  There is no anonymity.  It's just

8    communicating the way people normally communicate over the

9    Internet.  If you want anonymity, you can get it, but you

10   have to do something additional.

11        What else did he tell us?  He tells us there are

12   many different ways of achieving anonymity.  I'm not saying

13   there's only one way of doing it, but there are certain

14   common features of how it's done, and they all relate to

15   concealing or hiding in some way the true IP addresses.

16   And we see that in the patent.  Every example, every

17   embodiment in the patent hides IP addresses.

18        TARP, we heard about, hides IP addresses.  The

19   different other ways of achieving anonymity -- mixes, crowds,

20   Onion Routing, all different ways of achieving anonymity.

21   They all hide IP addresses.

22        As Dr. Blaze explained, every one of the known

23   anonymity techniques that people use in this field, hide the

24   public subscriber IP addresses, the IP addresses that are

25   actually used on the Internet.  That's what Dr. Blaze

1    explained to you.  That's what's in every example of the

2    patent.

3         And if you think about the evidence that VirnetX

4    actually brings to this case, what did they actually show you

5    that says that FaceTime is anonymous?  All right.  We know it

6    uses basic Internet communications.  That's not anonymous.

7    We've seen documents.  We've seen -- we've seen web blogs.

8    We've seen articles.  None of the technical manuals, none of

9    them identify FaceTime as one of the techniques or features

10   you can use if you want anonymity.

11        And so where does the evidence take us?  Well, as

12   you know, the Court's definition requires data security and

13   anonymity.  FaceTime is missing anonymity.  If FaceTime does

14   not -- if you remember that soccer ball and football example

15   I used at the beginning of this case in opening statements?

16   You must have all the elements, all the requirements.

17        FaceTime is missing anonymity, and so there is no

18   infringement.

19        So when you go into the jury room and you fill out

20   the verdict form, this is Question 1 on the screen, think

21   about the evidence.  FaceTime is not anonymous.  And for that

22   reason, the answer to all of the questions, all of the claims

23   in Question 1 is no, for the same reason.  All of those

24   claims require anonymity.  FaceTime is not anonymous and does

25   not infringe.

1          So, Ladies and Gentlemen, that brings me to the end

2    of my comments, and I'm going to turn the floor over to

3    Mr. Jones.

4          But think about the evidence as you head back to

5    the jury room.  Think about the fact that the IP address over

6    the Internet is one of the key pieces of information used by

7    advertisers, Internet service providers, police authorities,

8    and websites, and anybody who is looking at Internet traffic.

9          As Dr. Blaze explained, the IP address is the key

10   to -- to -- to anonymity on the Internet; and once that IP

11   address is shared, there is no anonymity.

12         FaceTime simply does not work that way.  And as

13   Dr. Jones admitted, both the public and the private addresses

14   are shared over the Internet.  The public addresses are that

15   gateway or the path to the front door of your house on the

16   Internet.  There is no anonymity with FaceTime, and it cannot

17   infringe the VirnetX patents.

18         So thank you very much, Ladies and Gentlemen.

19         And with that, let me turn the floor over to

20   Mr. Jones.

21         MR. JONES:  Your Honor, could I have a warning at

22   seven minutes?

23         THE COURT:  Certainly.

24         MR. JONES:  And how much time do we have?

25         THE COURT:  You have 17 minutes left.

```
 1              MR. JONES:  Seventeen?

 2              THE COURT:  Yes.

 3              MR. JONES:  Thank you.

 4              THE COURT:  Almost 18.

 5              MR. JONES:  Thank you so much.

 6          Everybody's got to have a board today.  I'm only

 7   going to get one, though.

 8              May it please the Court.

 9          Ladies and Gentlemen of the Jury, thank you very

10   much.  I join everybody else in thanking you.  We thank you

11   for your time.  We thank you for your service.  We truly

12   appreciate it.

13          Mr. Ward said that we admit that we owe $23 million

14   for infringing FaceTime.  That is not correct.

15          We admit we owe $23 million with regard to VO --

16   VPN on Demand.  That's what we admit.  The issue of whether

17   or not FaceTime infringes is in your hands.

18          Now, the damages question in this case is what I'm

19   going to talk about.

20          Can we go to Slide 1?

21          This is the question that you will be asked:  What

22   sum of money did VirnetX prove by a preponderance of the

23   evidence would fairly and reasonably compensate VirnetX for

24   Apple's infringement by VPN on Demand and infringement, if

25   any, by FaceTime?
```

1          You are to apply the Court's instructions, you are

2     to look at the evidence, and you are to answer that question.

3     That's what you're being asked to do in this case with regard

4     to damages.

5          Now, both experts have agreed on two things.

6          The first thing they've agreed on is that the same

7     rate applies whether or not the two patents that we admit are

8     infringed is all that's infringed, or whether the four

9     patents, all four patents are found by you to infringe.  So

10    both experts admit the same rate applies.

11         And both experts have told you in their

12    calculations that this is the most important evidence you

13    should consider.  These six licenses, this shows you the

14    amounts paid under the licenses.  This shows you the

15    applicable units with Microsoft, that's U.S. only, and then

16    this is the per-unit rate that was calculated by Mr.

17    Weinstein, calculated by Mr. Weinstein.  The only rate,

18    though, that's disputed is the 19 cents.  And we'll get to

19    that in just a minute.

20         So they agreed on the important evidence you should

21    look at.  And, you know, it's not surprising, because if you

22    would look at the Court's charge or the Court's instructions,

23    they'll give you --

24         If we'll go to Slide 3.

25             -- which is going to be part of 6.3 of your jury

1    instruction, you'll find this paragraph beginning on Page 13.

2          The Court says that if you choose to rely on

3    license agreements -- and both of these experts have and they

4    suggested to you that you should -- then the Court tells you

5    what you need to do when you rely on them.

6          And he says you must account for any differences

7    between those licenses and the hypothetical negotiation

8    question in this case between VirnetX and Apple when you make

9    your reasonable royalty determination.

10          And then he tells you what are the key differences

11   that you need to look at.  And Mr. Ward has already looked at

12   one of them, but I want to look at some others that you need

13   to look at when you consider those licenses and apply them.

14          And if we could go to Slide 4.

15          And the first thing he tells you is you need to

16   consider the type of technology involved and how it compares

17   to what's in question in this case.  Well, at question in

18   this case, we have phones like this, iPads, and Mac

19   computers.

20          Now, with regard to the Aastra license, what do we

21   have?

22          Can you show us, Mr. Loy?

23          That's what we have, we have a desk phone, it's an

24   intelligent phone used by some businesses.

25          With regard to the NI -- NEC license, again, we're

1    supposed to compare it to this.  What do we have there?

2            Another desk phone, intelligent phone.

3            Siemens, what do we have, what kind of products are

4    we talking about with that license?  Compared to this.

5            Mitel, how does that technology compare if we -- if

6    we do what the Court tells us to do?  Again, another desk

7    phone used by businesses and intelligent phone.

8            Okay.  Then let's go to Avaya, what do we got

9    there?  We have another desk phone.  And down here for the

10   first time we see a pad.  Remember, iPads are involved, so

11   we're getting closer.  The technology here is very different.

12   We're getting a little closer there.

13           And when we get to Microsoft, what are we looking

14   at what when we compare the technology that we're talking

15   about?  That's what we're talking about in license -- this is

16   what we're talking about here.

17           Finally, bingo, we get something that's comparable.

18   And the Court's told us we're supposed to look at comparable

19   technology.

20           So when we look at that determination, that's what

21   we see.

22           The next thing the Court has told us we can look at

23   is when the license was entered into.

24           If we could go to Slide 6.

25           And we see here that when the licenses were entered

1    into, we look at the date, the closest in time, it's the

2    Microsoft agreement, the one on the top of our chart.

3           If we go to Slide 7, the next thing we -- the Court

4    says we can consider is the financial or economic conditions

5    of the parties at the time the parties entered into the

6    license.

7           Now, Mr. Ward just talked about that.  Boy, we've

8    heard a lot of evidence about that.  Attorneys can confuse

9    things.  I think we've confused it.

10          If we could, let's go to Slide 8, because I'd like

11   to do a little timeline on the evidence.

12          If you recall, we went through with Mr. Larsen a

13   talk about what was the financial condition of this

14   corporation at various times?  And what we found was that on

15   August the 13th, 2009, there was an investor call.  And on

16   that investor call, he said we're in a strong position with

17   regard to Microsoft.

18          And he also said with regard to Microsoft --

19          Slide 9, can we bring that up?

20          -- that we're not going to do any small deals.  He

21   said, obviously, we're not going to settle for small

22   licensing deals just to get one done quickly because that

23   would, in fact, be a benchmark in the context of our

24   Microsoft damages calculations.  He said we're not going to

25   do that.  So that's that first date.

1          Then the next date that comes up --

2          If we could go back to our timeline.

3          -- is a date you'll all remember, the 8-K filing,

4    and that's when they file things.  And they said we're going

5    to give bonuses, we're going to give raises, and we're going

6    to give stock options.

7          Now, Mr. Ward has said, oh, oh, but that's unfair

8    because that was filed on February 24, and then on March the

9    30th, 2010, things changed with a 10-K security filing.  When

10   that was filed, it showed, oh, things were bad and we were in

11   trouble.

12         But if we could, let's look at that security

13   filing.  What does that security filing really deal with?

14         Let's go to Slide 8.

15         No, excuse me, let's go to Slide 12.  I read it

16   wrong.

17         This security filing was filed by VirnetX on March

18   the 30th, 2010.  But it says right here when you look at the

19   highlighted portion that it's dealing with the year 2009.  So

20   when it discusses the financial condition of the corporation,

21   it's not discussing what's going on in 2010.  It's discussing

22   is what's going on in 2009.

23         And what you see here when you put it in context --

24         If we could go back to the timeline.

25         -- is what we see here when we put it in context is

1    that the reason he got the raise, and the 8-K filing says

2    this, is because he had raised cash.  He had done two good

3    private equity offerings.  The corporation was doing better;

4    and since it was doing better in 2010, he got the raise, the

5    CFO got the raise, and got -- got the other compensation.

6            THE COURT:  Mr. Jones, you have ten minutes

7    remaining.

8            MR. JONES:  Okay.  What we see here reflected is

9    that things had improved.

10           Next, the Court tells us -- if we could go to Slide

11   13 -- that we need to consider the number of patents involved

12   in the license.

13           Now, there's been a lot of criticism here about

14   looking at the number of patents involved in the license.

15           But like, for example, with this Microsoft license,

16   when we look at it, there are 160 -- excuse me, 186 patents

17   that were licensed in this agreement.

18           Now, the Court didn't tell you look at the

19   patents-in-suit.  The Court doesn't tell you look only at two

20   patent families that happen to be in suit.  No, the Court

21   says, look at all the licenses -- excuse me, look at all the

22   patents that apply to the license agreement.  And that was

23   186 with regard to Microsoft.  That's what Microsoft wanted,

24   and that's what they got.

25           Mr. Weinstein disregards all but two of these.  He

1    just throws them away.  Don't believe your lying eyes when

2    you look at all these.  There are only two that matter.  But

3    that's not what Microsoft bought.  And the Court says you

4    have to consider that and put that in perspective.

5              If we could go to Slide 16?

6              The Court also says we have to consider whether or

7    not the license covered foreign rights.  Again, the Microsoft

8    license, the one that the technology is close to, it included

9    foreign rights.  There were worldwide coverage here.  When he

10   calculates this unit rate, he only looks at the U.S. sales.

11             He totally discounts -- he totally discounts the

12   other sales when he considers this agreement.  That's not

13   what the agreement said.

14             Again, you'll have it.  It's Plaintiffs' Exhibit

15   1084 in front of you.  And your eyes will tell you, it's a

16   worldwide agreement.  And he admitted that the unit figure,

17   when you consider it's worldwide, is 2 billion.  And he

18   admitted that the per-unit rate then would be 10 cents per

19   unit.  And the Court tells you to consider that.

20             Let's move on.  The Court says you may also

21   consider the extent to which litigation may have affected --

22   excuse me, the extent to which litigation may have affected

23   the licenses.

24             Let's go to Slide 19?

25             Here it is.  The extent to which litigation --

1    litigation may have affected the licenses.  What does this

2    mean?  This means that every one of these licenses was the

3    settlement of lawsuits.

4         Now, you have heard that to defend a patent lawsuit

5    like this costs millions of dollars.  Everybody has agreed

6    with that.  So Aastra, for example, they had a choice.  Do

7    they spend millions or do they pay that amount?  NEC, same

8    choice, spend millions, pay 46,000?  Siemens, spend millions,

9    pay 55,000.  Mitel, spend millions, pay 450.  Avaya today

10   paid that.  They contend that Avaya is going to be a total of

11   $10 million in the future with all the payments that are put

12   together, but they had that decision to make.

13        What does that tell you?  That tells you that it

14   was a business decision, that these were settled for cost

15   of -- these lower ones because it made more sense to pay that

16   money than to fight out the litigation.  And that's what they

17   tell you.  And don't just take my word for it because the

18   general counsel of Avaya's deposition was taken in this case.

19        And look what he said -- if we could go to

20   Slide 20, he said this, what -- with respect to Aastra's

21   position, he said in our opinion, we didn't infringe the

22   patents.  From the beginning, we asserted that.  From our

23   view, any settlement that was less than the cost to go to

24   trial was open for discussion.  That's what happened.

25        And if you look at this, you could see that with

regard to these four down here, the ones that Mr. Weinstein

says are most important, they're all within the range -- the

cost of these settlements.  The only two that are not, we

have effective royalty ranges of 19 cents by Mr. Weinstein

and 34 cents by Avaya.

Moving on, what else does the Court tell us we must

consider?  The Court tells us that we are looking at key

differences.  We -- we must compare what is going on with

regard to the license for this product with what's going on

in these agreements and account for those differences.

And when you do that, when you compare those and

when you account for those differences, you have to ask

yourselves the questions, why -- why on earth would Apple pay

in 2009 an agreement for 302 million for 250 million units

when Microsoft paid 223 million for 2 billion units?

Could we go to Slide 21?

What we see here is Microsoft licensed 2 billion

units.  They paid 200 million.  Then they paid 23 million

more.  Why is it so much more?  Their damages period goes on

for 20 years.  The damages period you're only looking at is

four years.  That's why they paid so much more.  And that's

why when you look at the correct figure, it is 10 cents, and

that tells you everything you need to know.

It's just not reasonable that Apple would pay for

only 250 million units, so much more than Microsoft would pay

1    for 2 billion units.

2            Now, what is fair?  I think what is fair is clearly

3    that we are tied to the agreements we are most like.  It

4    really is the Microsoft agreement.  And the per-unit rate Mr.

5    Weinstein says is 19 cents; but if you look at worldwide,

6    it's 10 cents.

7            And when you look at that, the figure you come up

8    with when you look at the approximate unit figures -- if we

9    could go to Slide 22 -- excuse me, if we could go to Slide

10   24?

11           What we see when we make those calculations is 250

12   million units.  The approximate units times 10 cents would be

13   25 million.  If you use the 19 cents, it would be 250

14   million -- and the approximate -- excuse me, it would be

15   47,500 -- $47,500,000.  Those are the two figures you see.

16           The other figure you might look at -- the only

17   other one that's even close to applicable is the 24-cent

18   figure.  These figures are just so different that when you

19   apply the Court's factors, they really just don't apply at

20   all in this case due to the nature of them.

21           Now, Ladies and Gentlemen of the Jury, I want to

22   close by talking about an issue that has percolated through

23   this case from the very, very beginning.  And that is Apple's

24   failure to call witnesses.

25           On voir dire, Mr. Ward brought it up.  First thing

 1   he did.  You know, I asked you on voir dire, I said, you

 2   know, are you going to hold it against Apple, are you going

 3   to be mad at them because they don't bring their own

 4   employees here to testify?  That's why I asked it.

 5          Now, Mr. Bakewell took the stand, our first

 6   witness, and the first thing he did was ask him about that.

 7   And he led off a list of names Frank Casanova, Joe Abuan,

 8   Mark Buckley.  He said all these people have been deposed,

 9   and you've reviewed their depositions.  And he said:  Why

10   aren't they here at trial?

11          Well, Ladies and Gentlemen of the Jury, I'm going

12   to tell you, there have been a lot of depositions in this

13   case.

14          VirnetX has requested and taken the deposition of

15   24 employees of Apple in this case.  There have been hours

16   upon hours of deposition.  There are literally hundreds of

17   pages of deposition testimony from Apple employees under

18   oath.  They've had the opportunity to question Apple

19   employees over and over and over again in this case.

20          Over 800,000 pages of sworn testimony of our

21   employees are in the record in this case by way of

22   depositions.  They've had every opportunity to talk to Apple

23   employees.

24          Now, how much of that have they played to you?  I

25   don't think even 30 minutes of it.  Not even 30 minutes of

1    it.  Think about that.  They complain that they haven't had a

2    witness here, yet they've had 24 people to depose for hours

3    and days and hundreds of thousands of pages of transcripts.

4           You know, Dr. Blaze explained that even Mr. -- Dr.

5    Jones didn't disagree with the way our employees said our

6    products operated.  They don't disagree about that.  You

7    know, they have had every opportunity to get anything they

8    needed from our witnesses.

9           Let me leave you with this question:  Don't you

10   know in all the hours and days of deposition testimony of

11   those 24 different employees, if one of them had said, hey,

12   these products are anonymous, you would have heard about it?

13   They would have played it to you.  They've had all kinds of

14   opportunity to question Apple witnesses.  And they played

15   what they played.  And it was very little.

16          You know, we could have been here for weeks

17   listening to all that testimony.  But luckily, we stuck with

18   what were the disputed issues in this case.

19          Ladies and Gentlemen of the Jury, I wish you God

20   speed in your deliberations.  I thank you for your time

21   again.

22          MR. CALDWELL:  Your Honor, how much time do I have?

23          THE COURT:  Have you 18-and-a-half minutes, but I

24   gave Mr. Jones a little extra time, so I might give you a

25   minute, too.

```
 1              MR. CALDWELL:  Will you give me a minute to get
 2   organized?
 3              THE COURT:  I certainly will.
 4              MR. CALDWELL:  Thank you.
 5              Your Honor, may I proceed?
 6              THE COURT:  You may.
 7              MR. CALDWELL:  Ladies and Gentlemen of the Jury,
 8   thank you a lot for your patience with all of the lawyers.  I
 9   suspect you don't like watching lawyers get up here and
10   argue.  You probably don't like watching the fact witnesses
11   argue, but it's real important that we come to you.
12              And we present arguments to you.  And the witnesses
13   present evidence to you because one of the things you saw in
14   that charge is that you were to be the judge of the
15   credibility of those witnesses.
16              And Mr. Ward has already made the point about what
17   you can see when somebody is sitting in that witness stand,
18   and you can look at them and you see them cross-examined in
19   front of a jury of eight people and a Judge.
20              I don't know if you can tell from these little
21   clips how one of these depositions goes, but Mr. Curry and I
22   or Dr. Jones will fly out to someplace in California, and we
23   go to a lawyer's office, and we sit in the room with a table
24   like this and ask the person questions.  There's no judge
25   that's sitting there keeping them in line.  There's no jury
```

1  that's watching their reaction and keeping them in check.   It

2  doesn't happen.   That's why we have trials in front of

3  juries.   It's the reason we're here.

4           Now, I can't go through everything that was just

5  said to you that's just not true, and that's -- we have a

6  limited amount of time.

7           But let me just point out something.   When

8  Mr. Arovas gets up here and the first thing he does is he

9  starts off with how blown away that -- that my colleague,

10 Mr. Ward, got up here and said, I'm surprised to see that

11 Dr. Blaze challenged anonymity.

12          What we're surprised by is that he completely

13 changed his anonymity theory today.   I played for you this

14 clip of us asking him questions after his report came out

15 when we asked him what he thinks is involved in anonymity.

16 And he says it's hiding those internal IP addresses.   That

17 was his theory.

18          And we come in today and his theory is, wait a

19 minute, yeah, yeah, you're right, those are hidden, we don't

20 send them, you can't detect those, you can't figure out who

21 it is in the hotel or the office building that's talking.

22 And you have -- that's enough for anonymity to hide one

23 person.

24          But today he has decided that those internal IP

25 addresses don't matter, and now it's just the public IP

1    addresses that matter, and those have to be encrypted.

2            Guys, you've seen the evidence.  You know this

3    can't be true.  First of all, we know FaceTime is

4    specifically designed to provide the information to allow

5    these communications that hide the IP addresses.

6            Can I see Slide 192?

7            We know that the NAT hide a person's private IP

8    address.

9            FaceTime built -- the FaceTime team specifically

10   built a server called comNAT, specifically built it to make

11   these calls go across these NATs.  They went out of its way

12   to support FaceTime calls originating behind a NAT,

13   terminating behind a NAT.  That's right.  There are features

14   in FaceTime intended to do that.  Because they specifically

15   developed the comNAT server to do it.  That's right.

16           And then, perhaps the most shocking thing, is I'm

17   asking him, wait, you admit this is anonymous, and it's not

18   anonymous with the NAT.

19           This is a different version of the slide even that

20   has the -- that has the router here.  But the original

21   version of the slide I showed you today, I showed you both of

22   them.  The other version of the slide I showed you was

23   literally if we changed the box from a VPN server to a NAT,

24   suddenly there's not anonymity versus something you already

25   know provides the exact same anonymity of these patents.

```
 1   It's just not credible.  And that's why you're here, to

 2   resolve these sorts of issues.

 3         Apple's lawyer argues, well, you know, surely

 4   somewhere in these depositions somebody would have admitted

 5   that there's anonymity if there's anonymity.  And do you

 6   think these people just walk into the deposition and --

 7   without preparing beforehand, and just walk into the

 8   deposition and answer our questions?

 9         I mean, just take a minute and look at the folks in

10   this courtroom, and do you think that what Apple's

11   witnesses -- whether it's the paid experts or their fact

12   witnesses, do you think for a minute that what they say

13   during the pendency of this lawsuit is not very carefully

14   cultivated?  And now I'm supposed to walk in and, gosh, if we

15   infringe there must have been some sort of admission they

16   could have shown you.

17         Look at the lawyers in this courtroom.  Does that

18   make any sense to you?

19         Now, briefly, there was a reference to a jury

20   question on tracking, and I don't know if this was an attempt

21   to sort of confuse or whatnot.  Most of us have seen these

22   sort of websites where you're browsing Yahoo mail, you're

23   reading an article, and then something kind of comes up in

24   line, and what I see is, I see a Dallas Cowboy jersey because

25   I got one for my little boy, right?  Since I was searching
```

1   for Cowboy's jerseys, what do you know, I start getting a

2   bunch of ads that are about Cowboy's jerseys.

3          That has nothing to do with someone knowing your IP

4   address and sending an IP -- something to your IP address,

5   knowing who you are, knowing what you're interested in.

6   Nothing whatsoever.

7          As Dr. Jones explained after the question, those

8   are a result of tracking cookies.  Because if you don't

9   change that setting on your website -- which, by the way,

10  that paragraph we've never seen in trial said nothing about

11  IP addresses.  If you don't change that setting in your

12  browser, your browser actually receives a little piece of

13  code that it runs each time you go back to those websites.

14         And it updates what you've -- it updates the

15  websites on what it is you've been searching for so they can

16  pull ads, show them to you, and they get paid for showing you

17  those ads.  It has not one thing to do with knowing who was

18  associated with an IP address.

19         So ask yourself, why would Apple present that

20  argument in closing arguments in this case talking about

21  whether FaceTime provides anonymity?

22         And, frankly, if it was all about whether cookies

23  defeat anonymity, do you think we would be here in this

24  trial?  Do you think the parties would have spent the

25  millions of dollars and fought for six years over a setting

1    that's in the website like that?  Does it even make sense to

2    you that Apple is making that argument to you?

3              One thing that Mr. Ward said, I think it was pretty

4    telling, he asked:  I wonder if we'll see Apple apologize for

5    infringing?

6              And I think because we've heard Apple speak to you

7    for the last time, we know the answer to that question.

8              They started infringing seven years ago, and

9    they've still not told Dr. Short, hey, good job on that

10   invention.  Sorry, we infringe.  Still didn't hear it.

11             And, you know, you can have different perspectives

12   on this idea of bringing witnesses.  Apple argues, well, we

13   don't bring witnesses because your contracts are -- are

14   confidential; but you know what, they've been using it in

15   open Court for years.

16             And more to the point, most of the confidential

17   documents -- remember when they made Dr. Short stand up and

18   scoot on out the door?  Most of the confidential documents

19   we've seen in this case are Apple confidential documents that

20   their engineers could see.  Their engineers could take the

21   stand, and they could let myself, Mr. Cassady, Mr. Curry, Mr.

22   Ward cross-examine them and ask about statements they've

23   made, but they chose not to.

24             Just ask yourself.  You've seen lots of evidence on

25   IP addresses -- probably more than you ever hope to.  What

1    you've heard is that Apple is convinced it doesn't infringe

2    on FaceTime because if a hacker intercepts that FaceTime

3    packet, he can see the public Internet source and destination

4    IP address.

5              Did you catch that I asked Dr. Blaze, it's hard to

6    get slides -- I cross-examined him probably two hours ago.

7              Did you see I asked Dr. Blaze:  Isn't it true that

8    there is that kind of publicly routable Internet address in

9    the clear on every single patent -- I'm sorry, every single

10   packet sent across the Internet -- every single one?  He

11   agreed.

12             And then I said:  Even on the anonymous ones?  And

13   he said:  Yes, that's true.

14             So as a result of Apple switching its theories, and

15   let's pretend these internal private IPs that actually do

16   identify a specific machine within the network, let's pretend

17   those don't matter.  Let's focus on the ones in the -- out in

18   the public Internet.  They back themselves into this corner

19   where they present to you a completely nonsensical argument,

20   because we know the packets don't even get from the iPhone to

21   the VPN server in VPN on Demand that we know infringes, if

22   they don't have those IP addresses in the clear so that all

23   those routers that are out on the Internet that are in these

24   non-descript beige buildings that we don't even see, that

25   bounce packets around on the Internet, the packets don't get

where they're going if those addresses are not out in the clear.

So ask yourself, is Apple's new theory that the necessary IP addresses must be encrypted or hidden, is that new theory logical?  And how do you reconcile that with the fact that we know VPN on Demand infringes?

I'd like to talk to you a little bit about -- about damages.

Another thing that the instructions told you was that you need to take into account the financial or economic conditions of the parties at the time the parties entered into a license.

And it is absolutely true that in March of 2010, there is a 10-K that's reporting on 2009.  It also deals with events from 2010 and is signed March 2010.

Plus, Mr. Larsen told you that they were incurring very extensive expenses at that point in time between March and between when the deal was done with Microsoft.  That's completely unrebutted.  Nobody even disputes it.  It's absolutely true.

So speaking of smoke -- smoke screens and trying to get you to look the wrong way, who's trying to get you to look the wrong way?  There is no dispute that VirnetX was in dire straits.  They signed a deal for $200 million.

But one of the weirdest things that we heard in

this trial about that $200 million is that Mr. Bakewell said

he's really surprised the VirnetX stock went up when they

publicly announced that Microsoft had validated the

technology and infused the company with $200 million.  Does

that make sense to anybody?

But there's another thing that's real different

about the Microsoft situation and the situation you've got

here.  And, that is, remember that when you go back to award

damages -- and we all know -- like I said from Day 1, this is

an unusual case.  You know you're awarding damages.  When you

go back to award damages, there's a big, big additional

reason it's different than Microsoft.

You think Microsoft was just rolling over and

saying, yeah, this stuff is valid and infringed?  Well, if

Microsoft was rolling over saying it's valid and infringed,

why was the company bleeding money on Microsoft litigation

back then?

But in the hypothetical negotiation you've got to

consider -- it's in the instructions -- when you're figuring

out of the differences between any of those licenses and the

one that you've got to work on, you have to take into account

whether they were assuming infringement, validity, which they

were not, and the fact that you are.

So in your hypothetical negotiation, Apple walks in

and is not making these arguments, these new arguments, these

1    strange arguments about whether 200 million is a good thing.

2    They're just saying, yeah, we do it.  We're infringing.  It's

3    valid.  That's the context in which this hypothetical

4    negotiation occurs.

5          You know, this actions speak louder than words --

6    one thing that's certain to happen if you're a trial lawyer

7    and you use a saying, you can guarantee the other side will

8    grab it and try and make it their own.  One thing that I just

9    don't want to get lost is, remember, we walked in here

10   knowing VPN on Demand infringes.  Apple knows VPN on Demand

11   infringes.

12         Why is it when they were about to ask their

13   customers how important that feature is, did someone dive in

14   and say, whoa, stop, let's erase that question from the

15   survey?  Don't ask that one.  Why is that?  Ask yourself.

16         We've heard a lot about this hypothetical

17   negotiation.  You know, I just -- something just occurred to

18   me watching this whole -- this whole trial.

19         Mr. Diaz, will you put that slide up, 196?

20         Guys -- Mr. Larsen, will you stand up?  You guys

21   met Mr. Larsen, and you remember there was some discussion

22   about whether he would stay in the courtroom.  He is

23   fortunately allowed to be back here the rest of the day.

24         Thank you, sir.

25         Dr. Short, please stand up.

1           Those are the guys sitting on that side of this

2    table.  Who's sitting at the other end of that table for

3    Apple in this hypothetical negotiation?  Have you met them?

4    Do you have any reason whatsoever to believe that they're

5    going to have the kind of resolve that Kendall Larsen and

6    Dr. Bob Short have after pursuing this since 1999?

7           Ladies and Gentlemen, my time is almost up, and

8    I'll leave you with this:  First of all, obviously I want to

9    thank you on behalf of Mr. Larsen and his wife and Dr. Short

10   and his wife, my colleagues, our whole team, thank you very

11   much.  We know it's hard work.  It's late on a Friday, and I

12   don't envy the position that you're in.

13          But I'll leave you with this:  You know, just after

14   this, the only folks that are Apple employees that you've

15   seen are a couple of lawyers sitting in the back.  And at

16   some point when your verdict is read, they're going to make a

17   call back to the office.

18          How is that call going to go?  Is that call going

19   to be:  Well, it worked; we were able to convince the jury to

20   think that the 200-million-dollar license was a bad thing,

21   take the lowest possible interpretation based on sales of

22   Windows software in New Zealand in the year 2020, convince

23   the jury that that's comparable to the sale of an infringing

24   iPhone or iPad with FaceTime, and walk out of here for

25   pennies on the dollar?  Or is that call going to say:  You

1    know what, the jury got it right?

2           Ladies and Gentlemen, thank you for all your

3    effort.  We look forward to your verdict.

4           THE COURT:  Ladies and Gentlemen of the Jury, it is

5    now time for you to retire to the jury room to begin your

6    deliberations.  You will take with you the Court's final

7    charge, as well as one copy of the verdict form.  And the

8    exhibits which have been admitted into evidence will be

9    provided to you shortly.

10          The first thing you should do, of course, is to

11   select your foreperson and then begin your deliberations.

12          As I told you earlier, if you recess during your

13   deliberations, please follow all of the instructions that I

14   have previously given you about your conduct during the

15   trial.

16          Once again, if you want to communicate with me at

17   all at any time during your deliberations, please give a

18   written message or a question to Ms. Mayes, the Court

19   Security Officer, who will bring it directly to me.

20          There are sheets that will be provided for you in

21   that regard.  I will respond as quickly as I can, either in

22   writing or by having you brought into the courtroom to

23   provide you an oral answer.  And I will always, of course,

24   disclose your question and my response to the attorneys

25   before answering.

1            It's now time for you to retire for your

2    deliberations.

3            COURT SECURITY OFFICER:  All rise for the jury.

4            (Jury out for deliberations.)

5            THE COURT:  Okay.  I would ask that each side --

6    I'm -- before everybody scatters, please make sure you leave

7    somebody from your team in the courtroom, okay?  Thank you.

8            (Recess.)

9            (Jury out.)

10           THE COURT:  Okay.  We're on the record.  It's 6:20.

11   We've got a note dated today, timed at 6:15 p.m.  It's Jury

12   Note No. 2.  The first note indicated that the jury

13   foreperson is Mr. Place, I think.

14           Jury Note No. 2 says they need the evidence boards

15   with the red-colored checkmarks from the Plaintiff and the

16   board from the Defendant with the X marks.

17           Now, my policy has been on this that unless the

18   parties agree, demonstratives don't go back to the jury.  I'm

19   happy to allow it if you-all are agreeable to it, but you're

20   going to have to agree to it.

21           MR. JONES:  Could we consult just for a second?

22           THE COURT:  Yeah, and you can read the note

23   yourself if you want.

24           MR. AROVAS:  No, that's all it says right here.

25           MR. CALDWELL:  Can I read it?

```
1            THE COURT:  Okay.
2            (Off the record discussion.)
3            THE COURT:  Let's go back on the record.
4            Go ahead.
5            MR. AROVAS:  We -- from Apple's perspective, we're
6    fine with these particular demonstratives.  Obviously, we
7    want to take demonstratives up one-by-one if they ask --
8            THE COURT:  Yes, yes.
9            MR. AROVAS:  For these particular ones, it's fine.
10           MR. CALDWELL:  Sure.  We're fine with these --
11   these particular checkmarks and the X boards.
12           THE COURT:  Okay.  We'll provide that.  So --
13           MR. AROVAS:  We have them here.
14           THE COURT:  Does VirnetX have theirs here?
15           MR. CALDWELL:  Yes, Your Honor.
16           THE COURT:  All right.
17           MR. CASSADY:  Thank you, Your Honor.
18           THE COURT:  All right.  How many is it?
19           MR. JONES:  We have two, Your Honor.
20           THE COURT:  Okay.
21           MR. PEARSON:  Seven, Your Honor, for the Plaintiff.
22           THE COURT:  Seven -- seven from the Plaintiff.
23           MR. CALDWELL:  Seven from the Plaintiff and two for
24   them.
25           THE COURT:  Okay.  Are we agreed --
```

```
 1              MR. CALDWELL:  Do you want us to carry it close by?

 2              THE COURT:  Are we agreed that's the ones the jury

 3   is referring to?

 4              MR. CALDWELL:  I don't think there's any dispute to

 5   these --

 6              MR. AROVAS:  Seems to be.

 7              THE COURT:  Are we good?

 8              MR. CASSADY:  I think we're good.

 9              MR. CALDWELL:  Yeah.

10              THE COURT:  All right.  Ms. Mayes, you want to just

11   take them back?

12              MR. CASSADY:  We're going to put them close, but we

13   won't take them in.

14              THE COURT:  Don't take them in, please.

15              MR. AROVAS:  Your Honor?

16              THE COURT:  Yes.

17              MR. AROVAS:  Can I just be heard?

18              THE COURT:  Yeah.

19              MR. AROVAS:  Is it -- is it okay to raise a

20   different issue, something --

21              THE COURT:  Yeah, let's wait until she gets in the

22   door.

23         Okay.

24              MR. AROVAS:  So I just want to -- we had talked

25   yesterday about the issue of the jury consultant.
```

```
 1              THE COURT:  Right.

 2              MR. AROVAS:  I had thought that yesterday we had

 3    provided the informal discovery that the Court expected us to

 4    provide.  Then we just got an email today starting more

 5    discussions over discovery, and I don't really want to drag

 6    this out.

 7              I had thought we had complied with what we were

 8    supposed to comply with, and I wasn't sure if the Court had

 9    some expectation while we're all together as to what we were

10    supposed to be doing, or if there was some procedure that

11    people had in mind, but we had viewed that we had complied.

12              We provided that nonprivileged information on the

13    record in the conference.

14              MR. CASSADY:  Your Honor, with regards to the

15    conversations we had yesterday on the record, many of those

16    answers, even in that hearing, changed from counsel for

17    Apple.

18              So we asked questions about how certain they were

19    about their investigation they had done, and we asked other

20    questions that came from the fact that, for instance, they

21    said Mr. Larsen's cross outline had been sent to Bloom.  They

22    did not yet know whether or not any comments came back or

23    they were -- discussed any with him.

24              The problem we've got is we're still just

25    information-disadvantaged.  So what I would say is, Your
```

1   Honor, we're not moving.  Obviously, that comes with its own

2   ramifications, but we do believe some formal discovery is

3   probably going to be necessary on this issue.

4           THE COURT:  Formal?

5           MR. CASSADY:  Yeah.  But we hope that formal

6   discovery leads to not having any problems.  But I -- I can't

7   waive an issue for my client without the full information of

8   that understanding.  So that's -- that's what I can tell the

9   Court right now.

10          THE COURT:  Right.  I understand.  I -- I mean,

11  you've made your record about it.  As I said yesterday, I

12  don't think there's anything I can do particularly to fix

13  this at the present time.

14          I understand you're not asking for a mistrial.  I

15  understand you're not asking for -- for Kirkland & Ellis to

16  be disqualified as this point.  You've sought some

17  information, some information has been provided, perhaps not

18  everything that -- that you believe, at least, you need to --

19  you need in order to be able to properly advise your client

20  and put your client in a position of making a fully informed

21  decision.

22          Whatever the law of waiver is on this issue,

23  obviously is something that we may ultimately have to -- to

24  take up and to consider, but I'm certainly not in a position

25  to -- to, you know, do anything further at this time.

1          I think the ball is in your court more or less,

2     Mr. Cassady, on behalf of your client in terms of what

3     further information you need from Apple on this, and I

4     don't -- have you sent a letter, or is there some further

5     communication?

6          MR. CASSADY:   There's further email communications.

7     Your Honor, I'll tell you what my plan is, it is to continue

8     to try and meet and confer about what we should get.

9          And if that breaks down, and I'm hoping it's not

10    broken down yet, then we may move the Court for additional

11    relief about the discovery.

12         But, again, as I said yesterday, I mean it from the

13    bottom of my heart, this is a serious issue, I take it very

14    personally, I know Mr. Bloom personally.

15         THE COURT:   Right.

16         MR. CASSADY:   I just want to be able to advise my

17    client that they're not in a bad spot, so...

18         THE COURT:   Yeah, no, certainly I understand that.

19         And certainly all the representations Mr. Arovas

20    has made to the Court, you know, on behalf of his client, I

21    obviously take at face value, as I know you do, too, as I

22    know you do, as well.

23         So, you know, to the extent you need any additional

24    information to resolve this, I encourage you, Mr. Arovas, to

25    comply with that.

```
 1              MR. AROVAS:  Yeah.

 2              THE COURT:  Provide that information.

 3              MR. AROVAS:  Yeah, okay, so -- thank you, Your

 4   Honor.

 5              I wanted to make sure there was nothing the Court

 6   was expecting us to do that we had not done because I had

 7   made commitments to the Court to --

 8              THE COURT:  I've not been asked to --

 9              MR. AROVAS:  Yeah, yeah, yeah.

10              THE COURT:  -- provide relief to anyone.

11              MR. AROVAS:  Yeah, yeah, okay.  Thank you, Your

12   Honor.

13              THE COURT:  Thank you, Your Honor.

14              (Recess.)

15              THE COURT:  Okay.  Note No. 3, although it's not

16   indicated as such, it is the third note, and they're asking

17   for the charts depicting the dollar amounts all companies

18   paid VirnetX.

19              MR. JONES:  I guess they're talking about the one I

20   put up.

21              MR. AROVAS:  Yeah, it was a big board of --

22              THE COURT:  They're probably talking about the one

23   you put up and used in closing.

24              MR. CASSADY:  Well, it could be talking -- Roy's

25   says the same thing, but we can send both back.  They have
```

1    the same information on them.  Let me look at them.

2              MR. JONES:  Yeah.

3              THE COURT:  You want to pull them?

4              MR. AROVAS:  Yeah, yeah.

5              THE COURT:  No, y'all confer, and I'll give you a

6    couple of -- not too long, though, okay?

7              MR. AROVAS:  Couple minutes, Your Honor.

8              THE COURT:  Yeah.

9              MR. CASSADY:  Can I hear that again one more time,

10   Your Honor?

11             THE COURT:  Yeah.  Need charts depicting dollar

12   amounts all companies paid VirnetX.

13             MR. CASSADY:  That actually -- I just wanted to

14   note I think there's a little bit of ambiguity there.  We

15   have the ones that show per units Kendall Larsen showed how

16   much they paid overall.  We'll confer about that, but I just

17   wanted to put that on the record.

18             (Recess.)

19             THE COURT:  Okay.  So we're back on the record.

20             The parties have met and conferred and have agreed

21   to send back the demonstratives, what was --

22             MR. AROVAS:  PX --

23             THE COURT:  -- PX --

24             MR. AROVAS:  -- 1088.3 --

25             THE COURT:  Okay.

1          MR. AROVAS:  -- and a board labeled No. 61 that was

2     used in closing.

3          THE COURT:  And it was Apple's closing board?

4          MR. AROVAS:  Yes.

5          THE COURT:  Okay.  All right.  And that's agreed,

6     right?

7          MR. CASSADY:  Yes, Your Honor.

8          THE COURT:  All right.  Very good.

9          (Recess.)

10         COURT SECURITY OFFICER:  All rise.

11         THE COURT:  Okay.  Anything before we have the jury

12    brought in?

13         Ms. Mayes.

14         (Jury in.)

15         THE COURT:  Please be seated.

16         Mr. Place, I understand you've been selected by the

17    jury to be the jury foreperson; is that correct?

18         THE FOREPERSON:  Yes, sir, I have.

19         THE COURT:  All right.  Has the jury reached a

20    verdict?

21         THE FOREPERSON:  Yes, sir, we have.

22         THE COURT:  Is the verdict unanimous?

23         THE FOREPERSON:  Yes, sir, it is.

24         THE COURT:  All right.  I'm going to ask that you

25    hand the verdict to Ms. Mayes.

1          Okay.  I'm going to hand the verdict back to Mrs.

2     Schroeder, our Courtroom Deputy, and I'm going to ask that

3     she read it.

4          And I would request that the members of the jury

5     pay very close attention to Mrs. Schroeder as she is reading

6     the verdict because I'm going to ask you at the -- at the end

7     of the reading of the verdict whether it was the decision of

8     each of you, in that you're -- in other words, was your

9     decision unanimous.

10          So, Mrs. Schroeder, if you would read the verdict.

11          COURTROOM DEPUTY:  Question No. 1.  Did VirnetX

12    prove by a preponderance of the evidence that Apple's

13    FaceTime infringed any of the following claims of VirnetX's

14    '504 and '211 patents?

15          '504 patent:

16          Claim 1, yes.

17          Claim 2, yes.

18          Claim 5, yes.

19          Claim 27, yes.

20          The '211 patent:

21          Claim 36, yes.

22          Claim 47, yes.

23          Claim 51, yes.

24          What sum of money did VirnetX prove by a

25    preponderance of the evidence would fairly and reasonably

1    compensate VirnetX for Apple's infringement by VPN on Demand

2    and infringement, if any, by FaceTime?

3              $302,427,950.

4              THE COURT:  All right.  Ladies and Gentlemen, all

5    of you who voted for this verdict, would you please stand?

6              (All jurors stood.)

7              THE COURT:  All right.  Very well.

8              Let the record reflect that all eight jurors stood.

9    And the verdict --

10             You may be seated.

11             The verdict, of course, will be filed by the Clerk

12   of the Court either later this evening or -- or early on

13   Monday morning.

14             Ladies and Gentlemen, you are now about to be

15   dismissed.  And I dismiss you with the thanks of the Court

16   and the attorneys and the parties who have submitted this

17   dispute to you.

18             I told you at the beginning of this trial on Monday

19   morning that I firmly believed that jury service is one of

20   the most important forms of public service that you can

21   render to your country; and by being here and participating

22   as you have throughout this week, your careful attention,

23   your hard work and patience with the Court and the attorneys,

24   you have -- you have done us all a great service, and you

25   have done your duty as citizens to preserve, protect, and

1   defend the Constitution of the United States and the rights

2   that are guaranteed to all of us by virtue of the

3   Constitution, and, of course, in particular the right to the

4   trial by jury as part of the Bill of Rights.

5           So on behalf of the parties and the attorneys and

6   the United States District Court for the Eastern District of

7   Texas, I hope you will accept my profound appreciation for

8   your hard work and your service.

9           I would ask at this time for you to go back to the

10  jury room, someone will be there shortly to dismiss you.

11          The -- after you leave the courthouse, of course,

12  you're certainly free to -- to speak with anyone you want to,

13  but I have asked the attorneys and will ask the attorneys not

14  to initiate any conversation with you, and so they should not

15  be contacting you.  And, of course, I would let -- I would

16  ask you to let me know if that occurs.

17          With those comments, again, I appreciate your --

18  your service and your hard work, and you all can go back to

19  the jury room.

20          COURT SECURITY OFFICER:  All rise for the jury.

21          (Jury out.)

22          THE COURT:  Okay.  You all can be seated.

23          I expect that the verdict will be filed, Mrs.

24  Schroeder, tonight or first thing on Monday morning.

25          I do expect the -- the transcript to be completed,

1    Ms. Holmes, over the weekend perhaps, early next week.

2              Okay.  I would -- I don't know what the parties'

3    thoughts are.  My suggestion is post-trial motions and

4    briefing -- opening briefs perhaps be due, say, 14 days after

5    the transcript has been filed with -- with responses due 14

6    days after that.  Replies seven days after that and

7    sur-replies seven days after that.

8              To the extent the parties want to meet and confer

9    and propose an alternate schedule, I'm certainly open to

10   doing that as well.  But just preliminarily, those are sort

11   of what my thoughts are, as well.

12             I also would be open to the parties meeting and

13   conferring on, you know, a reasonable extension on the page

14   limits, as well, if you think that's necessary.

15             Mr. Caldwell?

16             MR. CALDWELL:  Your Honor, we were actually -- we

17   were actually going to stand up and request something fairly

18   expedited under the circumstances.  So we're totally on-board

19   with that proposal, the schedule that you laid out.

20             THE COURT:  Well, again, you all visit, and, you

21   know, if there's something that's slightly different that

22   accommodates other concerns that I may not be aware of, I'm

23   certainly open to an alternative schedule.

24             I -- the only other thing I want to do is to

25   congratulate the counsel and to compliment all of you on the

1    tremendous work and effort that each of you put into trying

2    this case.

3            I know that I've observed and I know how much work

4    has gone into doing everything you can to represent your

5    clients to the very best ability, and I've seen that

6    throughout this trial by all of you.  So I do appreciate your

7    hard work, and I appreciate your cooperation, and I do

8    appreciate your professionalism.

9            So unless there's anything further, we'll be in

10   recess.

11           COURT SECURITY OFFICER:  All rise.

12           (Court adjourned.)

13

14                          CERTIFICATION

15           I HEREBY CERTIFY that the foregoing is a true

16   and correct transcript from the stenographic notes of the

17   proceedings in the above-entitled matter to the best of our

18   abilities.

19   /s/_____
     SHELLY HOLMES, CSR, TCRR                  September 30, 2016
20   Official Court Reporter
     State of Texas No.:  7804
21   Expiration Date  12/31/16

22
     /s/_____
23   SHEA SLOAN, CSR, RPR
     Official Court Reporter
24   State of Texas No.:  3081
     Expiration Date:  12/31/16

25